**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 1:16cv03759-JFM |
| | * | |
| ACCESS FUNDING, LLC, et al., | * | |
| | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**ACCESS FUNDING DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR BURFORD ABSTENTION AND STAY, OR IN THE ALTERNATIVE, TO DISMISS**


Andrew J. Chiang
O'HAGAN MEYER, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8602
Email: achiang@ohaganmeyer.com

Charles M. Sims
(*Pro Hac Vice to be submitted*)
O'HAGAN MEYER, PLLC
411 East Franklin Street, Suite 500
Richmond, VA 23219
Telephone: (804) 403-7111
Email: csims@ohaganmeyer.com

*Attorneys for Access Funding, LLC, Access Holding, LLC, Reliance Funding, LLC, Lee Jundanian and Raffi Boghosian*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

THE ALLEGATIONS ..................................................................................... 5

ARGUMENT ................................................................................................. 9

A. Court Should Dismiss the Equitable Remedies Sought in this Action and Stay the Damages Portion of this Action under *Burford* ....................................9

1. State Courts Have Primary Supervisory Authority Over Transfers of Structured Settlement Payment Rights Under the Maryland Act ................12

2. *Burford* Principles Counsel for Abstention and Stay..................................15

B. The Full Faith and Credit Clause Bars the Bureau's Collateral Attack on Enrolled Judgments Entered by Maryland Circuit Courts ...............................16

1. The Bureau is Collaterally Estopped Under Maryland Law from Re-litigating the Issue of Whether Smith Provided Independent Professional Advice or Whether the Transactions Were Fair to Payees .....18

a. Maryland Courts Have Already Determined that Smith Provided the Payees with Independent Professional Advice and that the Transaction was Fair to the Payee .......................................................19

b. The Bureau is in Privity with the Payees, Who Had a Fair Opportunity to be Heard on the Issue. .......................................................................20

2. Maryland Law Bars Collateral Attacks of Final Enrolled Judgments .........22

a. Maryland Circuit Courts had Jurisdiction to Enter the Enrolled Judgments ..........................................................................................22

b. The Bureau Has Not Alleged Extrinsic Fraud, Which Is Required to Successfully Attack An Enrolled Judgment ........................................23

3. The CFPA Does Not Contain an Express or Implied Repeal of §1738...... 25

C. The Bureau Has Failed to State a Claim for Relief ..........................................26

1. Standard ..................................................................................................26

2. The Bureau Has Failed to State a Claim Against the Access Funding Defendants for Knowingly or Recklessly Providing Substantial Assistance

to Smith's Alleged Unfair, Deceptive and Abusive Acts or Practices ........27

a. Smith is Not a Covered Person Under the CFPA .................................27

b. Smith's Alleged Conduct is Excluded from the Bureau's Authority and Therefore the Access Funding Defendants Cannot Be Held Liable for Their Alleged Assistance to Smith.......................................30

3. The Bureau's Conclusory Allegations Fail to State a Claim Against Access Funding Engaging in Abusive Acts and Practices...........................32

CONCLUSION...............................................................................................34

CERTIFICATE OF SERVICE ..........................................................................35

## TABLE OF AUTHORITIES

**Cases**

*321 Henderson Receivables Origination, LLC v. Siateco*,
173 Cal. App. 4th 1059 (2009) ....................................................................................29

*Abbott v. Aetna Cas. & Surety Co.*, 42 F. Supp. 793 (D. Md. 1942) ..................................24

*Ashcraft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................26

*Bland v. Hammond*, 935 A.2d 457 (M.D. App. 2007).....................................................22, 23

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) ..................................................................9, 10

*CFPB v. American Debt Settlement Solutions, Inc.*,
No. 9:13cv80548, 2013 WL 12094225 (S.D. Fla. 2013)....................................................21

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) ...............................................................21

*Capela v. J.G. Wentworth, LLC*, No. CV09-882, 2009 WL 3128003 (E.D.N.Y. 2009) .....28

*Consumer Financial Protection Bureau v. Frederick J. Hanna & Associates, P.C.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015) ..............................................................29, 30

*Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*,
No. 1:14cv00292, --F. Supp. 3d --, 2015 WL 1013508 (S.D. Ind. 2015)............................29

*Consumer Financial Protection Bureau v. The Mortgage Law Group, LLP*,
157 F. Supp. 3d 814 (W.D. Wis. 2016) ..............................................................................29

*Cosby v. Dept. of Human Res.*, 42 A.3d 596 (Md. 2012) ....................................................19

*First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345 (4th Cir. 2002) ............................10

*FNB Bank v. Richmond*, 731 A.2d 916 (Md. 1999)............................................................20

*First Federated Commodity Trust Corp. v. Comm'r of Sec.*,
322 A.2d 539 (Md. 1974) ..........................................................................22, 23, 24

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) ........................................................26

*Garrity v. Maryland State Bd. Of Plumbing*, 135 A.3d 452 (Md. 2016)..........................19, 20

*Green v. Ford Motor Credit Co.*, 828 A.2d 821 (Md. App. 2003).....................................24

*Heckert v. Dotson (In re Heckert)*, 272 F.3d 253 (4th Cir. 2001) .......................................18

*Hresko v. Hresko*, 574 A.2d 24 (Md. App. 1990)....................23, 24

*Jaffe v. Accredited Surety and Cas. Co., Inc.*, 294 F.3d 584 (4th Cir. 2002) ....................18, 25

*Johnson v. Collins Entertainment Co., Inc.*, 199 F.3d 710 (4th Cir. 1999)....................9, 10, 16

*Klein v. Whitehead*, 389 A.2d 374 (Md. App. 1978)....................24

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461 (1982) ....................17, 18, 25

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) ....................17, 25

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989)....................10

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)....................19

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987)....................9

*Poteet v. Sauter*, 766 A.2d 150 (Md. App. 2001) ....................20

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ....................10

*Robertson v. Sea Pines Real Estate Companies, Inc.*, 79 F.3d 278 (4th Cir. 2012)....................26

*Rourke v. Amchem Prods., Inc.*, 863 A.2d 926 (2004) ....................19

*Schwartz v. Merchants Mortg. Co.*, 322 A.2d 544 (Md. 1974) ....................22, 24

*Singer Asset Fin. Co. v. Bachus*, 294 A.D.2d 818 (N.Y. Div. 2002)....................28

*Tandra S. v. Tyrone W.*, 648 A.2d 639 (Md. 1994) ....................22, 24

*Thacker v. Hale*, 806 A.2d 751 (Md. App. 2002)....................22

*Warner v. German*, 642 A.2d 239 (Md. App. 1994) ....................20

**Statutes**

Md. Code, Cts. & Jud. Proc. §5-110(b)(3)....................20

Md. Code, Cts. & Jud. Proc. § 5-1101 ....................1, 2, 12, 15

Md. Code, Cts. & Jud. Proc. § 5-1102....................3, 7, 24

Md. Code, Cts. & Jud. Proc. § 5-1104....................15

Md. Code, Cts. & Jud. Proc. § 5-1107....................15

Md. Code, Cts. & Jud. Proc. § 5-1108 ....................15

Md. Code, Cts. & Jud. Proc. § 5-1109 ....................15

Md. Code, Cts. & Jud. Proc. § 5-1110 ....................15

Md. Code, Cts. & Jud. Proc. § 5-1112 ....................15

Md. Code Com. Law §§13-101 – 13-501 ....................2

12 U.S.C. § 5481 ....................7, 27

12 U.S.C. § 5517 ....................29, 30

12 U.S.C. § 5531 ....................8, 32

12 U.S.C. § 5536 ....................8, 31

15 U.S.C. § 45(a)(1) ....................10

15 U.S.C. § 5531(a) ....................8

15 U.S.C. § 5536 ....................8

26 U.S.C. § 589(b)(2) ....................12

26 U.S.C. § 5891 ....................10

28 U.S.C. § 1738 ....................4, 9, 17, 18, 25, 33

Defendants Access Funding, LLC ("Access Funding"), Reliance Funding, LLC ("Reliance"), Lee Jundanian ("Jundanian") and Raffi Boghasian ("Boghasian") (collectively the "Access Funding Defendants"), by counsel, state as follows in support of their Motion for *Burford* Abstention and Stay, or in the Alternative, to Dismiss the Complaint filed by the Consumer Financial Protection Bureau ("Bureau") pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

