**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU | * | |
| Plaintiff, | * | |
| v. | * | Case No. 1:16cv03759-JFM |
| ACCESS FUNDING, LLC, et al., | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**ACCESS FUNDING DEFENDANTS' REPLY TO THE CONSUMER FINANCIAL PROTECTION BUREAU'S OPPOSITION TO ITS MOTION FOR *BURFORD* ABSTENTION AND STAY, OR IN THE ALTERNATIVE, TO DISMISS**

Defendants Access Funding, LLC ("Access Funding"), Reliance Funding, LLC ("Reliance"), Lee Jundanian ("Jundanian") and Raffi Boghasian ("Boghasian") (collectively the "Access Funding Defendants"), by counsel, file this Reply and state as follows in further support of their Motion for *Burford* Abstention and Stay, or in the Alternative, to Dismiss the Complaint filed by the Consumer Financial Protection Bureau ("Bureau") pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## ARGUMENT

### A. Application of *Burford* Abstention Principles Compel this Court's abstention of the Bureau's Claims for Equitable Relief and a Stay of its Damages Claims.

The Bureau grounds its argument against *Burford* abstention on a myopic view of this case that fails to consider the implications of having this Court issue a verdict that contradicts the determinations already made by the sovereign courts of Maryland. The Bureau asserts that this case presents solely a question regarding enforcement of the federal Consumer Financial

Protection Act ("CFPA").[1] In so doing, the Bureau glosses over significant state law considerations. For example, the Bureau argues against *Burford* abstention because it contends "state law requirements simply provide the factual backdrop for the Bureau's claims."[2] It also argues that the litigation of its claims "would not disrupt state efforts to establish a coherent policy with respect to structured-settlement transfers." [3]

Contrary to the Bureau's argument, state law does more than provide the "requirements" for approving the transfer of structured settlement rights at issue in this case. State law provides an adjudicative procedure before the Maryland Courts for the authorization, and thus, validation of those transfers. Let there be no mistake about this point: Under Maryland law, each of the transfers at issue in this case are valid and enforceable, because a Maryland court has made a factual determination that the parties to the proceeding before it met the requirements mandated by Maryland law for the valid and enforceable transfer of structured settlement payment rights. The Bureau does not seek to rescind those transactions (nor can it). Yet, the thrust of the Bureau's action is to prove facts contradicting those found by the Maryland Courts approving those transfers, and to seek damages, which would nullify the economic terms of the transactions approved by the Maryland Courts.

Striking is the Bureau's argument that its action "would not disrupt state efforts to establish a coherent policy with respect to structured-settlement transfers."[4] To the contrary, if this Court were to find in the Bureau's favor on its claims, then the third-party insurers who are making payments to the transferees, as approved by the Maryland Courts, would be faced with

[1] Opposition Brief, (Dkt. No. 23 at 7) ("Indeed, the only claims in the lawsuit are for violations of the CFPA, a federal statute.).
[2] *Id. at* 4.
[3] *Id.*
[4] *Id.*

the *Hobson's* choice of deciding whether to continue making those payments, or, cease making the payments because this Court has found the Defendants' actions giving rise to the transactions violated Federal law. Should those insurers cease making payments, that would negatively impact third-parties who purchased the structured settlement payment rights for value based on the Maryland Court orders approving the transfers and subsequent assignment of those rights. An award of "damages" or disgorgement would fundamentally alter the economics of the transaction approved by the Maryland Courts.

This is not a circumstance, however, where federal law specifically regulates the transactions at issue. Indeed, the Bureau concedes that its Complaint does not allege that the transfers of structured settlement payment rights is an extension of credit or involves the servicing of a loan.[5] Nor does the Bureau allege that structured settlements or structured-settlement transfers are extensions of credit regulated by federal law.[6] Instead, this is a circumstance where the Bureau is utilizing federal law as a means to re-litigate the factual underpinning of a state regulatory process that has already made a conclusive determination of not only the facts, but the fairness of the transaction. A ruling in favor of the Bureau on its claims would impose potentially different standards for the enforceability of transactions involving the transfer of structured settlement rights, thereby potentially disrupting the regulatory scheme enacted by the Maryland General Assembly for enforcement of structured settlement payment rights.

