IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU | * | |
| | * | |
| v. | * | Civil No. 16-cv-03759-JFM |
| | * | |
| ACCESS FUNDING, LLC, ET AL. | * | |

\*\*\*\*\*\*

**MEMORANDUM**

Plaintiff Consumer Financial Protection Bureau ("CFPB") files suit against defendants

Access Funding, LLC, Access Holding, LLC, Reliance Funding, LLC, Lee Jundanian, Raffi

Boghosian, and Michael Borkowski (collectively the "Access Funding Defendants") and

attorney Charles Smith ("Smith"), seeking a permanent injunction, damages, disgorgement, and

payment of redress, civil penalties, and costs for violation of various provisions of the Consumer

Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5481 *et. seq.*, relating to the transfers of

structured settlements. Now pending are the defendants' motions for *Burford* abstention and a

stay, or in the alternative, to dismiss. The parties have fully briefed the issues, and no oral

argument is necessary. *See* Local Rules 105.6. For the reasons set forth below, the motions for

*Burford* abstention and a stay are denied. The motions to dismiss are granted as to Counts I-IV,

but denied as to Count V.[1]

**BACKGROUND**

At the motion to dismiss stage, this court accepts as true the facts alleged in the

complaint. *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2001). Plaintiff CFPB is an "agency

---

[1] The complaint mistakenly refers to Count V as "Count VI." (ECF No. 1, p. 15).

of the United States charged with regulating the offering and providing of consumer-financial products and services" under certain federal statutes, including the CFPA (ECF No. 1, ¶ 5). Defendant Access Funding, LLC is a limited-liability company with a principal place of business in Chevy Chase, Maryland that purchased payment streams from structured settlement holders— a practice known as "structured settlement factoring"—from December 2012 to November 2015. *Id.* at ¶ 6. Defendant Access Holding, LLC is the "sole and managing member of Access Funding and is legally responsible for the liabilities of Access Funding." *Id.* at ¶ 8. Defendant Reliance Funding, LLC is a "successor in interest to Access Funding," as Access Funding sold all of its assets to Reliance Funding upon being notified of the CFPB investigation that forms the basis for this matter. *Id.* at ¶ 9. Defendant Michael Borkowski ("Borkowski") is the CEO of Access Funding and has been since May 2014. *Id.* at ¶ 12. Prior to becoming CEO, Borkowski was the CFO and COO of Access Funding. *Id.* Defendant Raffi Boghosian ("Boghosian") is the COO of Access Funding and has been since May 2014. *Id.* at ¶ 11. Defendant Lee Jundanian ("Jundanian") was the CEO of Access Funding from February 2013 to May 2014 and an advisor to Access Funding thereafter. *Id.* at ¶ 10. Jundanian, Boghosian, and Borkowski each have "an ownership interest in Access Funding and [each] helped develop Access Funding's business model and manages its business." *Id.* at ¶ 10-12. Defendant Charles Smith is "a Maryland-based attorney who provided purportedly independent professional advice for almost all Maryland consumers who made structured-settlement transfers to Access Funding." *Id.* at ¶ 13.

This dispute involves the sale of structured settlements. Structured settlements are "established by legal judgments or settlements of tort claims to provide recipients with an arrangement for periodic payment of damages for personal injuries" and are "often used to ensure the financial well-being of victims who have suffered long-term physical or cognitive

2

harm." *Id.* at ¶ 19. From its founding in December 2012 until November 2015, Access Funding's principal business was structured-settlement-factoring. *Id.* at ¶¶ 14, 18. Structured settlement factoring is the offering to "recipients of structured settlements the opportunity to transfer a portion of their future payment streams in exchange for a discounted immediate lump sum." *Id.* at ¶ 20. Access Funding conducted approximately seventy percent of its transfers in Maryland. *Id.* at ¶ 31.

Maryland is one of forty-nine states that have enacted Structured Settlement Protection Acts ("SSPAs") in order to protect individuals who have suffered long-term physical or cognitive harm from entering into transactions that are not in their best interest. *Id.* at ¶ 21. Maryland's SSPA requires structured settlement factoring companies to obtain court approval before purchasing a payment stream. *Id.* at ¶ 22. It also requires the court to "find that the consumer has consulted with an independent professional advisor ("IPA") before it can approve a structured-settlement transfer." *Id.* at ¶ 29. "During the relevant period, Maryland's SSPA required that an IPA advise [each consumer] on the financial, legal, and tax implications of a transfer. Md. Cts. & Jud. Proc. §§ 5-1102(b)(3)(2000)." *Id.* at ¶ 32.

The complaint alleges that Access Funding aggressively pursued structured settlement holders in the hopes of purchasing their settlements. Their aggressive business practices included searching court records to identify consumers who had previously transferred a portion of their structured settlements, then contacting those consumers and enticing them to transfer the remainder of their settlements to Access Funding; searching court records for pending filings by other structured-settlement-factoring companies, then contacting the consumers named in those filings and enticing them to back out of the impending transfers and enter into deals with Access Funding instead; pressuring individuals who had already entered into transactions with Access

3

Funding to transfer to Access Funding all of their remaining expected payments; and more generally pursuing structured settlement holders via aggressive phone and mail solicitations. *Id.* at ¶¶ 23-26. It is not this general pattern of aggressive business practices, however, that forms the basis for the complaint.