The Bureau's Complaint follows on the heels of a lawsuit filed by the State of Maryland, Office of the Attorney General, Consumer Protection Division (the "Division"), against essentially the same defendants in the Circuit Court for Baltimore City in May 2016 (the "Division's Lawsuit").[1] Both this case and the Division's lawsuit arise out of Defendants' actions giving rise to at least 158[2] enrolled judgments entered by Maryland Circuit Courts approving the transfer of structured settlement payment rights to Access Funding or its affiliates and their designees pursuant to the Maryland Structured Settlement Transfer Act, Md. Code, Cts. & Jud. Proc. § 5-1101 *et seq.* (the "Maryland Act"). While the Bureau's Complaint references the Access Funding Defendants' alleged business operations in each of the 50 States, its only factual allegations pertain to the Access Funding's business operations in Maryland, and more specifically the actions of a Maryland lawyer, Charles Smith ("Smith"), who served as an independent professional advisor to persons selling structured settlement payment rights in Maryland.

[1] The Division's Amended Complaint, which was filed in June 2016, is attached as Exhibit 1. In addition to suing the same defendants in this case, the Division has also sued two affiliates of Access Funding – Assoc, LLC and En Cor LLC, as well as Scott Blumenfield, who also served as an independent professional advisor to persons selling structured settlement payment rights.

[2] The Bureau's Complaint refers to 158 transfers being approved by Maryland Circuit Courts (Doc. No. 1, at ¶ 31), while the Division's Amended Complaint refers to 159 such transactions. Exh. 1, at ¶ 30.

Likewise, the Division's Complaint concerns Defendants' actions in Maryland. The Division's Lawsuit asserts claims under the Maryland Consumer Protection Act, Md. Code, Com. Law §§ 13-101 – 13-501, and declaratory judgment, among others. Exh. 1. The Division seeks the Circuit Court's order declaring void the 159 enrolled judgments entered by Maryland Circuit Courts approving the transfer of structured settlement payment rights, and it seeks other equitable relief, the imposition of penalties, and an order preventing Defendants from using prohibited practices in the future. *Id.* at ¶¶ 157 and ¶ 165.

The Bureau, however, does not seek avoidance of the enrolled Maryland judgments, but rather it seeks an award of damages, and disgorgement of alleged "ill-gotten revenues" by Defendants, and an order permanently enjoining Defendants from participating in the structured settlement industry, as well as civil penalties, among other things. (Doc. No. 1, at 16). Thus, the Bureau and the Division seek plainly inconsistent remedies for the benefit of Maryland "payees."[3] The Division's pursuit of the equitable remedy of rescission is the antithesis of the Bureau's action at law for damages. The former disavows the transaction and attempts to put the parties in the same position as they were, whereas the latter affirms the transactions and attempts to make the allegedly injured party whole for the alleged harm caused by the defendant.

Notwithstanding that the Federal and State lawsuits differ substantially regarding the appropriate remedy for Defendants' alleged conduct, they are based on the same facts, circumstances and transactions and they implicate substantial questions regarding the finality of judgments and application of the Maryland Act. They also raise substantial questions concerning which arm of the government – the judicial branch or the executive branch – was given primary if not overall responsibility by the Maryland General Assembly to supervise and approve the

---

[3] The Maryland Act refers to persons who are transferring their structured settlement payment rights as "payees." Md. Act § 5-1101(f).

transfer of structured settlement payment rights. Indeed, the Complaints filed by the Bureau and the Division acknowledge that in approving the transfer of structured settlement payment rights, Maryland law obligated the Maryland Circuit Courts to determine that the payees received independent professional advice, which they did. (*See* Doc. No. 1, ¶ 22; and Exhibit 1 at ¶ 24 ("a court may not authorize any transfer of structured settlement payment rights unless it makes an additional 'finding' that the tort victim transferring the rights 'received independent professional advice regarding the legal, tax, and financial implications of the transfer.'") (citing Md. Code, Cts. & Jud. Proc. § 5-1102(b) & (b)(3)). Both lawsuits attack the Maryland Circuit Courts' findings of facts; and specifically contest the findings that the payees received independent professional advice and that the transfers were fair to the payees. Indeed, the essence of both lawsuits is that the Maryland Circuit Courts -- in the exercise of their statutory duty to approve the transfers of structured settlement payment rights only if certain criteria had been met -- got it wrong.

Accordingly, both lawsuits raise substantial questions regarding the finality of judgments under Maryland law. Indeed, the Circuit Court for Baltimore City received extensive briefing on whether the Division had the authority and standing to collaterally attack the 159 enrolled Maryland judgements at issue, and even so, whether the Division has alleged a basis for collaterally attacking those judgements as a matter of law.[4] The Circuit Court of Baltimore City has not yet ruled on the Defendants' motions.

[4] The Access Funding Defendants' Motion to Dismiss in the Division's Lawsuit is attached as Exhibit 2. The Division's Opposition to the Motion to Dismiss is attached as Exhibit 3. The Access Funding Defendants' Reply Brief is attached as Exhibit 4. The Access Funding Defendants' Post-Hearing Brief is attached as Exhibit 5, and the Division's Post-Hearing Brief is attached as Exhibit 6. The other defendants in the Division's Lawsuit filed motions to dismiss, which papers have not been attached as an exhibit.

Accordingly, under *Burford* abstention principles, this Court should abstain from ruling on the Bureau's equitable claims and stay this action with respect to its legal claims for damage in deference to issues of comity; the finality of the Maryland Court judgments; and in deference to the substantial issues of state law that are the subject of ongoing state regulation and are of a core concern for Maryland.

Alternatively, this Court should dismiss Count IV of the Complaint against the Access Funding Defendants under the Full Faith and Credit Act, 28 U.S.C. §1738, because the allegations giving rise to the Bureau's claim for providing substantial assistance to Smith's alleged unfair, deceptive and abusive acts in violation of the Consumer Financial Protection Act (the "CFPA"), are premised exclusively on whether Smith provided independent professional advice to persons in Maryland selling all or a portion of the structured settlement payment rights. The Maryland Courts have decided that issue and determined that Smith had performed those services.

The payees consented to the Maryland Circuit Court's jurisdiction, were given notice of the petitions seeking approval of the transfers, and were given an opportunity to appear and be heard in connection with the Maryland Circuit Court's determination of whether to approve the transfer of structured settlement payment rights. Thus, the payees were parties to the proceedings approving the transfer of their structured settlement payment rights.

While the Bureau was not a party to the proceedings before the Maryland Courts, it is in privity with the payees to the extent it seeks to obtain damages and other equitable remedies for the benefit of the payees who transferred their structured settlement payment rights. The Bureau has not alleged, nor can it, that Defendants' conduct caused the Bureau any harm. Rather the Bureau seeks to remedy injuries allegedly suffered by the payees. It is, thus, the payees' legal

interests in damages, disgorgement of ill-gotten gains, and other equitable relief that the Bureau asserts in this action. Accordingly, Maryland's doctrine of collateral estoppel or issue preclusion bars the Bureau from re-litigating the issue of whether Smith provided independent professional advice to the payees.

More fundamentally, to the extent that the Bureau's action attacks the fairness of the transactions to the payees in both Counts IV and VI[5] of the Complaint, that issue also has been conclusively decided by the Maryland Courts, which found that the transfers were necessary, reasonable, and appropriate under the circumstances. The Bureau has failed to allege any basis to collaterally attack the Maryland Court judgments.