**1. The States Have Primary Responsibility for Regulating Transfers of Structured Settlement Payment Rights.**

[5] *Id.* at 19.
[6] *Id.*

The Bureau concedes in its Complaint that the states, and not the federal government, regulates the transfer of structured settlement payment rights. [7] As the Bureau itself states, "[f]orty-nine states have enacted Structured Settlement Protection Acts (SSPAs) that set forth requirements for structured-settlement transfers."[8] There is no federal structured settlement protection act, only an ancillary tax provision included in the Internal Revenue Code. This provision mandates a 40% excise tax on structured settlement transfers that were not approved under applicable state structured settlement protection acts.[9] Though federal tax law touches upon the tax implications of a structured settlement transfer, it also reiterates that state law governs approval of such transfers.[10]

Only a few states, such as Maryland, require persons transferring their structured settlement payment rights to receive independent professional advice before approving the transfers.[11] The standards used in determining the nature and adequacy of independent professional advice given to payees varies by state.[12]

Irrespective of those differences, this case focuses on the Defendants' actions in Maryland. The Bureau's Opposition does not dispute that is the case.[13] When the acts giving

[7] Complaint, ¶21.
[8] *Id*.
[9] IRC § 5891
[10] IRC § 5891(b)(2)(B), (b)(3), and (b)(4).
[11] Other states include – Alaska, ALASKA STAT. § 09.60.200 *et. seq.* (2003); Delaware, DEL. CODE ANN, tit. 10. § 6601 *et seq.* (2000); Florida, FLA STAT. ANN. § 626.99296 (2016); Louisiana, LA REV. STAT. ANN. §9.2715 (2001); Maine, ME. REV. STAT. ANN, tit. 24-a. § 2241 *et. seq.* (1999); Massachusetts, MASS. GEN. LAWS ANN, Ch. 231C § 1 *et. seq.* (2000); Michigan, MICH. COMP. LAWS ANN, § 691.1191 *et. seq.* (2006); Minnesota, MINN. STAT. ANN. § 549.30 (1999); North Carolina, N.C. GEN. STAT. ANN. § 1-543.10 *et. seq.* (1999); and Ohio, OHIO REV. CODE ANN. § 2323.58 (2000).
[12] Indeed, states such as Georgia, Indiana, Kentucky, Tennessee, and West Virginia have SSPAs that do not even require that the payee be given notice of a right to obtain independent professional advice. *See* Daniel W. Hindert and Craig H. Ulman, *Transfers of Structured Settlement Payment Rights: What Judges Should Know About Structured Settlement Protection Acts*, 44 No. 2 Judges' J. 19 (2005).
[13] *See* Access Funding Memo. (Dkt. No. 14, p. 1) ("While the Bureau's Complaint references the Access Funding Defendants' alleged business operations in each of the 50 states, its only factual allegations pertain to the Access Funding's business operations in Maryland…").

rise to the Complaint occurred, the Maryland Structured Settlement Transfer Act, Md. Code, Cts. & Jud. Proc. § 5-1101 *et seq.* (the "Maryland Act"), permitted a Maryland Circuit Court, in the exercise of its discretion, to authorize the transfer – which it did – after making specific factual findings, including that the "transfer is necessary, reasonable, or appropriate," and "the payee received independent professional advice regarding the legal, tax and financial implications of the transfer."[14]

To establish its claims against the Access Funding Defendants, the Bureau must do more than simply "refer" to the state law requirements as a "factual backdrop" for its claims. The Bureau must re-litigate the issues, and have this Court come to different conclusions than those made by the Maryland Courts. In so doing, this Court will be potentially interjecting into Maryland's established regulatory scheme potentially new and different standards for the approval of structured settlement transfer payment rights.

Accordingly, the circumstances of this case fall squarely within the analytical construct for application of *Burford* abstention, which is 'not [a] rigid pigeonhole[] into which federal courts must try to fit cases.' Rather, 'it reflect[s] a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes.'"[15] This Court should therefore abstain from deciding the Bureau's equitable claims for relief and stay this action with respect to the legal claims for relief under the *Burford* abstention doctrine.