The complaint is based instead on two of Access Funding's specific business practices. First, the complaint alleges that Access Funding violated the CFPA by abusing consumers with respect to the payment of advances. It alleges that after contacting consumers and offering to purchase their settlements, Access Funding entered into advance agreements with many of them, pursuant to which it advanced their lump sum payments while they waited to complete their paperwork and finalize their transfers. *Id.* at ¶ 41. "These advances often consisted of $500 for signing a contract, $1,000 when a court date was set, and another $1,000 when a judge approved the sale." *Id.* The advance agreements notified the consumers that they would be liable to repay the advances if they did not ultimately go through with the transaction, and that in order to keep the advances they would have to cooperate fully with the company in obtaining court approval for the transaction. *Id.* at ¶¶ 43, 78. Specifically, the complaint alleges that "consumers who could not otherwise repay the advances were told that they were obligated to go forward with the transfer even if they realized it was not in their best interest." *Id.* at ¶ 79. It further alleges that the consumers, many of whom were "lead-poisoning victims with cognitive impairments," *id.* at ¶ 28, "did not understand the risks or conditions of the advances, including that the advances did not bind them to complete the transactions." *Id.* at ¶ 80. Jundanian, Boghosian, and Borkowski each allegedly "participated in establishing Access Funding's policies related to advances, including the terms of the advances and how they were presented to consumers, and dictated when Access Funding would issue advances to consumers." *Id.* at ¶ 42.

4

The second basis for the complaint is Smith's conduct as an IPA. The complaint alleges that Access Funding used Smith as the IPA for "almost all of its Maryland transactions." *Id.* at ¶ 33. Although Smith was supposed to be an independent advisor, he in fact had both personal and professional ties to Access Funding. *Id.* at ¶ 34. Specifically, Access Funding paid him $200 for each IPA letter he provided. *Id.* at ¶ 39. Access Funding would email Smith, "telling him when and at which phone number to contact consumers" and would "courier[] to consumers prepaid cell phones that Smith used to contact the consumers." *Id.* at ¶ 36. Smith would then get on the phone with consumers to provide what was supposed to be "independent professional advice" regarding the "legal, tax, and financial implications" of the transfers. *Id.* at ¶ 46. In fact, the calls would last only a few minutes and involved Smith doing little more than reciting the terms of the contract and asking the consumers whether they understood them. *Id.* at ¶ 37. Afterwards, Smith would send an affidavit to the consumers for them to sign, which stated that they had been "advised to seek independent professional advice in connection with the transfer" and in fact had received such advice and still desired to proceed with the transfer. *Id.* at ¶ 54. Although the consumers did not know that Smith had ties to Access Funding, Jundanian, Boghosian, and Borkowski were aware of this arrangement. *Id.* at ¶ 35.

On November 21, 2016, the CFPB filed a complaint in this court alleging three violations of the CFPA by Smith and two violations of the CFPA by the Access Funding Defendants. Each of the claims against Smith and one of the claims against the Access Funding Defendants arise out of Smith's conduct as an IPA. Specifically, the CFPB alleges that Smith engaged in unfair (Count I), deceptive (Count II), and abusive (Count III) acts and practices, in violation of 12 U.S.C. §§ 5531(a), (b), and (d) and that the Access Funding Defendants substantially assisted Smith's unfair, deceptive, and abusive acts (Count IV), in violation of 12 U.S.C. § 5536(a)(3).

5

The fifth claim arises out of the Access Funding Defendants' conduct with respect to the advances. Specifically, the CFPB alleges that the Access Funding Defendants engaged in abusive acts and practices, in violation of 12 U.S.C. § 5531(d)(2)(a). On January 30, 2017, defendants Access Funding, Borkowski, and Smith, each filed a motion for *Burford* abstention and a stay, or in the alternative, to dismiss each of the five counts for failure to state a claim upon which relief can be granted.

## STANDARDS

### I.   PRUDENTIAL AND JURISDICTIONAL BARS

Before turning to defendants' motions to dismiss the complaint for failure to state a claim upon which relief can be granted, I must determine whether a federal court has jurisdiction to hear this case. *Jones v. American Postal Workers Union*, 192 F. 3d 417, 422 (4th Cir. 1999). Plaintiff bears the burden of establishing jurisdiction. *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). In determining whether plaintiff has carried that burden, the court "presumes that general allegations embrace those specific facts that are necessary to support the claim" and "accept as true…allegations for which there is sufficient factual matter to render them plausible on their face." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). And here, before determining the jurisdictional question raised by defendants' invocation of the collateral attack doctrine, I address their contentions that the prudential bars of *Burford* abstention and issue preclusion preclude me from hearing this case. *See Cioca v. Rumsfeld*, 720 F.3d 505 n.4 (4th Cir. 2013) (noting that prudential bars such as abstention represent the kind of threshold questions that may be resolved before addressing jurisdiction). Courts should exercise their discretion to abstain from deciding a case under *Burford* in a "narrow range of circumstances" in which "federal adjudication would unduly intrude upon complex state administrative processes."

6

*Martin v. Stewart*, 499 F.3d 360, 364, quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726 (1996). The proponent of issue preclusion bears the burden of establishing its elements. *Sedlack v. Braswell Services Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

## II.    FAILURE TO STATE A CLAIM

To adequately state a claim under Rule 12(b)(6), a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether the CFPB's claim has crossed "the line from conceivable to plausible," the court must employ a "context-specific inquiry," drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 680.  When performing this inquiry, the court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court need not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009).

## ANALYSIS

### I.    PRUDENTIAL AND JURISDICTIONAL BARS

Defendants argue that there are both prudential bars and a jurisdictional bar to the court hearing this case. First, defendants argue that the abstention doctrine set forth in *Burford v. Sun*

*Oil*, 319 U.S. 315 (1943), mandates that the court dismiss the CFPB's claims for equitable remedies and stay its claims for damages. Second, defendants argue that the doctrine of issue preclusion bars the CFPB from re-litigating the issues at the heart of its complaint—namely, whether Smith gave independent professional advice and whether the Access Funding transfers were fair and reasonable. Third, defendants argue that the collateral attack doctrine bars the CFPB from challenging final judgments of the Maryland state courts. For the reasons that follow, I find none of these three arguments persuasive and therefore determine that there is neither a prudential nor a jurisdictional bar to the court hearing this case.