Additionally, this Court should dismiss Count IV because Smith is not a covered person under the Consumer Financial Protection Act ("CFPA"), because he was not providing financial advisory services to payees. Indeed, the Complaint's allegations make clear that he was providing advice to persons who intended to sell their structured settlement payment rights. Further, his conduct as a lawyer who provided legal advice to his clients is exempt from the Bureau's regulation.

Finally, Count V is defective because the Bureau has failed to allege anything more than labels and conclusions with respect to the alleged advance payment by the Access Funding Defendants of the purchase price.

## THE ALLEGATIONS

The Bureau alleges that Access Funding operated in all 50 states (Doc. No. 1, at ¶ 6), and that Access Funding's principal business was to acquire future structured-settlement payment streams and transfer those payment streams to third-party investors. (*Id.* at ¶ 18). It asserts that

[5] Count V was mislabeled as "Count VI" in the Complaint. There are three counts asserted against Smith and two counts asserted against the Access Funding Defendants, including Michael Barkowski.

"[s]tructured-settlement-factoring companies like Access Funding offer recipients of structured settlements the opportunity to transfer a portion of their future payment streams in exchange for a discounted immediate lump sum." (*Id.* at ¶ 20).

The Bureau acknowledges that "[f]orty-nine states have enacted Structured Settlement Protection Acts (SSPAs) that set forth requirements for structured-settlement transfers." (*Id.* at ¶ 21). Under these laws and federal tax law, "a structured settlement-factoring company that wishes to purchase all or a portion of a structured settlement from a structured-settlement holder and avoid certain taxes must, among other things, petition for and receive court approval for the sale." (*Id.* at ¶ 22).

The Bureau asserts that Access Funding searched court records for pending filings by other structured-settlement-factoring companies and contacted the consumers involved before the courts approved the transfers to attempt to convince the consumers to back out of the pending transfers and enter transactions with Access Funding instead. (*Id.* at ¶ 24).[6] Access Funding would then allegedly continue to pressure the structured-settlement holders to enter into additional transactions with it until all their remaining expected payments were transferred. (*Id.* at ¶ 25).

The Bureau alleges that many States, including Maryland, "require the court to find that the consumer has consulted with an independent professional advisor ("IPA") before it can approve a structured-settlement transfer." (*Id.* at ¶ 29). The Bureau asserts that Access Funding conducted approximately 70% of its transfers in Maryland," and that Access Funding sought court approvals for approximately 200 transfers in Maryland, of which 158 have been approved. (*Id.* at ¶ 31).

---

[6] Implicit in this allegation is that the Access Funding Defendants offered payees a better deal than what they had already agreed to with another purchaser.

The Maryland Act requires an independent professional advisor to counsel the structured-settlement transferee on "the financial, legal, and tax implications of a transfer." (*Id.* at ¶ 32 (citing Md. Cts. & Jud. Proc. §§5-1102(b)(3) (2000)). The Bureau alleges that Access Funding steered the Maryland payees to Smith, "who acted as the IPA for almost all of its Maryland transactions." (*Id.* at ¶ 33). The Bureau alleges that "Smith had both personal and professional ties to Access Funding," and that he was paid directly by Access Funding for his purported IPA services." (*Id.* at ¶ 35).

The Bureau also alleges that Access Funding told Smith when and how to contact the transferee, and that Access Funding sometimes conducted three-way calls with the transferee and Smith. (*Id.* at ¶ 36). It also alleges that Access Funding sometimes provided "consumers prepaid cell phones that Smith used to contact" them. (*Id.*). This was done "to ensure the calls with Smith were completed." (*Id.*). Smith then allegedly provided Access Funding "a substantially similar letter for every consumer to whom he purported to provide IPA services stating that the consumer had received 'independent professional advice,''' which were then submitted to the court for approval of the transfer. (*Id.* at ¶ 38).

The Bureau also alleges that Access Funding provided advances to consumers that were to be repaid through a deduction from the proceeds of structured-settlement transfers once those transactions were completed. (*Id.* at ¶¶ 7 and 41). The Bureau asserts that the advances "were extensions of credit to consumers, and therefore consumer financial products or services under § 1002 of the CFPA." *Id.* (citing 12 U.S.C. §§5481(15)(A)(i)). It asserts, therefore that Access Funding is a "covered person" under §1002 of the CFPA. (*Id.*) (citing 12 U.S.C. § 5481(6)).

The Bureau alleges three Counts against Smith. In Count I, the CFPB alleges that Smith engaged in unfair acts and practices in violation of §§ 1031 and 1036 of the CFPA (15 U.S.C.

§5531(a), 5536(a)(1)(B)). In Count II, the Bureau alleges that Smith engaged in deceptive acts or practices in violation of §§1031 and 1036 of the CFPA (12 U.S.C. §§ 5531(a), 5536(a)(1)(B)). In Count III, the Bureau asserts that Smith engaged in abusive acts and practices in violation of §§ 1031(d)(d)(A) and 1036(a)(1)(B) of the CFPA (12 U.S.C. §§5531(d)(2)(A) 5536(a)(1)(B)).

The Bureau asserts two counts against the Access Funding Defendants. In Count IV, the Bureau asserts that the Access Funding Defendants knowingly or recklessly provided substantial assistance to Smith's unfair, deceptive, and abusive acts or practices in violation of §§ 1031 and 1036(a)(3) of the CFPA (12 U.S.C. §§5531, 5536(a)(3)). The Bureau alleges that "Access Funding knew or should have known that Smith engaged in only cursory communications with these consumers and did not provide truly independent professional advice, including by failing to consider consumers' individual circumstances," and that "Smith's representations that the consumers he advised had received independent professional advice were inaccurate." (*Id.* at ¶¶ 69-70). The Bureau also alleges that "Jundanian, Boghosian, and Borkowski were aware that Access Funding referred nearly all of its Maryland consumers to Smith for IPA services, that Smith had personal relationships with individuals at Access Funding, that Smith was paid directly by Access Funding for providing purported IPA services, and that Smith could be relied on to provide IPA letters when asked." (*Id.* at ¶ 73).

In Count VI, the Bureau alleges that the Access Funding Defendants engaged in abusive acts and practices related to advances made to consumers by taking "unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the advance loans, in violation of §§ 1031(d)(2)(A) and 1036(a)(1)(B) of the CFPA (12 U.S.C. §§5531(d)(2)(A) and 5536(a)(1)(B). In support of this claim, the Bureau asserts that the Access Funding Defendants knew the "consumers frequently had an immediate need for cash, and the company's practice

was to encourage consumers to take advances to meet those needs." (*Id.* at ¶ 77). The Access Funding Defendants allegedly "represented to consumers who received advance[s], including in the advance agreement Access Funding used, that consumers would be bound to complete the transaction and liable to pay the advance if they did not complete the transaction," and "consumers who could not otherwise repay the advances were told that they were obligated to go forward with the transfer even if they realized it was not in their best interest." *Id.* at ¶¶ 78-79.

## ARGUMENT

### A. Court Should Dismiss the Equitable Remedies Sought in this Action and Stay the Damages Portion of this Action under *Burford*.

The federal courts' deference to issues of comity and respect for State court final judgments, as reflected in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and in the Full Faith and Credit Act, 28 U.S.C. §1738 (the "Full Faith and Credit Act"), counsel for this Court's abstention from deciding the Bureau's claims for equitable remedies in this case and a stay of the damages claims pending resolution of the Division's case pending in the Circuit Court for Baltimore City, which raises substantially identical issues raised by the Bureau in this case. *See* Exhibit 1.