**2. The Bureau's attempt to distinguish case law applying *Burford* abstention is unpersuasive.**

In *Johnson v. Collins Entm't*, 199 F.3d 710 (1999), the Fourth Circuit determined that the federal court should have applied *Burford* abstention in a context with important parallels to the

[14] *Id.* at §5-1102(b).
[15] *Johnson v. Collins Entm't*, 199 F.3d 710 (1999) (*quoting Pennzoil, Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n. 9 (1987).

case at bar. Like this case, *Johnson* involved federal statutory claims. The defendants removed the case to federal court based on the existence of federal RICO claims. Though the *Johnson* case included state law claims as well as the federal RICO claims, the Fourth Circuit emphasized that there were disputed questions under state law that would affect a federal court's adjudication of the federal RICO claims.[16] The Bureau attempts to distinguish *Johnson*, arguing "[t]he claims at issue were governed by state law that the state courts had not definitively addressed."[17]

That distinction offers no help to the Bureau. While the Fourth Circuit noted that the district court in *Johnson* would have to "'try[] to predict how the South Carolina Supreme Court would decide" disputed issues "'without definitive state court guidance,'"[18] there was no suggestion by the Fourth Circuit that the district court should ignore the state court's determinations, which the Bureau seeks to have this Court do.

Moreover, this case involves disputed questions about the meaning of the Maryland Act and the preclusive effect of the state court judgments. Finally, the Fourth Circuit in *Johnson* noted that the underlying industry at issue (gambling/regulation of video poker) was regulated "by a variety of legislative, administrative, and judicial mechanisms" of the South Carolina state government.[19] Here, transfers of structured settlement payment rights (1) are regulated by the Maryland Act, (2) require state court adjudication and approval of the transfers, and (3) under current law, also fall within the purview of the Maryland Attorney General to promulgate regulations and institute litigation for alleged violations of the Maryland Act

---

[16] *Johnson*, 199 F.3d at 728 ("For example, the state courts have not yet determined whether plaintiffs' gambling losses can constitute an "unlawful debt" actionable under RICO").
[17] Opposition Brief (Dkt. No. 23 at 5).
[18] *Id.* (quoting *Johnson*, 199 F.3d at 720).
[19] *See Johnson*, 199 F.3d at 715.

In *First Penn-Pac. Life Ins. v. Evans*, 304 F.3d 345 (4th Cir. 2002), the Fourth Circuit upheld the District Court's application of *Burford* abstention in the context of the life insurance industry.[20] This case also involved a potential undermining of underlying state court orders.[21] The Bureau tries to distinguish *First Penn-Pac. Life* by noting that the states have long been primarily responsible for regulating the insurance industry and adding in conclusory fashion that that a state receivership proceeding is complex.[22] As discussed above, the transfer of structured settlement payment rights has been traditionally regulated by states through the enactment of state statutes and adjudication in state courts. Moreover, the Fourth Circuit in *First Penn-Pac. Life* also noted that *Burford* abstention is especially applicable where concurrently-pending state court litigation is instituted by a state administrative agency like the Maryland Consumer Protection Division.[23] Further, "it is relevant that the relief previously obtained…was granted by the Circuit Court pursuant to state law…."[24] Here too, there are underlying Circuit Court judgments approving the structured settlement transfers at issue, and the Circuit Courts entered those judgments pursuant to the Maryland Act.

The Bureau's discussion of *Pomponio v. Fauquier County Bd. Of Supervisors*, 21 F.3d 1319 (4th Cir. 1994), further evidences the appropriateness of a *Burford* abstention. Similar to the Bureau's treatment of *First Penn-Pac. Life*, its argument as to *Pomponio* is rooted in the idea that land-use and zoning are functions of state and local governments.[25] Again, the Bureau ignores the fact that the transfer of structured settlement payment rights is regulated by the states, including Maryland, and not the federal government.

---

[20] *See First Penn-Pac. Life Ins.*, 304 F.3d at 346.
[21] *Id*. at 347.
[22] Opposition Brief (Dkt. No. 23 at 6).
[23] *First Penn-Pac. Life Ins.*, 304 F.3d at 351.
[24] *Id*.
[25] Opposition Brief (Dkt. No. 23 at 7).

**B. Preclusion law principles mandate that the final enrolled state judgments enjoy full faith and credit and the Bureau's Opposition fails to demonstrate otherwise.**

As has already been briefed, the Full Faith and Credit Act, 28 U.S.C. § 1738 (the "Act") is made applicable in this case by Maryland's (1) collateral-estoppel principles, and (2) the bar on collateral attacks on final enrolled judgment.[26] The Act requires a federal court to afford state court judgments the same respect that it would receive in the state courts of Maryland.[27] The thrust of the Bureau's argument against the application of the Full Faith and Credit Act is two-fold: (1) the Bureau was not a party to the prior proceedings approving the transfer of structured settlement payment rights, and thus, it had no opportunity to be heard in the prior proceeding; and (2) the issues in the Bureau's Complaint have not been previously decided.[28]