### a. *Burford* Abstention

Defendants first argue that the court should abstain from hearing this case under *Burford* because the CFPB asks this court to come to a decision that would conflict with decisions of the Maryland state courts. The CFPB argues that this case is not one of the few in which the *Burford* abstention doctrine applies. I agree with the CFPB.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them" by Congress. *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976). The *Burford* doctrine relaxes this obligation, allowing federal courts to abstain from hearing cases in two very limited circumstances. First, courts may abstain where there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Id.* at 814. Second, they may abstain where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern. *Id.* "Abstention is the exception, not the rule." *Id.* at 813.

Neither of the circumstances in which *Burford* is appropriate is present here. First, there are no difficult questions of state law before the court. In fact, there are no questions of state law before the court. The only question before the court is how to interpret the Consumer Financial Protection Act of 2010, which is a question of federal law. (ECF No. 1, ¶ 1). Of the three cases defendants cite in support of their argument for *Burford* abstention, two involved federal courts that were asked to interpret state law. *See Johnson v. Collins Entertainment Co., Inc.*, 199 F.3d 710, 715 (4th Cir. 1999) ("The district court granted the injunction based on its interpretation of *state law* and ruled in plaintiff's favor on a question of *state unfair competition law*. In doing so, however, the district court improperly interfered with a state regulatory scheme whose design is at the heart of the state's police power. The district court should instead have abstained under the doctrine of *Burford* . . . .") (emphasis added); *First Penn-Pac. Life Ins. v. Evans*, 304 F.3d 345, 351 (4th Cir. 2002) ("*State law* also controls the instant dispute over the validity of a policy that may be a substantial asset of the receivership estate.") (emphasis added). The first rationale for *Burford* abstention was applicable in these cases because the courts were presented with difficult questions of state law. This case is far different because the court is asked to interpret federal law. Here the first rationale for *Burford* is simply not applicable.

Moreover, this court's review of this case will not disrupt Maryland's efforts to establish a coherent policy with respect to a matter of substantial public concern. The Maryland SSPA requires the sellers of structured settlements to obtain court approval before selling a settlement. (ECF No. 1, ¶ 29). This requirement reflects a policy decision that Maryland citizens should not be allowed to make ill-advised, uninformed decisions to sell structured settlements. Rigid enforcement of the CFPA—a federal statute meant to protect consumers from unfair, deceptive, and abusive acts and practices by individuals who provide consumer-financial products or

9

services—would do nothing to create confusion regarding this policy. 12 U.S.C. § 5531(a). If anything, the consumer protection rationale underlying the state and federal statutes is the same.

Defendants cite only one case where a court abstained under the second *Burford* rationale, that resolution of the federal claim would interfere with a state's attempt to establish a coherent policy. In *Pomponio v. Fauqier County Bd. of Sup'rs*, 21 F.3d 1319 (4th Cir. 1994), the plaintiff brought an 18 U.S.C. § 1983 claim, alleging that state officials had engaged in arbitrariness, made false statements, abused their authority, and engaged in other misconduct while administering local land and zoning laws. The court held that *Burford* abstention was appropriate—although the case involved an issue of federal law—because the plaintiff's argument:

> boil[ed] down to an assertion that his plan complied with the zoning laws, and the local authorities wrongfully disapproved his plan by misapplying the laws and by abusing their authority in the decision-making process. In *NOPSI v. Council of New Orleans*, 491 U.S. 350 (1989), the Supreme Court found *Burford* abstention inappropriate in part because the claim asserted there was not "a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant *state-law* factors." 491 U.S. at 362. [Plaintiff's] claim is just such a claim, and under the Supreme Court's precedent and our own, the *Burford* abstention doctrine applies in this case.

*Id.* at 1328. The second rationale for *Burford* was applicable in *Pomponio* because the plaintiff was arguing that the defendant—a state actor who was supposed to be the arbiter of its own state law—had misapplied that law. The court determined that by hearing such a case it would necessarily disrupt the state's efforts to establish a coherent policy with respect to its own state law. Here, unlike in *Pomponio*, the CFPB does not argue that the defendants violated federal law by improperly applying state law. This case would be like *Pomponio* if the CFPB were suing the state judges who approved the settlements at issue, arguing that they violated federal law by

10

approving those settlements. The CFPB makes no such argument. Here the federal claim stands on its own. Thus, the second rationale for *Burford* is equally inapplicable.

Ultimately, defendants seem to be asking this court to abstain from hearing this case under *Burford* based on a belief that it is inappropriate for a federal court to hear a case that might impact a state administrative scheme. Neither the Supreme Court nor the Fourth Circuit has taken such an expansive view of *Burford*. Indeed, "while *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a potential for conflict with state regulatory law or policy." *NOPSI*, 491 U.S. 350, 362 (1989). Congress enacted the CFPA to ensure that federal law protects consumers from unfair treatment by financial advisers. The existence of a state administrative scheme whose requirements reflect a similar concern does not provide this court with a reason to abstain from enforcing federal law if it has been violated. Accordingly, I will not abstain from hearing this case under *Burford*.

### b. Issue Preclusion

Defendants next ask the court to find that the CFPB is barred by the doctrine of issue preclusion from relitigating two issues that were decided in Maryland state court: whether Smith provided independent professional advice and whether the structured settlement transfers were fair to the consumers. The CFPB argues that three of the four requirements for issue preclusion are not present and that it would therefore be inappropriate to apply the doctrine in this case. I find that at least two of the requirements for issue preclusion are not present and therefore agree with the CFPB.