The foundational principles underlying *Burford* abstention do not lend themselves to the formulation of a rigid set of criteria or list of factors that must be satisfied before abstention can be deemed appropriate. *Johnson v. Collins Entertainment Co., Inc.,* 199 F.3d 710, 728 (4th Cir. 1999). Rather, *Burford* abstention "'reflect[s] a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes.'" *Id.* at 728-29 (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n. 9 (1987)). These considerations counsel for abstention where "state actors are charged with resolving state law issues that intimately affect state regulation of a core concern." *Id.*

Accordingly, "a federal court's exercise of discretion in deciding whether to invoke *Burford* abstention 'must reflect principles of federalism and comity.'" *First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002)(quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)). "These constitutional commitments require federal courts to 'exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.'" *Id.* (quoting *Burford*, 319 U.S. at 318). Courts, therefore, "should abstain from deciding cases presenting 'difficult questions of state law bearing on policy problems of substantial import whose importance transcends the results in the case then at bar,' or whose adjudication in a federal forum 'would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).

Where the relief is equitable, such as a request for a permanent injunction, the federal courts have the power to dismiss the case under abstention principles enunciated under *Burford*. *Johnson*, 199 F.3d at 727. Where the lawsuit seeks damages, however, "*Burford* can support only a stay, and not the outright dismissal or remand, of a damages action." *Id.* (citing *Quackenbush*, 517 U.S. at 721, 730). This may require the federal court to stay the damages portion of an action while dismissing claims for equitable relief entirely. *Id.*

*Burford* abstention is appropriate because this case addresses a matter of core state concern that is subject primarily to state regulation. While federal law provides favorable tax treatment for structured settlement transfers if certain criteria are met, and empowers the Federal Trade Commission to investigate and punish unfair and deceptive acts and practices (26 U.S.C. § 5891; 15 U.S.C. § 45(a)(1)), state law governs the requirements for establishing a lawful transfer of structured settlement payment rights. Significantly with respect to the Maryland conduct at

issue in this case, Maryland law requires that Maryland Circuit Courts enter orders approving the transfers after expressly finding that certain facts had been established. The Bureau concedes as much in its Complaint. (*See* Doc. No. 1, at ¶ 21).

On the other hand, the Bureau neither cites to nor suggests in its Complaint that Federal law governs the validity of transfers of structured settlement rights. Indeed, the one mention of structured settlement payment right transfers on the Bureau's website makes no mention of any federal law regulating the transfers of those rights. *See* Exhibit 6. Instead, it asks the question: Do you have rights under your state law? The Bureau responds to that question, stating:

> Nearly all states require a judge to approve the agreement to give up a structured settlement. These states may require a judge to decide if the agreement is in your best interest or is necessary, reasonable, or appropriate. Your state law may provide for certain disclosures to be made before you sign. You should think hard about whether this is a good deal for you.

Exh. 6 at 2 of 3. Furthermore, the Bureau's web page lists federal regulations "implementing consumer financial protection laws," but not one of them govern the transfer of structured settlement payment rights. Exhibit 7.

State law mandates the steps that must occur before there can be a legally enforceable transfer of structured settlement rights, and as the Bureau concedes, state legislatures, such as Maryland's General Assembly, have delegated to the state courts primary supervisory authority over structured settlement payment transfers. Indeed, absent a court order approving the transfer of structured settlement payments, the transfer is invalid in Maryland. Thus, the transfer of structured settlement payment rights is primarily a matter of state regulation and is a matter of substantial public concern for Maryland.

### 1. State Courts Have Primary Supervisory Authority Over Transfers of Structured Settlement Payment Rights Under the Maryland Act

The Maryland General Assembly enacted a court supervised procedure to give structured settlement beneficiaries greater financial flexibility. The Maryland Act, §§ 5-1101 *et seq*. The Maryland Act was amended effective October 1, 2016.[7] As part of the amendment, the Maryland General Assembly declared its finding that "it is necessary to regulate transfers of structured settlement payment rights to: (1) Ensure that the transfers are effectuated on fair and reasonable terms and are in the best interest of payees; and (2) Protect payees against deceptive practices." *Id.* at § 5-1101.1.

During the period when Smith provided independent professional advice to payees, the Maryland Act governed the transfer of structured settlement payment rights, if (1) an "interested party is domiciled" in Maryland; (2) "the structured settlement agreement was approved by a court or responsible administrative authority" in Maryland; or (3) "the settled claim was pending before" a Maryland court "when the parties entered into the structured settlement agreement." *Id.* at § 5-1101(j)(1)-(3).[8]

Both the previous versions and the amended version of the Maryland Act required the Court to approve the transfer of structured settlement payment rights after the Maryland Court made certain required findings. A comparison of the requirements is outlined below:

| Before Amendment | After Amendment |
| --- | --- |

[7] The transactions giving rise to the Bureau's claims occurred before the Maryland Act was amended. Because the Bureau seeks a permanent injunction, however, the revisions to the Maryland Act are relevant for consideration under *Burford.* Accordingly, all references in this Memorandum to the Maryland Act are to the amended Act, unless otherwise stated.

[8] The amended version of the Maryland Act governs the transfer of structured settlement rights if the payee resides in Maryland. *Id.* at § 5-1101(l)(1). It also applies if the payee does not reside in Maryland, provided that the settled claim was pending before a Maryland court or the structured settlement agreement was approved by a Maryland Court or governmental agency and the payee does not reside in another state or jurisdiction that has enacted a statute providing for entry of a qualified order as defined in 26 U.S.C. § 589(b)(2)." *Id.* at § 5-1101(2) and (3).

| | |
|---|---|
| Transfer is authorized in an order of court based on a finding that: | Transfer is authorized in an order of a court based on express finding that: |
| 1. The transfer is necessary, reasonable, or appropriate; | 1. The transfer is necessary, reasonable and appropriate and in the best interest of the payee, taking into account the welfare and support of payee's dependents; |
| 2. The transfer is not expected to subject the payee, the payee's dependents, or both to undue or unreasonable financial hardship in the future; | 2. The financial terms of the transfer agreement are fair to all parties, taking into account;<br>(i) The difference between the amount payable to the payee and the discounted present value of the payments to be transferred; and<br>(ii) The discount rate applicable to the transfer; |
| 3. The payee received independent professional advice regarding the legal, tax, and financial implications of the transfer; and | 3. The payee received independent professional advice concerning the proposed transfer; and |
| 4. The transferee disclosed to the payee the discounted present value. | 4. At least 10 days before the date on which the payee signed the transfer agreement, the transferees provided to the payee a separate disclosure statement, in at least 14 point boldface type, that states:<br>(i) The amounts and due dates of the structured settlement payments to be transferred;<br>(ii) The aggregate amount of the payments to be transferred;<br>(iii) The discounted present value of the payments to be transferred;<br>(iv) The amount payable to the payee in exchange for the payments to be transferred;<br>(v) An itemized listing of all brokers' commissions, service charges, application fees, processing fees, closing costs, filing fees, administrative fees, notary fees, and other charges payable by the payee or deductible from the gross amount otherwise payable to the payee, except attorney's fees and related disbursements; |

> (vi) The transferee's best estimate of the amount of any attorney's fees and disbursements payable by the payee or deductible from the gross amount otherwise payable to the payee;
>
> (vii) The net amount payable to the payee after deduction of all commissions, fees, costs, expenses, and charges described in items (v) and (vi) of this item;
>
> (viii) The discount rate applicable to the transfer, which shall be disclosed in the following statement: "Based on the net amount that you will receive from us and the amounts and timing of the structured settlement payments that you are transferring to us, you will, in effect, be paying interest to us at a rate of __ percent per year.";
>
> (ix) The amount of any penalty or liquidated damages payable by the payee in the event of any breach of the transfer agreement by the payee; and
>
> (x) A statement that the payee has the right to cancel the transfer agreement, without penalty or further obligation, at any time before the transfer is authorized by a court order under this subtitle.