With respect to the Bureau's first argument, the question is not whether the Bureau was an actual party to the prior proceedings or had the opportunity to appear and be heard in the prior proceeding. Rather, the question is whether the Bureau was in privity with the parties to the prior action, namely the various payee consumers. The Bureau concedes that the parties to the prior proceeding need not be identical; only that "the relationship between the party to the original suit and the party sought to be precluded in the later suit" must be "sufficiently close to justify preclusion."[29]

The Bureau argues that its relationship to the consumer is not sufficiently close because it has "a statutory obligation to enforce the CFPA."[30] The Bureau also argues that the "consumers involved in the prior state-court proceedings did not fully represent the Bureau's interests, nor

---

[26] Access Funding Defendants' Memo, pp.16-25.
[27] Access Funding Defendants' Memo, p.17 (citing *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 373 (1996).
[28] Opposition Brief (Dkt. No. 23 at 7).
[29] *Id.* at 9-10.
[30] *Id.* at 10 (citing 12 U.S.C. § 5564(a)-(b)).

did they have an incentive to do so."[31] The Bureau's arguments miss the point, because the Bureau attempts to sweep discrete factual and legal questions at issue in this case under the proverbial rug of the CFPA. Concededly, the consumers in the state court proceedings had no interest in enforcing the federal CFPA, but that does not render application of collateral estoppel inapplicable to the facts and legal issues in this case under Maryland law – particularly with respect to the Bureau's request for damages and disgorgement of alleged profits.

Collateral estoppel is a doctrine of issue preclusion – not claim preclusion. Issues of fact or law that are actually litigated and determined by a court, which are essential to the judgment, are conclusive in subsequent actions between the parties and their privies. [32] The issues that were decided by the Maryland courts, and which were essential to their judgments approving the transfer of structured settlement transfers concerned: (1) whether the transfer was necessary, reasonable, or appropriate under the circumstances of the case; (2) whether the transfer would subject the payee, its dependents or both to undue or unreasonable hardship; (3) whether the payee obtained independent professional advice regarding the legal, tax and financial implications of the transactions; and (4) the transferee disclosed to the payee the discounted present value of the transaction.[33] Maryland Court judgment conclusively establishes that by complying with the requirements of Maryland law, the transactions transferring structured settlement payment rights were fair to the payees under the circumstances of each case.

As the Access Funding Defendants noted in their Opening brief, the Bureau is asserting in this action essentially the same legal right to damages and disgorgement remedies that the payees would assert if they brought a claim against defendants arising out of the same facts and

---

[31] *Id.* at 10.
[32] *Garrity v. Maryland State Bd. Of Plumbing*, 135 A.3d 452, 458 (Md. 2016).
[33] Md. Cts. & Proc. § 5-1102(b).

circumstances giving rise to the Bureau's claims.[34] The Bureau does not address this point in its Opposition. Because the Bureau represents the same legal rights and interest in damages and other forms of equitable relief as the payees have for such relief, it is in privity with the payees, and thus had the same opportunity as the payees to be heard on the legal and factual issues pertinent to the Maryland Court's judgments approving the transfer of structured settlement rights.

Indeed, the payees (consumers) had an incentive to ensure that the court determined these issues. Moreover, application of the collateral estoppel doctrine does not require that the proceeding be "adversarial," only that the issues be adjudicated, in the sense that the Court is presented with evidence and determines the facts and legal issues presented.[35]

With respect to the Bureau's second argument that the issues in its Complaint have not been previously decided, there are two responses. First, issues relating to whether the structured settlement transfers were properly approved have been previously decided by the state courts.

Secondly, the issues that the Bureau seeks to litigate in this action were decided by the Maryland Courts. The Bureau's arguments are inconsistent. In one respect, it argues that "state-law requirements" provide "the factual backdrop for the Bureau's claims."[36] On the other hand, it argues that it intends to prove in this case that Smith violated the CFPA by deceiving consumers by "holding himself out as providing independent advice" when in fact he had not provided that service.[37] The Bureau, however, cannot escape the fact that the state courts found Smith had, in fact, provided consumers with independent professional advice. That issue has

[34] Access Funding Memo. (Dkt. No. 14 at 21).
[35] *Id.*
[36] Opposition Brief (Dkt. No. 23 at 4).
[37] *Id.* at 9.

been conclusively determined and is fatal to the Bureau's claim. As is the determination by the Maryland Courts that the transactions were fair to the payees.