The Full Faith and Credit Act, 28 U.S.C. § 1738, dictates that a federal court must give a state court judgment the same preclusive effect it would be given in the courts of the state that

11

rendered the judgment. Therefore, this court must give any Maryland judgments the same preclusive effect they would be given in Maryland state court under Maryland law. Under Maryland law, a party is precluded from relitigating an issue when:

> (1) the issue previously decided was identical to the one presented in the current action; (2) there was a final judgment on the merits in the previous action; (3) the party against whom preclusion is sought to be applied was in privity with a party to the prior adjudication; and (4) the party against whom preclusion is sought to be applied was given a fair opportunity to be heard on the issue.

*Garrity v. Maryland State Board of Plumbing*, 135 A.3d 452, 459 (Md. 2016).

The issues presented in this case are closely related, if not identical, to those that were previously decided by final judgments of the Circuit Court for Prince George's County. Nevertheless, it would be inappropriate to apply the doctrine of issue preclusion in this case, as the CFPB was neither a party to those cases nor in privity with a party to those cases, and therefore has not yet been given a fair opportunity to be heard on the issues currently before the court.

Under Maryland law, "the analysis of privity for purposes of collateral estoppel focuses on whether the interests of the party against whom estoppel is sought were fully represented, with the same incentives, by another party in the prior matter." *Matthews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 628 (2013). "Maryland cases analyzing the concept of privity within the rules of collateral estoppel place great emphasis on the procedural rights of the party against whom the doctrine is to be invoked." *Warner v. German*, 100 Md.App. 512, 520 (Md. App. 1994). "In discerning whether a party's procedural rights have been addressed adequately, a court may focus on the nature of the interests binding the two parties, and, correspondingly, whether they share the same incentive in their separate litigation attempts." *Id.* at 521. "This priority is reflected in the requirement of collateral estoppel that a second party cannot be

12

covered by a previous decision unless he or she had an appropriate opportunity to appeal the first decision." *Id.*

The CFPB was not fully represented, by a party with the same incentives, in the state cases. The CFPB has an incentive to curb consumer fraud by ensuring that financial advisers do not take advantage of potentially vulnerable consumers. The parties to the state cases were the consumers and Access Funding. The consumers came before the court as willing participants in the prospective settlement transfers, whose primary incentive was to have those transfers approved. It would be circular to find that the consumers adequately represented the interests of the CFPB when the very reason the CFPB exists is to represent individuals like the consumers who are not positioned to adequately represent themselves. Moreover, no one suggests that the CFPB had any opportunity to appeal the decisions in the state cases.

Defendants argue that the CFPB was in privity with the consumers for two reasons. First, defendants argue that the CFPB is seeking remedies that "will inure to the consumers' benefit." (ECF No. 13, p. 20). Second, defendants argue that the CFPB "is asserting in this action essentially the same legal right to damages and disgorgement remedies that the consumers would assert if they brought a claim against defendants arising out of the same facts and circumstances giving rise to the Bureau's claims." (ECF No. 13, p. 21). *See also* ECF No. 26, p. 10 ("Plaintiff represents the same legal rights and interest in damages and other forms of equitable relief as the consumers have for such relief").

Even assuming the CFPB is seeking remedies that will inure to the consumers' benefit and is asserting the same legal rights that the consumers would assert if they brought a claim against defendants, neither fact is relevant to determining whether the CFPB was in privity with the consumers under Maryland law. In fact, defendants' forward-looking arguments are at odds

13

with the law of issue preclusion, which is inherently backward-looking. The question is not whether the consumers *would* assert similar claims or *will* benefit if the CFPB makes out its claims, but whether the consumers have *already* adequately represented the CFPB's interests such that it can be said that the CFPB has already had its day in court.

Although, as defendants point out, the mutuality requirement has been relaxed, this relaxation has its bounds. Privity does not exist wherever two parties make similar arguments or assert claims that may benefit each other. The CFPB's interests were not actually and efficiently protected by the consumers in the state cases. As a result, the CFPB was not in privity with them, and has not yet had a chance to fully and fairly litigate the issues before the court. Accordingly, the doctrine of issue preclusion does not preclude this court from deciding the issues presented in this case.

### c. Collateral Attack

Defendants next argue that the collateral attack doctrine deprives this court of jurisdiction over the CFPB's claims. Defendants argue that the CFPB is essentially trying to relitigate whether the structured settlement transfers should have occurred, in order to deny the force and effect of the judgments of the Maryland Circuit Courts that approved those transfers. The CFPB argues that the collateral attack doctrine is not yet at issue because the finality of judgments is only at issue when a court enters relief inconsistent with a prior judgment. I disagree with both parties' arguments. The resolution of this issue turns on whether the CFPB was in privity with the consumers. Because, as explained above, they were not, the collateral attack doctrine does not apply.

The CFPB's argument that the collateral attack doctrine is not yet before the court is plainly incorrect. Indeed, "while res judicata is concerned only with the effect of final judgments

and with their effect assuming them to be valid and enforceable, collateral attack includes judgments and orders of all kinds without regard to their finality and is concerned with the circumstances under which and the extent to which they may be impeached and shown to be invalid." *Klein v. Whitehead*, 40 Md.App. 1, 21 (Md. App. 1978). Thus, the reason the collateral attack doctrine does not apply in this case is not that the issue is not yet before the court.