Under the prior version of the Maryland Act, "Independent Professional Advice" was defined to mean "advice of any attorney, certified public accountant, actuary, or other licensed professional advisor;

(1) Who is engaged by a payee to render advice concerning the legal, tax, and financial implications of transfer of structured settlement payment rights;

(2) Who is not affiliated with or compensated by the transferee of the transfer; and

(3) Whose compensation is not affected by whether a transaction occurs."

*Id.* at § 5-1101(c) (pre-amendment). The amended version of the Maryland Act kept this definition but changed subpart (c)(1) to provide that the independent advisor is engaged by the payee to render "advice concerning whether a proposed transfer of structured settlement payment rights would be in the best interest of the payee, taking into account the welfare and support of the payee's dependents." *Id.* at § 5-1101(d)(1).

The amended Maryland Act contains additional provisions. For example, the amended Maryland Act requires that if the structured settlement was established to resolve a tort claim seeking compensation for cognitive injuries, the petition seeking approval of the transfer must notify the court and provide certain additional information. *Id.* at § 5-1104. Also, the Maryland Act proscribes anyone from filing a petition for a transfer of structured settlement payment rights unless the person is "(1) [i]s registered with the Attorney General as a structured settlement transferee; or (2) [h]as a pending application for registration, and the Attorney General has not acted on the application with the time specified in this subtitle." *Id.* at § 5-1107. The amended Maryland Act further provides requirements for application to the Attorney General for registration as a structured settlement transferee (*Id.* at § 5-1108); the posting of a letter of credit, cash or bond in the amount of $100,000 (*Id.* at § 5-1109); and the Maryland Act grants the Attorney General the power to suspend or revoke the registration of a structured settlement transferee or deny an application under certain specified circumstances. *Id.* at § 5-1110.

Finally, the amended Maryland Act authorizes the Attorney General to adopt regulations to carry out the Maryland Act. *Id.* at § 5-1112.

### 2. ***Burford* Principles Counsel for Abstention and Stay.**

The Maryland Act leaves little doubt that regulating transfers of structured settlement payment rights involving Maryland payees is a core concern for Maryland. There also can be no

doubt that before and after the amendment to the Maryland Act, the Maryland General Assembly delegated to the Maryland Courts the duty to ensure the fairness of the transactions and to ensure that the specific requirements for the validity of the transfers dictated by state law had been met. Following the Amendment to the Maryland Act, the Attorney General's office was also given explicit regulatory oversight over person's seeking to obtain transfers of structured settlement payment rights, but even so, the Maryland Courts retained sole authority to approve transfers of structured settlement rights.

Furthermore, the Division, in the exercise of its purported authority under Maryland's Consumer Protection Act, has initiated a civil enforcement action against these same defendants and has directly challenged the validity of the transfers approved by the Maryland Courts. While Defendants dispute the Division's authority to bring its action or to challenge the validity of the enrolled judgment, the Division's actions establish beyond dispute that "state actors are charged with resolving state law issues that intimately affect state regulation of a core concern" to Maryland. *Johnson*, 199 F.3d at 728.

Accordingly, the issues raised by the Bureau in this case concern difficult questions of state law bearing on policy problems of a substantial import to Maryland. This Court should, therefore, abstain from resolving the equitable claims in this action and stay the resolution of the damages portion of this case.

### B. The Full Faith and Credit Clause Bars the Bureau's Collateral Attack on Enrolled Judgments Entered by Maryland Circuit Courts.

While the Bureau's Complaint speaks of Access Funding's alleged operations in all 50 States, the allegations supporting Counts I through IV focus solely on the actions of a Maryland lawyer, Smith, whose actions as an independent professional advisor to payees satisfied an essential requirement under the Maryland Act to obtain Court orders approving the transfer of

structured settlement payment rights to Access Funding, or its designee. Likewise Count VI implicates the Maryland Court's order because, as alleged by the Bureau, the Access Funding Defendants conducted 70% of its business in Maryland. (Doc. No. at ¶ 31).

The Maryland Circuit Courts entered enrolled judgments approving the structured settlement payment transfers and in each order, specifically found that Smith provided the statutorily required independent professional advice to the payees. In addition, the Maryland courts found that the transfer was "necessary, reasonable and appropriate." Copies of enrolled judgments for which Smith served as an independent professional advisor are attached as Exhibit 8.

The Bureau's Complaint essentially asserts that the Maryland Circuit Courts got it wrong, and by this action impermissibly seeks to collaterally attack those judgments by relitigating issues already decided by the Maryland Courts. The Full Faith and Credit Act, 28 U.S.C. § 1738, however, bars the Bureau's collateral attack on the legal and factual conclusions embodied within the Maryland Court judgments approving the transfer of structured settlement payment rights.

"The Full Faith and Credit Act mandates that the 'judicial proceedings' of any State 'shall have the same full faith and credit in every court within the United States … as they have by law or usage in the courts of such state … from which that are taken." *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 373 (1996)(quoting 28 U.S.C. § 1738). The Act "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state. Federal Courts may not 'employ their own rules … in determining the effect of state judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.'" *Id.* (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481-82 (1982)).

Courts employ a two-step analysis to determine whether the Full Faith and Credit Act applies to a particular case. *Jaffe v. Accredited Surety and Cas. Co., Inc.*, 294 F.3d 584, 590 (4th Cir. 2002). First, the federal court refers to the "'preclusion law of the State in which the judgment was rendered' to ascertain the preclusive effect of the state-court judgment in that state." *Id.* (quoting *Heckert v. Dotson (In re Heckert),* 272 F.3d 253, 257 (4th Cir. 2001)(internal quotation marks and citation omitted)). Second, if that state's law would afford the judgment preclusive effect, then the federal court determines whether Congress created an exception to § 1738. *Id.* If federal law does not provide an exception to § 1738, then the federal court must give a state court judgment the same preclusive effect given it under that state's law. *Id.*; *See In Heckert*, 272 F.3d at 257-58 ("Only in the most rare case, however, may federal courts refuse to give full faith and credit to a state court judgment, and then only if 'a later statute contains an express or implied partial repeal' of § 1738.")(quoting *Kremer v. Chemical Contr. Corp.*, 456 U.S. 461, 468 (1982)).

**1. The Bureau is Collaterally Estopped Under Maryland Law from Re-litigating the Issue of Whether Smith Provided Independent Professional Advice or Whether the Transactions Were Fair to Payees.**

The Maryland Courts decided the legal and factual issue of whether Smith provided independent professional advice with respect to each enrolled judgment approving the transfer of structured settlement rights and whether the transactions were fair to the payees. Accordingly, under Maryland law, the Bureau is collaterally estopped from re-litigating those issues.

The doctrine of collateral estoppel, or more appropriately referred to as the doctrine of issue preclusion, provides that "'[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or

different claim.'" *Garrity v. Maryland State Bd. of Plumbing*, 135 A.3d 452, 458 (Md. 2016) (quoting *Cosby v. Dept. of Human Res.*, 42 A.3d 596 (Md. 2012)).[9] "Treating adjudicated facts as established 'protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy and . . . promot[es] judicial economy by presently needless litigation.'" *Id.* (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).

The strict mutuality requirement for application of collateral estoppel "has been relaxed" under Maryland law, "so long as the other elements of collateral estoppel are satisfied." *Id.* (citing *Rourke v. Amchem Prods., Inc.*, 863 A.2d 926 (2004)). Accordingly, collateral estoppel applies when it is shown that:

> 1) the issue decided in the prior adjudication is identical with the one presented in the action at question;
>
> 2) there was a judgment on the merits;
>
> 3) the party against whom the plea is asserted is a party or in privity with a party to the prior adjudication; and
>
> 4) the party against whom the plea is asserted was given a fair opportunity to be heard on the issue.