**C. The Bureau's Complaint constitutes an impermissible collateral attack on State-Court judgments.**

The Bureau does not contest that Maryland law bans collateral attacks on enrolled judgments. Nor does the Bureau assert that it has not pled extrinsic fraud, which would permit the collateral attack of an enrolled judgment. The Bureau argues that "only in the event relief inconsistent with these judgments is entered [by this Court] would their finding be at issue."[38] That argument, however, disregards Maryland law on the issue.

The rule against collateral attacks of a judgment under Maryland law "prevents a litigant from pursing a subsequent action that is predicated upon the impeachment of a prior judgment." *Bryan v. Muffoletto*, No. 13-C-04-60524, 2006 WL4758297* (Howard County, Sept. 28, 2006); *Klein v. Whitehead*, 40 Md. App. 1, 20 (1978). The Court of Appeals in *Klein* addressed a situation where a trustee in bankruptcy brought an action against those he alleged had tortuously, and fraudulently brought civil proceedings against the debtor. *Klein*, 40 Md. App. at 22. In so doing, the Trustee did not seek to vitiate the earlier proceeding or to annul the prior confessed judgment against the debtor. *Id.* Instead, the Trustee sought to obtain "civil damages against those whom he accuses as the tortfeasors, the successful suitors in the prior proceeding and their attorneys." *Id.*

The Court of Appeals held that such an action was barred by the collateral attack doctrine. In so doing, the Court said the law "is clear, and quite well settled, . . . that such an action . . . amounts to and is regarded as a collateral attack upon the prior judgments themselves,

[38] Opposition Brief (Dkt No. 23 at 11).

and is generally prohibited." *Id.* In so doing, the Court approved of the following language from Freeman on Judgments (§ 28) as cited in *Nicholson v. Nicholson*, 15 N.E. 223, 226 (Ind. 1888):

> The settled policy of the law forbidding that a matter once adjudicated shall be again drawn in issue while the former adjudication remains in force, does not permit the prosecution of an action for obtaining judgment by false and fraudulent practices, or by false and forced evidence.

*Id.*

Accordingly, the CFPB's Complaint is nothing less than a collateral attack on Maryland enrolled judgments, prohibited by Maryland law.

**D. The Bureau's Opposition does nothing to remedy its failure to state a claim as to Count IV or Count VI.**

The Access Funding Defendants' original memorandum argues, in the alternative to its *Burford* abstention and full faith and credit arguments, that Count IV and VI of the Complaint must be dismissed for failure to state a claim.

With respect to Count IV, the Access Funding Defendants note that the Bureau fails to state a claim against Charles Smith ("Smith") because (1) he did not provide "financial advisory services" and therefore is not a "covered person" as those terms are defined under the CFPA, and (2) the CFPA's express practice of law exclusion bars the Bureau from prosecuting CFPA claims against an attorney.[39] Since the Bureau's claims against them are wholly derivative of its claim against Smith, and Count IV fails against the Access Funding Defendants.

With respect to the CFPA's practice of law exclusion, the Bureau argues that the Court should not treat Smith as though he were a lawyer for purposes of a CFPA claim, because "Smith did not provide legal advice or services to, or establish an attorney-client relationship with, any

[39] Access Funding Defendants' Memo, pp. 27.

Access Funding consumers…."[40] There is no question that Smith is a lawyer, barred in Maryland to practice law. The Bureau concedes as much.[41]

The Bureau does not allege or assert that Smith presented himself to the payees in any role other than as an attorney. What the Bureau is really complaining about is the level of service Smith allegedly provided the payees. But that is different than the reason for which he was engaged. It goes without saying that a lawyer who is engaged to provide legal advice for a client is engaged in the practice of law notwithstanding the lawyer's alleged failure to provide the requested advice or the lawyer's alleged negligent performance of those services. Here, the Maryland Act required the independent professional advisors to provide advice regarding "the legal, tax and financial implications of the transaction." Plainly, the payees retained Smith for the provision of the legal advice, and he accepted that engagement.

None of the exceptions to the exclusion for legal services under the CFPA apply.