For their part, defendants appear to conflate two distinct applications of the collateral attack doctrine. On the one hand, the collateral attack doctrine bars attempts by non-parties to *expressly* invalidate the judgment of a court rendered in a dispute between two other parties. Certain of the cases defendants cite involved this application of the doctrine. *See, e.g. Fisher v. DeMarr*, 226 Md. 509 (Md. 1961) (decedent's brothers and sisters sought to invalidate decedent's wife's divorce decree from a prior marriage, because they would have inherited the entirety of the decedent's estate had that decree been invalid and her marriage to decedent therefore also invalid); *Kent Island, LLC v. DiNapoli*, 430 Md. 348, 356 (Md. 2013) ("The present action, *Kent Island II*, was filed by Respondents, who were not parties to *Kent Island I*, on 23 December 2009 in the Circuit Court for Queen Anne's County. Respondents asked the Circuit Court for Queen Anne's County to invalidate the Consent Order entered in *Kent Island I*."). This case is unlike those cases, because the CFPB is not seeking to expressly invalidate any Maryland state court judgments. At most, the CFPB is seeking a judgment that would be inconsistent with the state court judgments.

The second application of the collateral attack doctrine bars attempts by *parties or privies* of parties to an original case to obtain judgments that would be inconsistent with judgments from

that prior case. Defendants Borkowski and Smith[2] cite the correct legal standard for this application of the doctrine:

> Judgments of a legally organized judicial tribunal, proceeding within the scope of its allotted powers, and possessing the requisite jurisdiction over the subject matter of the suit and the parties thereto, whether correct or erroneous, cannot be called in question *by the parties or privies* in any collateral action or proceeding.

*Id.* at 20 (emphasis added). *See also* Second Restatement of Conflicts § 94 ("Persons who are bound personally by the adjudication of litigated matters are (1) parties who were personally subject to the jurisdiction of the court which rendered the judgment; (2) persons in privity with a party, and (3) more rarely, persons who stand in a special relationship to a party or privy."). Certain of the cases defendants cite refer to this application of the doctrine. *See Johnson v. Johnson*, 265 Md. 327, 330-31 (Md. 1972) ("Nothing is more certain than the proposition that an appeal will not lie from a court's refusal to reopen a previous decision which has become final. To hold otherwise would lead to interminable litigation . . . The . . . court order of 22 March 1971 was entered in a case involving the same parties and dealing with the same issues . . . ."); *Klein v. Whitehead*, 40 Md.App. 1, 21 (Md. App. 1978) (trustee in bankruptcy sought to collaterally attack an earlier judgment entered against the bankrupt, with whom the court found he was in privity). Although the CFPB seeks a judgment that would be inconsistent with the state

---

[2] In its opening brief, Access Funding cites the wrong legal standard, arguing that collateral attacks are only allowed where either "(1) the court entering the judgment lacked jurisdiction or (2) the prevailing party, by some extrinsic or collateral fraud has prevented a fair submission of the controversy." (ECF No. 13, p. 22) (citing *Bland v. Hammond*, 935 A.2d 457, 463 (Md. App. 2007)). *Bland* was not a case about the collateral attack doctrine. In *Bland* the plaintiff sought to vacate a dismissal of his claim based upon the misconduct of his attorney. *Id.* at 459. Thus, *Bland* sets forth a standard for what type of fraud justifies reopening and vacating an enrolled judgment in a subsequent action between the original two parties to the judgment. It has no bearing on this case, where a non-party to the original action seeks to obtain a separate ruling that may be inconsistent with the enrolled judgment. In its reply brief, Access Funding makes the same arguments made by Borkowski and Smith, which arguments fail for the same reasons theirs do.

court judgments, this case is unlike the cases defendants cite because—as discussed above—the CFPB was neither a party, nor in privity with a party, to any of the original state court cases. In fact, while arguing that the first application of the collateral attack doctrine bars the CFPB's claim, defendant Borkowski goes so far as to admit that the CFPB was *not* in privity with any party to the state cases. He argues that "the Bureau was a stranger to each and every one of [the more than 150 enrolled judgments referenced in the Complaint]. None of the judgments challenged in this action affected either the status or the interest of the Bureau, let alone the Federal Government." (ECF No. 16, p. 6) This is true, but is fatal to defendants' claim. Defendants fail to cite a single case in which the court applied the collateral attack doctrine against a party like plaintiff, who was neither a party nor in privity with a party to an earlier case and who does not seek to expressly vacate an earlier judgment.

The collateral attack doctrine is not implicated every time the outcome of one case might impugn the validity of the outcome of a prior case. Separate parties litigate separate claims regarding the same facts all the time. Absent proof that a party to the second case was in privity with a party to the first case, such conflicts are not problematic. As discussed above, no relationship of privity exists in this case. Accordingly, I find that the collateral attack doctrine does not apply. Because there is no prudential or jurisdictional bar that prohibits this court from hearing this case, I proceed to consider the merits of defendants' argument that the complaint fails to state a claim upon which relief can be granted.

## II.     FAILURE TO STATE A CLAIM

Defendants raise three arguments as to why the CFPB's complaint fails to state a claim upon which relief can be granted. First, they argue that Counts I-IV of the complaint must be dismissed because Smith was not a "covered person" under the CFPA, and therefore the statute

17

does not apply to him. Second, they argue that Counts I-IV of the complaint must be dismissed because, as an attorney who was giving legal advice, Smith's conduct was excepted from the CFPA under the "practice of law" exclusion. Third, they argue that Count V of the complaint must be dismissed because the CFPB has done no more than offer conclusory allegations in support of that claim. I find that Smith is a "covered person" under the meaning of the CFPA, but that as an attorney who was giving legal advice, he falls within the statute's "practice of law" exclusion. Accordingly, I dismiss Counts I-IV. But because the CFPB has alleged Count V with sufficient specificity to state a claim upon which relief can be granted, I deny the motion to dismiss Count V.

### a. Counts I-IV: "Covered Person"

Defendants first argue that Counts I-IV of the complaint should be dismissed because Smith is not a "covered person" under the CFPA and therefore the statute does not apply to his conduct. The CFPB argues that Smith is a "covered person" under the plain meaning of the statute. I agree with the CFPB.