*Id.*

**a. Maryland Courts Have Already Determined that Smith Provided the Payees with Independent Professional Advice and that the <u>Transaction was Fair to the Payee</u>.**

There can be no real dispute as to whether the Maryland Circuit Courts determined that Smith provided independent professional advice to each of the payees or that the Courts found that the transfers of structured settlement payment rights were fair to the payee. The Maryland Act required the Maryland Courts to make a finding that the payee had received independent professional advice before approving the transfer of Structured Settlement Payment Rights. Md.

[9] Because the Maryland courts more often address issue preclusion using the term "collateral estoppel", this Memorandum will also refer to the issue preclusion as collateral estoppel.

Cts. & Proc. §5-110(b)(3). The Bureau pleads as much in its Complaint. (*See* Doc. No. 1, ¶ 29)("many SSPAs, including Maryland's, require the Court to find that the consumer has consulted with an independent professional advisor ("IPA") *before* it can approve a structural settlement transfer.")(emphasis added). The Maryland Courts also found that the transfer was necessary, reasonable, and appropriate. Those findings were essential to the entry of each judgment approving a transfer of structured settlement payment rights.

**b. The Bureau is in Privity with the Payees, Who Had a Fair Opportunity to be Heard on the Issue.**

As noted earlier, the mutuality requirement for collateral estoppel under Maryland law has been relaxed. *Garrity*, 135 A.2d at 459. Privity, in the context of claim preclusion, has been described as implicating "a person so identified in interest with another that he represents the same legal right." *FNB Bank v. Richmond,* 731 A.2d 916, 930 (Md. 1999)(internal citation omitted). More specifically, Maryland courts have recognized that parties are in privity where "'they are so far represented by another that their interests receive actual and efficient protection.'" *Poteet v. Sauter*, 766 A.2d 150, 165 (Md. App. 2001)(quoting *Warner v. German*, 642 A.2d 239 (Md. App. 1994)).

By this action, the Bureau seeks equitable remedies and legal remedies in the form of damages against Defendants that, to the extent the Bureau is successful, will inure to the payees' benefit. The Bureau seeks an "award of damages or other monetary relief against Defendants (Doc. No. 1, at p. 16); an "order for Defendants to pay redress to consumers," (*Id.*); and order for Defendants to "disgorg[e]" alleged "ill-gotten revenues." *Id.* Plainly, the Bureau is not seeking damages for alleged harm to the Bureau caused by Defendants' action. Rather, the Bureau seeks to remedy alleged harm to the payees caused by Defendants' alleged action. Thus, the payees

have a legal interest in those alleged damages, because they are the persons who allegedly suffered the harm that is sought to be remedied by the payment of damages.

Indeed, the Bureau is asserting in this action essentially the same legal right to the damages that the payees would assert if they brought a claim against Defendants arising out of the same facts and circumstances giving rise to the Bureau's claim.[10] In so doing, the Bureau represents the same legal rights and interest in the alleged "damages" and other equitable relief, such as disgorgement of profits, as the payees have in such relief. *See C.f. CFPB v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016)(Bureau has Article III standing to prove claims "to vindicate . . . the public interest in making the defendant's alleged "victims whole."); *CFPB v. American Debt Settlement Solutions, Inc.*, No. 2013 WL 12094225, *4 (S.D. Fla. 2013)(funds received by the Bureau in satisfaction of a judgment to be used for redress for injured consumers, including refund of moneys, restitution, damages or other monetary relief.).

Finally, there is no allegation that the payees are not parties to the action approving the transfer of their structured settlement rights; did not receive notice of the court proceedings approving the transfer of their structured settlement payment rights; or that they did not have an opportunity to be heard on the issue of whether they had received independent professional advice, as required by the Maryland Act. Accordingly, the Bureau is barred by collateral estoppel from re-litigating the issue of whether the payees received independent professional advice or whether the transfer was fair to the payees.

[10]Two payees have filed a putative class action seeking damages against the Access Funding Defendants and Smith, among others arising out of the same facts and circumstances giving rise to the claims in this case, in the case styled *Linton, et al. v. Access Funding, LLC, et al.*, Case No. 24-C-16-003894-OT, pending in the Circuit Court for Baltimore City, which is attached as Exhibit 9.

**2. <u>Maryland Law Bars Collateral Attacks of Final Enrolled Judgments</u>.**

Maryland jurisprudence establishes a strong public policy favoring the finality and conclusiveness of judgments. *Bland v. Hammond*, 935 A.2d 457, 463 (M.D. App. 2007); *Tandra S. v. Tyrone W.*, 648 A.2d 639, 449 (Md. 1994)("clear that the overriding policy in Maryland emphasizes that once a case is decided, it shall remain decided with certain very narrow exceptions"). That public policy can only be overcome by showing that either the (1) the court entering the judgment lacked jurisdiction, or (2) "'the prevailing party, by some extrinsic or collateral fraud has prevented a fair submission of the controversy.'" *Bland*, 935 A.2d at 463 (quoting *Schwartz v. Merchants Mortg. Co.*, 322 A.2d 544, 546 (Md. 1974)).

The Bureau has not alleged facts establishing either circumstance.

**a. <u>Maryland Circuit Courts had Jurisdiction to Enter the Enrolled Judgments</u>**

As explained by the Maryland Court of Appeals, "'[w]hat is meant by the lack of jurisdiction in its fundamental sense such as to make an otherwise valid decree void is often misunderstood.'" *Thacker v. Hale*, 806 A.2d 751, 764 (Md. App. 2002)(quoting *First Federated Commodity Trust Corp. v. Comm'r of Sec.*, 322 A.2d 539, 543 (Md. 1974)). "'[J]urisdiction refers to two quite distinct concepts: (i) the <u>power</u> of a court to render a valid decree, and (ii) the <u>propriety</u> of granting the relief sought.'" *Id.* (quoting *First Federated Commodity Trust Corp.*, 332 A.2d at 543 (emphasis added). "'It is only when the court lacks the <u>power</u> to render a decree, for example because the parties are not before the court, as being improperly served with process, or because the court is without authority to pass on the subject matter involved in the dispute, that its decree is void.'" *Id.* (quoting *First Federated Commodity Trust Corp.*, 332 A.2d at 543 (emphasis removed). Explaining further, the Court stated that if "'by that law which defines the authority of the court, a judicial body is given the power to render the judgment over

that class of cases within which a particular one falls, then its action cannot be assailed for want of subject matter.'" *Id.* (quoting *Garrity Commodity Trust Corp.*, 332 A.2d at 543) (emphasis removed).

Such is the case here. There is no doubt that the General Assembly granted each of the Circuit Courts who issued the enrolled judgments the power to determine the interested parties' compliance with the Act and to render judgments approving the transfer of structured settlement rights. Accordingly, the Bureau cannot assail those judgments on the basis that those courts lacked jurisdiction to enter the judgments.

**b. The Bureau Has Not Alleged Extrinsic Fraud, Which Is Required To Successfully Attack An Enrolled Judgement.**

While the Bureau has failed to allege fraud, and thus, cannot collaterally attack the Maryland judgments, it is also true that "[o]nly extrinsic fraud will justify the reopening of an enrolled judgment; fraud which is intrinsic to the trial itself will not suffice." *Bland*, 935 A.2d at 463. "Fraud is extrinsic when it actually prevents an adversarial trial, but is intrinsic when it is employed during the course of the hearing or trial which provides the forum for the truth to appear." *Id.*

"In determining whether extrinsic fraud exists, 'the question is not whether the fraud operated to cause the trier of fact to reach an unjust conclusion, but whether the fraud prevented the actual dispute from being submitted to the fact finder at all.'" *Id.* (quoting *Hresko v. Hresko*, 574 A.2d 24, 26-27 (Md. App. 1990)). "There are notably few instances in Maryland jurisprudence where a judgment has been vacated on the basis of extrinsic fraud." *Bland*, 935 A.2d at 464.