The first instance where an attorney may hypothetically fall under the CFPA exists where that attorney provides a financial product or services that is *not part of its legal representation of clients.*[42] Here, there is no allegation in the Complaint that Smith either hid the fact that he was an attorney from the payees in a purposeful effort to act as a non-attorney consultant or advisor, or otherwise acted or presented himself in a manner inconsistent with being an attorney providing legal advice regarding transfers of structured settlement payment rights.

The second instance where an attorney might fall under the CFPA exists where that attorney has in fact acted as an attorney, but the aggrieved consumer was *not* the person who

---

[40] Opposition Brief (Dkt. No. 23 at 15).
[41] *Id.* at 15 ("Acknowledging Smith is an attorney).
[42] Access Funding Defendants' Memo, pp. 29 (citing *Consumer Financial Protection Bureau v. The Mortgage Law Group, LLP*, 157 F.Supp. 3d 814, 820 (W.D. Wis. 2016)

received legal services from that attorney.[43] This carve-out is inapplicable precisely because the opposite is alleged in the Complaint: Smith directly advised the allegedly aggrieved consumers.[44]

Finally, the third instance where the CFPA may be deemed applicable as to an attorney is where the CFPA identifies an enumerated consumer law or authority transferred under subtitle F or H.[45] Nowhere in the CFPA is (1) the Maryland Act, or (2) Maryland state consumer protection laws enumerated such that this carve-out would authorize the Bureau to pursue claims against Smith. Therefore, its claims against the Access Funding Defendants also fail.

The bulk of the Bureau's Opposition with respect to failures to state claims relate to Count I through Count IV (the counts relating to Smith and the other Defendants' derivative liability for their "substantial assistance" to Smith).[46] With respect to Count VI though, the Bureau's Opposition is as conclusory as the Complaint's allegations.[47] The Access Funding Defendants' original Memorandum identified the language of the CFPA that provides what an "unfair, deceptive, or abusive act or practice" is, and identifies the reasons why the Complaint fails even accepting as true all facts pled.[48] The Bureau cites to portions of the Complaint that describe an alleged cash advance provided by the Access Funding Defendants to consumers. However, it fails to plead the facts necessary to state a claim for "unfair, deceptive or abusive acts" such as (1) how the act causes substantial injury to consumers, or (2) how any purported substantial injury is not outweighed by the benefits to the consumers.[49] Instead, the Bureau

---

[43] Access Funding Defendants' Memo, pp. 30 (citing *Consumer Financial Protection Bureau v. Fredrick J. Hanna & Associates, P.C.*, 114 F.Supp 3d 1342, 1353 (N.D.Ga 2015) (allowing the Bureau's complaint to proceed against law firm because the law firm provided legal services to its creditor client, not to the consumer which the Bureau's lawsuit sought to protect).
[44] Access Funding Defendants' Memo, pp. 31.
[45] 12. U.S.C. § 5517(e)(3).
[46] *See generally* Opposition Brief (Dkt. No. 23 at 17-23).
[47] Opposition Brief (Dkt. No. at 22-23).
[48] Access Funding Defendants' Memo., pp.31-32.
[49] *See 12. U.S.C.* § 5531(c)(1).

dismissively takes the position that providing these adequate factual details about alleged consumer transactions and experiences "is of no moment."[50] To the contrary, it makes the Complaint subject to dismissal for failure to plead facts that would make the Bureau's claims possible.

**CONCLUSION**

WHEREFORE, for the reasons detailed in this Reply as well as in the previously filed Motions to Dismiss and accompanying Memorandums, the Access Funding Defendants request that this Honorable Court enter an Order awarding the relief requested in the Access Funding Defendants' Motion to Dismiss.

Respectfully submitted,

*/s/ Andrew J. Chiang*
Andrew J. Chiang
O'HAGAN MEYER, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8602
Email: achiang@ohaganmeyer.com

and

Charles M. Sims
*(Pro Hac Vice to be submitted)*
O'HAGAN MEYER, PLLC
411 East Franklin Street, Suite 500
Richmond, VA 23219
Telephone: (804) 403-7111
Email: csims@ohaganmeyer.com

*Attorneys for Access Funding, LLC, Access Holding, LLC, Reliance Funding, LLC, Lee Jundanian and Raffi Boghosian*

[50] Opposition Brief (Dkt. No. at 17).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of March 2017, a true copy of the foregoing *Reply* was served on counsel of record via the Court's electronic filing system.

*/s/ Andrew J. Chiang*
Andrew J. Chiang
O'HAGAN MEYER, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8602
Email: achiang@ohaganmeyer.com