The CFPB alleges in Counts I-III that Smith engaged in unfair, deceptive, and abusive acts or practices, in violation of §§ 5531 and 5536 of the CFPA. Under § 5531(a):

> The Bureau may take any action authorized under part E to prevent a *covered person or service provider* from committing or engaging in any unfair, deceptive, or abusive acts or practices under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

(emphasis added). Under § 5536(a)(1)(B), "[i]t shall be unlawful for any *covered person or service provider* to engage in any unfair, deceptive, or abusive act or practice" (emphasis added).

The CFPB alleges in Count IV that the Access Funding Defendants substantially assisted in Smith's unfair, deceptive, and abusive acts. Under § 5536(a)(3):

It shall be unlawful for any person to knowingly or recklessly provide substantial assistance to a *covered person or service provider* in violation of the provisions of Section 5531 of this title, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided.

(emphasis added).

Thus, for Counts I-IV to survive defendants' motions to dismiss, Smith must be a "covered person or service provider." Because the CFPB does not claim that Smith is a "service provider," each of these claims is dependent upon Smith being a "covered person." Under § 5481(6), a "covered person" is "any person that engages in offering or providing a consumer financial product or service." Under § 5481(15)(A)(viii), one type of "financial product or service" is:

> providing financial advisory services . . . to consumers on individual financial matters or relating to proprietary financial products or services, including providing credit counseling to any consumer; and providing services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure.

Thus, if Smith provided "financial advisory services . . . to consumers on individual financial matters" he is a "covered person" for purposes of the CFPA.

Defendants cite the correct legal standard for interpreting a statutory provision: "without a clear indication of legislative intent to the contrary, the statutory language controls [the provision's] construction." *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 (1981). Neither party argues that the legislative intent of the CFPA is at odds with the statutory language. Therefore, the plain language of the statute controls.

Under that plain language, Smith provided "financial advisory services . . . to consumers on individual financial matters." Indeed, the complaint alleges that Smith provided advice to consumers relating to the financial, legal, and tax implications of selling structured settlement

payments to Access Funding. (ECF No. 1, ¶ 13). The decision whether to sell a structured settlement for an immediate lump sum payment is clearly an "individual financial matter." When Smith advised consumers that they should go ahead with the sales, he provided "financial advisory services" on those matters. Moreover, the consumers signed affidavits stating that Smith fulfilled the role of independent professional advisor. This role required him to give legal, tax, and *financial advice* regarding the prudence of selling their settlements. Accordingly, the CFPB's argument that Smith is a "covered person" for purposes of the CFPA is plainly correct.

Defendant Access Funding argues that "[a] 'consumer financial product or service' means, in relevant part, 'extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions)." (ECF No. 13, p. 27) (citing § 5481(15)(A)(i)). Likewise, defendant Borkowski argues that "[t]he Bureau has attempted to shoehorn Defendants' activities into the CFPA, stating (in conclusory fashion) that the services provided constitute an 'extension of credit to consumers,' and therefore fall under the CFPA." (ECF No. 16, p. 8). Both defendants then explain why Smith did not "extend credit," and therefore did not engage in conduct which is prohibited under § 5481(15)(A)(i). These arguments are unavailing because Plaintiff does not allege that Smith "extend[ed] credit" and is therefore a "covered person" under § 5481(15)(A)(*i*). Plaintiff alleges that Smith is a "covered person" under § 5481(15)(A)(*viii*) because he "provided financial advisory services . . . to consumers on individual financial matters."[3] Therefore, defendants' argument fails.

---

[3] Defendants conflate the allegations that form the basis of Counts I-IV and the allegations that form the basis of Count V. The CFPB alleges in Count V that Access Funding engaged in abusive acts or practices relating to the advances they allegedly gave consumers, in violation of §§ 5531(d)(2)(A) and 5536(a)(1)(B). With respect to Count V, the CFPB argues that *Access Funding* is a "covered person" under § 5481(15)(A)(i) because it engaged in "extending credit

Only defendant Smith's reply brief engages with the allegations in the complaint. Smith acknowledges that if he "provid[ed] 'financial advisory services' to consumers regarding individual financial matters" he would qualify as a "covered person" under the statute. (ECF No. 24, p. 12). He argues that he did not provide such services because "'financial advisory services' include matters such as 'credit counseling, debt management and debt settlement.'" *Id.* Smith argues that his advice did not pertain to "credit counseling, debt management, or debt settlement" but instead pertained to a "sale or assignment." *Id.* This argument too fails. Indeed, under the plain language of § 5481(15)(A)(viii), "financial advisory services" are not limited to matters of "credit counseling, debt management, and debt settlement." Those form an illustrative, rather than exhaustive, list of what constitutes "individual financial matters." *See* Defendant Smith's Rep. Br., ECF No. 24, p. 12 ("'financial advisory services' *includes* matters such as 'credit counseling, debt management and debt settlement") (emphasis added). Defendant Smith cites only one case in support of his contention that only "credit counseling, debt management, and debt settlement" qualify as "financial advisory services." *See Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, 2015 WL 1013508 (S.D. Ind. 2015). That case, however, provides no support for his argument. In fact, it confirms that "credit counseling, debt management, and debt settlement" are merely a few of the many types of "individual financial matters" covered by the statute. *Id.* at \*\*22 ("the Act specifies that such advisory services include, *without limitation*, 'providing credit counseling to any consumer' and 'providing services to assist a consumer with debt management or debt settlement, modifying the terms of

---

and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions)." The concept of "extension of credit" is relevant to why Access Funding is a "covered person" with respect to the conduct at issue in Count V. It has nothing to do with whether Smith is a "covered person" with respect to the conduct at issue in Counts I-IV.

any extension of credit, or avoiding foreclosure.'" (emphasis added)). Thus, defendant Smith's argument, although it responds to the complaint, also fails.