The Maryland Act required that the Circuit Court approve the transfer of structured settlement rights only after making a finding that" the "payee received independent professional

advice regarding the legal, tax, and financial implications of the transfer," among other required findings. Md. Code, Cts. & Jud. Proc., §5-1102(b)(3). Thus, the question of whether the payee received independent professional advice was intrinsic to the Circuit Court's judgment.

The key issue the Bureau raises in its Complaint – whether the payees received independent professional advice – was the precise issue decided by each of the Circuit Courts that entered the 159 enrolled judgments. Without even alleging fraud, the Bureau essentially seeks a new trial on the same issue that was presented to the Circuit Courts in each of the 159 enrolled judgments, which it cannot do. *See Abbott v. Aetna Cas. & Surety Co.*, 42 F. Supp. 793, 802 (D. Md. 1942)(fraud is intrinsic when it relates to the very issue decided by the court rendering the judgment being assailed); *Thacker*, 806 A.2d at 764 (quoting *First Federated Commodity Trust Corp.*, 332 A.2d at 543)(the question of whether it was appropriate to grant the relief requested "merges into the final decree and cannot thereafter be successfully assailed for that reason once enrolled").

There are many decisions by Maryland Courts that find only alleged intrinsic fraud under similar circumstances. *See Schwartz v. Merchants Mortgage Co.*, 332 A.2d 544 (Md. 1974); *Klein v. Whitehead*, 389 A.2d 374 (Md. App. 1978); *Hresko*, 574 A.2d 24; *Tandra S.*, 648 A.2d 439; G*reen v. Ford Motor Credit Co.*, 828 A.2d 821 (Md. App. 2003). These cases stand for the proposition, as stated by the court in *Hresko*, fraud is intrinsic if it "pertains to issues involved in the original action or where acts constituting fraud were, or could have been, litigated therein." 574 A.2d at 26. Because the matters at issue here are intrinsic to the Maryland Circuit Courts' decisions, Maryland law would not permit the judgements to be assailed.

### 3. <u>The CFPA Does Not Contain an Express or Implied Repeal of § 1738</u>.

The Full Faith and Credit Act, § 1738, requires federal courts to give the Maryland enrolled judgments the same preclusive effect that Maryland would afford those judgments unless there is an express or implied repeal of the Act by the federal statute at issue. *Jaffe*, 294 F.3d at 592. Plainly, the CFPA does not contain an express repeal of § 1738. Nor does it contain an implied repeal of the Act.

An "implied repeal requires 'irreconcilable conflict' between the two federal statutes." *Id.* (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 468 (1982)). "The Supreme Court has noted that it 'has seldom, if ever, held that a federal statute impliedly repealed § 1738 . . . due to the relatively stringent standard' for such findings." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 380-81 (1996)).

There has been no implicit repeal of the Act, because there is no irreconcilable conflict between the CFPA and § 1738. This Court must, therefore, give full faith and credit to the judgments of the Maryland Circuit Courts. The only way that this Court can give full faith and credit to the Maryland enrolled judgments is to dismiss the Bureau's Complaint. To establish its claims, the Bureau must directly challenge the express findings by the Maryland Courts that (i) the transfer was necessary, reasonable, or appropriate; (ii) the transfer was not expected to subject the payee, the payee's dependents, or both to undue or unreasonable financial hardship in the future; (iii) the payee received independent professional advice; and (iv) the transferee disclosed to the payee the discounted present value of the transaction. These facts, which the Bureau is barred by the Full Faith and Credit Act from assailing, defeats its claims.

### C. <u>The Bureau Has Failed to State a Claim for Relief.</u>

#### 1. <u>Standard</u>.

The standard governing a Rule 12(b)(6) motion to dismiss is well-established. "A complaint must contain factual allegations in addition to legal conclusions." *Robertson v. Sea Pines Real Estate Companies, Inc.*, 79 F.3d 278, 288 (4th Cir. 2012). "Federal Rules of Civil Procedure 8 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "'naked assertion[s]' devoid of 'further factual enhancement' are not enough." *Id.* (quoting *Ashcraft v. Iqbal*, 556 U.S. 662, 678 (2009)). Thus, "'[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Plausibility requires that the factual allegations 'be enough to raise a right to relief above the speculative level … on the assumption that all the [factual] allegations in the complaint are true.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

To "discount … unadorned conclusory allegations, 'a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)(quoting *Iqbal*, 556 U.S. at 679). "This approach recognizes that 'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross the 'line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

**2. The Bureau Has Failed to State a Claim Against the Access Funding Defendants for Knowingly or Recklessly Providing Substantial Assistance to Smith's alleged Unfair, Deceptive and Abusive Acts or Practices.**

In Count IV, the Bureau asserts that Access Funding knowingly or recklessly provided substantial assistance to Smith's unfair, deceptive, and abusive acts or practices in violation of §§ 1031 and 1036(a)(3) of the CFPA. The Bureau's claim, therefore, is derivative of its claim against Smith. The Bureau's claim against Smith is defective for two reasons. First, notwithstanding the Bureau's conclusory assertions, Smith is not a "covered person" under the CFPA, because he was not providing "financial advisory services" to consumers. Second, the Bureau is precluded from exercising supervisory or enforcement authority over Smith's conduct because he was engaged in the practice of law. Because the Bureau has failed to state a claim against Smith, it has also failed to state a claim against the Access Funding Defendants.

**a. Smith is Not a Covered Person under the CFPA.**

The CFPA defines a "covered person" to mean, in relevant part, "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). A "consumer financial product or service" means, in relevant part, "extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions)." *Id.* at § 5481(15)(A)(i). The CFPA defines "credit" to mean the "right to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." *Id.*at 5481(7).

The Bureau's Complaint makes clear that Smith's role was to provide independent professional advice to the payees in connection with their transfer of structured settlement rights

to Access Funding.[11] Indeed, the Bureau does not assert that the transfer of structured settlement rights was an extension of credit or the servicing of a loan. Nor could it allege as much. The payees sold their structured settlement rights to Access Funding or its designee.

Courts across the country have consistently and uniformly determined that the purchase of structured settlement payment rights involves an assignment or sale of such rights and not the making of a loan or extension of credit. *See e.g., Capela v. J. G. Wentworth, LLC*, No. CV09-882, 2009 WL 3128003, at * 11 (E.D.N.Y. 2009)("You can call an assignment of structured settlement rights a TILA-governed loan as often as you like, but unless Congress says otherwise, a sale is still a sale."); *321 Henderson Receivables Origination, LLC v. Sioteco*, 173 Cal. App. 4th 1059, 1077 (2009)("[T]he transfer of structured settlement payment rights … is not a loan secured by assignment of periodic payments but is a sale of certain rights to receive periodic payments."); *Singer Asset Fin. Co. v. Bachus*, 294 A.D.2d 818, 820 (N.Y. Div. 2002)(structured settlement payment sale "is not a loan but an absolute assignment").

The logic and reasoning applied by these courts foreclose any claim that Smith is a covered person under the CFPA, because his role was to provide independent professional advice to payees in connection with their transfer of structured settlement payment rights to Access Funding, and not advise the payees in connection with the extension of credit or the making of loans.

---

[11] The Bureau alleges that "[m]any SSPAs, including Maryland's, require the court to find that the consumer has consulted with an independent professional advisor ("IPA") before it can approve a structured-settlement transfer." (Doc. No. 1, at ¶ 29). The Bureau alleges that Smith was engaged to advise payees on the financial, legal, and tax implications of a transfer" so that Access Funding could obtain court approval for the transfer of the structured settlement payment rights. (*Id.* at ¶¶ 32-33). The Bureau does not allege, nor could it, that Smith provided any advice to payees about the alleged advance payment made by Access Funding. Smith's role, therefore, was limited to providing legal advice about the transfer of structured settlement rights, which does not implicate the CFPA.