Ultimately, the plain meaning of the statute is sufficient to resolve the question of whether Smith is a "covered person." Pursuant to § 5481(15)(A)(viii), one who "provides financial advisory services . . . to consumers on individual financial matters" is a "covered person," regardless of the specific nature of that financial advice. (ECF No. 23, p. 13). By advising consumers about whether to sell their structured settlements for an immediate lump sum payment, Smith undeniably provided those consumers with "financial advisory services" regarding "individual financial matters." Accordingly, I find that he is a "covered person" within the meaning of the CFPA.

### b. Counts I-IV: "Practice of Law" Exclusion

Defendants next argue that even if Smith is a "covered person," Counts I-IV of the complaint should be dismissed because he was an attorney who provided legal advice and whose conduct is therefore subject to the "practice of law" exclusion to the CFPA. The CFPB argues that Smith's perfunctory conversations with consumers did not constitute the practice of law and therefore are not excluded from CFPA coverage. This is the closest of the issues before the court. Ultimately, I find that Smith was engaged in the practice of law, and that his conduct does not fall within either of the exceptions to the "practice of law" exclusion set forth in § 5517(e)(2). Thus, Counts I-IV of the complaint, each of which is premised upon Smith's conduct, must be dismissed.

The CFPA contains a provision which excludes lawyers from the scope of the statute's coverage. Under 12 U.S.C. § 5517(e)(1), "[e]xcept as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in

22

by an attorney as part of the practice of law under the laws of the state in which the attorney is licensed to practice law." Plaintiff acknowledges that Smith is a Maryland attorney (ECF No. 1, ¶ 13). In Maryland, to "practice law" means "to engage in any of the following activities: (i) giving legal advice; (ii) representing another person before a unit of the State government or of a political subdivision; or (iii) performing any other service that the Court of Appeals defines as practicing law."[4] Md. Code Ann., Bus. Occ. & Prof. § 10-101(h). The Maryland Court of Appeals has said that:

> to determine whether an individual has engaged in the practice of law, the focus of the inquiry should be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent . . . Where trial work is not involved but the preparation of legal documents, their interpretation, *the giving of legal advice*, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law.

*Lukas v. Bar Ass'n of Montgomery County*, 35 Md.App. 442, 448, cert. denied, 280 Md. 733 (Md. 1977) (emphasis added).

Accepting each of the allegations in the complaint as true, it is clear that Smith gave consumers legal advice and therefore was engaged in the practice of law. First, the complaint states that, "Charles Smith is a Maryland-based attorney who provided purportedly independent professional advice for almost all Maryland consumers who made structured-settlement transfers to Access Funding." (ECF No. 1, ¶ 13). Second, the complaint states that "Smith held himself out as an 'independent professional advisor,' and by purporting to provide IPA services for purposes of the structured-settlement transactions, was therefore obligated to explain the

---

[4] The statute further notes that the practice of law specifically includes: "(i) advising in the administration of probate of estates of decedents in an orphans' court of the State; (ii) preparing an instrument that affects title to real estate; (iii) preparing or helping in the preparation of any form or document that is filed in a court or affects a case that is or may be filed in a court; or (iv) giving advice about a case that is or may be filed in a court." Md. Code Ann., Bus. Occ. & Prof. § 10-101(h).

23

financial, *legal*, and tax implications of the transfers consumers made to Access Funding." (ECF No. 1, ¶ 46) (emphasis added).[5] Third, the complaint states that, "Smith held himself out as providing independent professional advice on the implications of consumers' contemplated transfers. Consumers reasonably relied on Smith to provide independent professional advice that took their best interest into account." (ECF No. 1, ¶ 60). Fourth, the complaint states that, "the cursory interactions Smith had with consumers implied to consumers that they did not need to understand anything else about the transfers they were contemplating." (ECF No. 1, ¶ 63). In other words, the complaint itself alleges that Smith is a Maryland attorney, that he fulfilled a role whose job description includes giving legal advice, that consumers believed him to be giving legal advice, and that consumers relied upon Smith's "implied" recommendation that they should enter into the transactions. Under the plain language of the complaint, Smith offered consumers legal advice and was therefore engaged in the practice of law.

The CFPB argues that Smith does not fall within the "practice of law" exclusion because he provided "wholly perfunctory" financial-advisory services "directed only at consummating the transactions Access Funding sought to complete." (ECF No. 23, p. 15). It argues that Smith "simply recited the terms of the contracts and asked whether consumers understood them, but provided no substantive advice or counsel to consumers." *Id.* The CFPB points to certain factual allegations—that there was no contact before or after brief calls between Smith and the consumers, that the calls were arranged by Access Funding, that someone from Access Funding was often on the calls, and that Smith was paid by Access Funding—as evidence that Smith was not in fact engaged in the "practice of law." *Id.* These arguments are unpersuasive. Indeed, even

---

[5] Pursuant to the Maryland SSPA, only an "attorney, certified public accountant, actuary, or other licensed professional adviser" could serve in this role. Maryland Structured Settlement Transfer Act, Md. Code, Cts. & Jud. Proc. § 5-1101(c).

24

assuming the facts alleged by the CFPB to be true, these facts go to the quality of the services provided by Smith, not to their nature.