**b. Smith's Alleged Conduct is Excluded from the Bureau's Authority And Therefore The Access Funding Defendants Cannot Be Held Liable For Their Alleged Assistance To Smith.**

The CFPA contains a broad limitation on the Bureau's ability to exercise any supervisory or enforcement authority over lawyers. Under 12 U.S.C. § 5517(e)(1), the CFPA provides that "[e]xcept as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." The CFPA's sweeping language plainly encompasses the services Smith provided to payees selling structured settlement payment rights. Indeed, the Bureau alleges that Smith "held himself out as an 'independent professional advisor'" to payees and "by purporting to provide IPA services for purposes of structured settlement transactions, was therefore obligated to explain the financial, legal, and tax implications of the transfers consumers made to Access Funding." (Doc. No. 1 at ¶ 46).

The CFPA contains three categories of activities that are not excluded from the Bureau's authority, none of which apply here. First, the CFPA excepts circumstances where the "law firm engaged in the provision of financial products or services that are not part of its legal representation of clients." *Consumer Financial Protection Bureau v. The Mortgage Law Group, LLP*, 157 F. Supp. 3d 814, 820 (W.D. Wis. 2016); *See* 12 U.S.C. § 5517(e)(2)(A); *see also Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, No. 1:14cv00292, -- F. Supp. 3d --, 2015 WL 1013508, at * 24, n. 29 (S.D. Ind. 2015). "Thus, the Bureau could, for example, exert its authority over an attorney's debt collection practices so long as such practices are not part of the attorney's law practice occurring exclusively within the scope of his attorney-client relationship." *Consumer Financial Protection Bureau v. Fredrick J. Hanna & Associates,*

*P.C.*, 114 F. Supp. 3d 1342, 1353 (N.D.Ga. 2015). Smith's alleged conduct does not fit within this category because the CFPA violations alleged in the Complaint arise out of legal advisory services Smith offered to the payees as part of his practice of law, which occurred exclusively within his relationship to his clients. *Id.*

The second category of activity over which the Bureau may exercise authority over a law firm implicates the provision of a consumer financial product or service by an attorney to "any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service." 12 U.S.C. § 5517(e)(2)(B). For example, in *Fredrick J. Hanna*, the court held that the debt collection actions of filing a breach of contract lawsuit and litigating that suit are acts provided for the Firm's creditor clients "'with respect to' consumers who themselves do "not receive[] legal advice or services from the attorney.'" 114 F. Supp.3d at 1353 (quoting 12 U.S.C. §5517(e)(2)(B)).

This second categorical exception to the attorney exemption from the CFPA does not apply to Smith because the thrust of the Bureau's complaint is that Smith owed the payees a duty to provide them with professional advice regarding the "financial, legal, and tax implications of the transfers" they made to Access Funding. (Doc. No. 1, at ¶ 46). The Bureau complains that Smith allegedly "did not seek out or consider information about the consumer's best interests; rather, he advised consumers without having any information about the consumers' financial situations." (*Id.* at ¶ 61).

The third exception captures any attorney who "is otherwise subject to any of the enumerated consumer laws or the authorities transferred under subtitle F or H." 12 U.S.C. § 5517(e)(3). The Complaint fails to identify any enumerated consumer law or authority that would be applicable to this exception.

Accordingly, Smith is exempt from the Bureau's authority, and thus, the Access Funding Defendants cannot be held liable for knowingly or recklessly providing substantial assistance to Smith's alleged violations of the CFPA.

### 3. The Bureau's Conclusory Allegations Fail to State a Claim Against Access Funding Engaging in Abusive Acts and Practices.

In Count VI, the Bureau alleges that the Access Funding Defendants took unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the so-called advance loans, in violation of the CFPA. (Doc. No. 1, ¶ 81). The Bureau's claim fails because it has failed to allege facts establishing that the Access Funding Defendants are covered persons under the CFPA and which establish a cause of action under the CFPA.

The Bureau has only asserted conclusory allegations unsupported by any facts. Indeed, the Bureau fails to identify any consumer who was told that they were "obligated to go forward with the transfer even if [the person] realized it was not in their best interest." (*Id.* at ¶ 79). Nor does the Bureau attempt to state one fact to support its bald allegation that the Access Funding Defendants "represented to consumers who received an advance," that they "would be bound to complete the transaction and liable to repay the advance amounts if they did not complete the transaction." (*Id.* at ¶ 78). Further, the latter allegation is internally inconsistent. In the one instance, the Bureau asserts that consumers were told that they were "bound" to complete the transactions," and in the other instance, it appears that the Bureau is asserting that consumers were informed that they did not have to complete the transaction, but would have to repay the advance. The latter circumstance is true with any advance payment of a purchase price, and plainly cannot be considered an unfair practice.

The Bureau alleges that the Access Funding Defendants engaged in an "unfair, deceptive, or abusive act or practice in violation of the CFPA, 12 U.S.C. §5536. The CFPA declares an act

or practice to be abusive in connection with the provision of a consumer financial product or service, if "it takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service…." 12 U.S.C. § 5531(d)(2)(A). Thus, to state a claim, the Bureau must allege facts establishing that Access Funding:

(1) engaged in acts or practices,

(2) in connection with the provision of a consumer financial product or service;

(3) that took unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product and service.

*Id.* In addition, the Bureau must establish that:

"[1] the act or practice causes or is likely to cause substantial injury to consumers,

[2] which is not reasonably avoidable by consumers; and

[3] such substantial injury is not outweighed by countervailing benefits to consumers or competition."

12 U.S.C. §5531(c)(1).

The Bureau has done nothing more than state conclusory allegations in support of the elements above. It has failed to allege facts establishing that the advance was "unfair," much less has it identified any consumer who did not know that he or she would have to pay back the advance if the transaction was not consummated. Nor has the Bureau alleged the existence of any consumer who felt compelled to go forward with the transaction after receiving the advance because the consumer could not pay the advance back. More importantly, the Bureau has failed to allege how the presence of the court approval process failed to protect the consumer, much less that any consumer suffered substantial injury because of the alleged advance.

Accordingly, this Court should dismiss Count VI for failure to state a claim.

**CONCLUSION**

For the reasons stated above, this Court should abstain from deciding the equitable claims for relief and stay this action with respect to the legal claims for relief under the *Burford* abstention doctrine. In the alternative, this Court should dismiss this action because the claims are barred under the Full Faith and Credit Act, § 1738, and this Court should dismiss Counts IV and V (mislabeled as VI in the Complaint) for failure to state a claim.

Respectfully submitted,

*/s/ Andrew J. Chiang*

Andrew J. Chiang
O'HAGAN MEYER, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8602
Email: achiang@ohaganmeyer.com

and

Charles M. Sims
(*Pro Hac Vice to be submitted*)
O'HAGAN MEYER, PLLC
411 East Franklin Street, Suite 500
Richmond, VA 23219
Telephone: (804) 403-7111
Email: csims@ohaganmeyer.com

*Attorneys for Access Funding, LLC, Access Holding, LLC, Reliance Funding, LLC, Lee Jundanian and Raffi Boghosian*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of January 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record:

Meghan Sherman Carter, Esq.
Christina Coll, Esq.
Consumer Financial Protection Bureau
1700 G Street, NW
Washington DC 20552
*Counsel for Plaintiff Financial Protection Bureau*

Gregg E. Viola, Esq.
Eccleston & Wolf, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076
*Counsel for Charles Smith*

Michael T. Hamilton, Esq.
Marks, O'Neill, O'Brien, Doherty & Kelly, P.C.
600 Baltimore Avenue, Suite 305
Towson, MD 21204
*Counsel for Michael Borkowski*

William C. Brennan, Jr., Esq.
Brennan McKenna Manzi Shay, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, MD 20770

/s/ Andrew J. Chiang
Andrew J. Chiang
O'HAGAN MEYER, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8602
Email: achiang@ohaganmeyer.com
*Attorneys for Access Funding, LLC, Access Holding, LLC, Reliance Funding, LLC, Lee Jundanian and Raffi Boghosian*