There are two exceptions to the practice of law exclusion under which the CFPA may apply to the conduct of lawyers. 12 U.S.C. § 5517(e)(2). But Smith's conduct as alleged in the complaint does not fall within either of these exceptions.[6] Under § 5517(e)(2), the exclusion for lawyers:

> shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title – (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

12 U.S.C. § 5517(e)(2).

Smith's conduct does not fall within the first exception to the exclusion. Any financial advice he offered was at least "incidental to" giving legal advice, and this legal advice "occur[ed] exclusively within the scope of the attorney-client relationship." "An attorney-client relationship may be found to exist even when the services performed by the attorney are not strictly legal in character." *Attorney Grievance Com'n of Maryland v. Shaw*, 354 Md. 636, 651 (Md. 1999). "In setting forth the test for determining when the relationship is formed, we have adopted the requirements of the Restatement (Third) of the Law Governing Lawyers." *Attorney Grievance Com'n of Maryland v. Stillwell*, 434 Md. 248, 276-77 (Md. 2013). According to the Third Restatement, "a relationship of client and lawyer arises when . . . a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person . . . and . . . the lawyer

---

[6] Because the CFPB argues that Smith was not engaged in the practice of law, it does not contend that his conduct falls within either of these exceptions.

25

manifests to the person consent to do so." *Id.* When consumers utilized Smith as their IPA and Smith performed that function for them, both Smith and the consumers manifested the intent necessary to form an attorney-client relationship.

Smith's conduct clearly does not fall within the second exception to the exclusion because he provided each of the consumers in question both "legal" and "financial" advice about the transactions.

Ultimately, the complaint alleges that Smith's advice was biased and erroneous, and that he encouraged the consumers to enter into transactions that were not in their best interest. Accepting the truth of that allegation, Smith nevertheless gave that advice and encouragement in his capacity as an attorney. Bad legal advice is still legal advice. By offering such advice, Smith was engaged in the practice of law. Therefore, his conduct falls within the "practice of law" exclusion to the CFPA, set forth in § 5571(e). Accordingly, I dismiss Counts I-IV of the Complaint.

### c. Count V: Specificity of the Complaint

Defendants lastly argue that Count V of the complaint must be dismissed because the CFPB has done nothing more than state broad, sweeping, conclusory allegations in support of its claim that Access Funding engaged in abusive practices with respect to the advances they offered consumers. The CFPB argues that it has provided specific enough allegations to warrant discovery on this claim. I agree with the CFPB.

The CFPB alleges in Count V that Access Funding engaged in abusive acts or practices relating to the advances they allegedly gave consumers, in violation of §§ 5531(d)(2)(A) and 5536(a)(1)(B). Section 5531(d)(2)(A) provides:

> The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or

26

service, unless the act or practice takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service.

And as stated above, under § 5536(a)(1)(B), "it shall be unlawful for any covered person or service provider to engage in any unfair, deceptive, or abusive act or practice."

The complaint alleges that Access Funding provided consumers with advances while the consumers waited to complete their paperwork and finalize their structured settlement transfers. (ECF No. 1, ¶ 41). These advances allegedly consisted of $500 for signing a contract, $1,000 when a court date was set, and $1,000 when a judge approved the sale. (ECF No. 1, ¶ 41). Count V of the complaint alleges that the Access Funding Defendants abused customers with respect to these advances. Specifically, it alleges that the company encouraged consumers who had an immediate need for cash to take advances to meet that need and alleges that consumers were bound to either pay back their advances or complete the transfers. (ECF No. 1, ¶ ¶ 77-78). Access Funding argues that having to pay back an advance is not unfair, and in fact is "true with any advance payment of a purchase price." (ECF No. 13, p. 31).

But the CFPB alleges something further. Specifically, the complaint alleges that "consumers who could not otherwise repay the advances were told that they were obligated to go forward with the transfer even if they realized it was not in their best interest" and that "consumers did not understand the risks or conditions of the advances, including that the advances did not bind them to complete the transactions." (ECF No. 1, ¶ ¶ 79-80). These allegations, if true, are sufficient to state a claim upon which relief could be granted. Indeed, if defendants misrepresented to the consumers the nature of the advances and the obligations that were incurred once an advance was accepted, that would constitute "taking unreasonable

27

advantage of consumers' lack of understanding of the material risks, costs, or conditions of [a] product or service." Accordingly, it would fall squarely under § 5531(d)(2)(A).

Defendants argue that the complaint is deficient because it fails to identify any particular consumers who were the subject of abusive acts or practices with respect to advances. (ECF No. 13, p. 31-32; ECF No. 16, p. 10). At this stage, the CFPB is not required to do so. It is sufficient that it alleges that defendants engaged in such acts or practices in their dealings with consumers. Discovery may reveal that defendants were pressuring certain vulnerable individuals by offering them free money and then misrepresenting what accepting that money obligated them to do going forward. It may instead reveal that defendants apprised all consumers of their precise legal rights and obligations. Regardless, the CFPB's inability to identify specific consumers at this stage is no reason to dismiss the claim.

Defendants also argue that the complaint is deficient because the CFPB fails to demonstrate "(1) how the [allegedly abusive] act causes substantial injury to consumers, or (2) how any purported substantial injury is not outweighed by the benefits to consumers." (ECF No. 26, p. 14). That argument is unavailing. Although § 5531(c) requires that a plaintiff prove these elements in order to make out a claim for "unfair" acts or practices, § 5531(d)—the provision at issue in Count V—does not require the CFPB to prove these elements in order to make out its claim for "abusive" acts or practices.

Therefore, I deny defendants' motion to dismiss Count V, and order discovery in order to allow the CFPB the opportunity to prove that consumers who could not otherwise repay the advances were told that they were obligated to go forward with the transactions even if they realized it was not in their best interest and that consumers did not understand the risks or

28

conditions of the advances, including that the advances did not bind them to complete the transactions.

## CONCLUSION

For the foregoing reasons, defendants' motions for *Burford* abstention and a stay are denied. Defendants' motions to dismiss Counts I-IV are granted. Defendants' motions to dismiss Count V are denied. Counts I through IV of the CFPB's complaint are hereby dismissed.

9/13/17
Date

/s/

J. Frederick Motz
United States District Judge