IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CONSUMER FINANCIAL
PROTECTION BUREAU

    *Plaintiff*,

    v.

ACCESS FUNDING, LLC, *et al.*

    *Defendants*.

Civil Action No. ELH-16-3759

## MEMORANDUM OPINION

Plaintiff Consumer Financial Protection Bureau ("CFPB" or the "Bureau") filed suit on November 21, 2016, against a host of defendants: Access Funding, LLC ("Access Funding"); Access Holding, LLC ("Access Holding"); Reliance Funding, LLC ("Reliance Funding"); Lee Jundanian; Raffi Boghosian; and Michael Borkowski (collectively, the "Access Funding Defendants"); as well as attorney Charles Smith. ECF 1 (the "Complaint"). CFBB seeks a permanent injunction, damages, disgorgement, payment of redress to consumers, civil penalties, and costs based on defendants' alleged violation of various provisions of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5481 *et seq.*, relating to the transfers of structured settlements. *See* ECF 1.[1]

Defendants filed motions for *Burford* abstention and a stay or, in the alternative, to dismiss. *See* ECF 13; ECF 16. By Memorandum (ECF 27) and Order (ECF 28) of September 13, 2017, Judge Motz denied these motions. But, he granted the motion to dismiss as to Counts I-IV, which were based upon the conduct of Smith, and denied the motion as to Count V, lodged against the

---

[1] The case was initially assigned to Judge J. Frederick Motz. It was reassigned to me on December 7, 2017. *See* Docket.

Access Funding Defendants, alleging substantial assistance in regard to Smith's unfair and deceptive acts. *Id.*[2]

CFPB subsequently moved for leave to file an Amended Complaint as to Counts I-IV. ECF 37. By Memorandum and Order of December 13, 2017, I granted the motion. ECF 42; ECF 43.

The Amended Complaint (ECF 44) alleges three violations of the CFPA by Smith and two by the Access Funding Defendants. The claims against Smith and one of the claims against the Access Funding Defendants arise out of Smith's conduct as an independent professional advisor ("IPA"). Specifically, the CFPB alleges that Smith engaged in unfair (Count I), deceptive (Count II), and abusive (Count III) acts and practices, in violation of 12 U.S.C. §§ 5531(a), (b), and (d), and that the Access Funding Defendants substantially assisted Smith's unfair, deceptive, and abusive acts (Count IV), in violation of 12 U.S.C. § 5536(a)(3). *See* ECF 44, ¶¶ 62-92. Count V is based on the conduct of the Access Funding Defendants with respect to credit advances. *See* ECF 44, ¶¶ 93-99. According to the CFPB, the Access Funding Defendants engaged in abusive acts and practices, in violation of 12 U.S.C. § 5531(d)(2)(a).

Smith and Borkowski filed motions to dismiss the Amended Complaint. ECF 46; ECF 48. In a Memorandum and Order of June 4, 2018, I denied both motions. ECF 66.

Now pending is the defendants' Joint Motion for Partial Summary Judgment with regard to the Bureau's claims for monetary damages on behalf of consumers. ECF 58. It is supported by a memorandum of law (ECF 59) (collectively, the "Motion") and several exhibits. ECF 59-1 – ECF 59-4. Discovery is not yet completed.[3] However, the basis for defendants' Motion is a

---

[2] Count VI, asserted against the Access Funding Defendants, alleged abusive acts and practices related to advances to consumers. It was not addressed in ECF 28. Nor is it included in the Amended Complaint. *See* ECF 44.

[3] By Order of December 4, 2018, I granted the parties' joint request that the Court further extend the discovery deadline to February 19, 2019. *See* ECF 86.

settlement agreement in connection with a class action suit filed in the Circuit Court for Baltimore City, *Crystal Linton, et al. v. Access Holding, LLC, et al.*, Case No. 24-C-16-003894-OT.  ECF 59 at 1-2.  In light of the settlement agreement, defendants contend that the Bureau's demand for consumer relief to enforce the CFPA "is barred by the doctrine of *res judicata* and the bar against obtaining a double recovery."  *Id*. at 2.

CFPB filed an Opposition (ECF 64), along with two exhibits.  ECF 64-1 – ECF 64-2.  Defendants have replied.  ECF 69 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rules 105.6.  For the reasons set forth below, I shall deny the Motion.

## I.      Factual Background[4]

CFPB "is an agency of the United States charged with regulating the offering and providing of consumer-financial products and services" under certain federal statutes, including the CFPA.  ECF 44, ¶ 5.  It "has independent litigating authority, including the authority to enforce the CFPA."  *Id*. (citing 12 U.S.C. § 5564(a)-(b)).

On or around December 1, 2012, Jundanian, Boghosian, and Borkowski founded Access Funding.  ECF 44, ¶ 14.  Access Funding is a limited liability company with its principal place of business in Chevy Chase, Maryland.  ECF 44, ¶ 6.  "Access Funding conducted business under two alter-ego names, Assoc LLC, and En Cor LLC."  *Id*.  Access Holding is "the sole and managing member of Access Funding and is legally responsible for the liabilities of Access Funding."  *Id*. ¶ 7.  Reliance Funding is a "successor in interest to Access Funding," as Access Funding sold all of its assets to Reliance Funding after it was notified of the CFPB investigation that forms the basis of this suit.  *Id*. ¶ 9.

---

[4] The facts are derived from the Amended Complaint and the parties' exhibits.

Jundanian, Boghosian, and Borkowski all have "an ownership interest in Access Funding and [each] helped develop Access Funding's business model and manage its business." ECF 44, ¶¶ 10-12. From February 2013 to May 2014, Jundanian served as CEO of Access Funding. *Id.* ¶ 10. As CEO, he "was responsible for managing all operations of the company." *Id.* ¶ 14. "After May 2014, Jundanian was an advisor to Access Funding." *Id.* ¶ 10. Since May 2014, "Boghosian has served as COO of Access Funding . . . ." *Id.* ¶ 11. His "responsibilities include[e] managing marketing and sales activities." *Id.* Also since May 2014, "Borkowski has served as CEO of Access Funding . . . ." *Id.* ¶ 12. "Before May 2014, he served as CFO and COO of Access Funding." *Id.* As CFO, COO, and CEO, Borkowski "was responsible for managing all operations of the company." *Id.* ¶ 17.

Access Funding's principal business was to acquire future structured-settlement-payment streams and transfer those payment streams to third-party investors." *Id.* ¶ 18. Access Funding purchased the "payment streams from structured-settlement holders," a practice known as "structured-settlement factoring." *Id.* ¶ 6. More specifically, structured-settlement factoring is the offering to "recipients of structured settlements the opportunity to transfer a portion of their future payment streams in exchange for a discounted immediate lump sum." *Id.* ¶ 20.

"Structured settlements are often used to ensure the financial well-being of victims who have suffered long-term physical or cognitive harm." *Id.* ¶ 19. They "are established by legal judgments or settlements of tort claims to provide recipients with an arrangement for periodic payment of damages for personal injuries." *Id.* Access Funding "provided advances to consumers that were to be repaid through a deduction from the proceeds of structured-settlement transfers once those transactions were completed." *Id.* ¶ 7. Notably, the advances constitute extensions of credit to consumers . . . ." *Id.*

Charles Smith is purportedly an IPA who advised "almost all Maryland consumers who made structured-settlement transfers to Access Funding." *Id*. ¶ 13. However, he "did not have an attorney-client relationship with the Maryland Consumers . . . ." *Id.*

Maryland is one of forty-nine states that has enacted a Structured Settlement Protection Act ("SSPA"). *Id*. ¶ 21. *See* Md. Code (2013 Repl. Vol., 2018 Supp.), §§ 5-1101 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."). Maryland's SSPA requires structured-settlement-factoring companies, such as Access Holding, to obtain court approval before purchasing a payment stream. ECF 44, ¶ 22; C.J. § 5-1102. It also requires "the court to find that the consumer has consulted with an [IPA] before it can approve a structured-settlement transfer." ECF 44, ¶ 29.

The Amended Complaint asserts: "During the relevant period, Maryland's SSPA required that an IPA advise on the financial, legal, and tax implications of a transfer." *Id*. ¶ 32. To finalize transfers of structured settlements, "Jundanian, Boghosian, and Borkowski each had responsibility for ensuring that Access Funding's transferors had consulted an IPA." *Id*. ¶ 30.

Access Funding conducted approximately seventy percent of its transfers in Maryland. *Id*. ¶ 31. From 2013 to 2015, it sought court approval in Maryland for about 200 transfers, "of which at least 158 have been approved." *Id.*

The Bureau contends that Access Funding aggressively pursued structured settlement holders in the hopes of purchasing their settlements. ECF 44, ¶ 25. Its business practices included searching court records to identify consumers who had previously transferred a portion of their structured settlements, then contacting those consumers and enticing them to transfer the remainder of their settlements to Access Funding, *id*. ¶ 24; pressuring individuals who had already entered into transactions with Access Funding to transfer to the company all of their remaining

expected payments, *id.* ¶ 25; and more generally, pursuing structured settlement holders via phone and mail solicitations. *Id.* ¶ 26.

The Bureau's allegations focus on two of Access Funding's business practices.

First, the Amended Complaint alleges that Access Funding abused consumers with respect to the payment of advances. *Id.* ¶¶ 93-99. Access Funding entered into advance agreements with consumers while they waited to complete their paperwork and finalize their transfers. *Id.* ¶ 59. Under these agreements, consumers assigned their future payment streams to Access Funding and, in return, the company advanced "a steeply discounted lump sum" payment to the consumers. *Id.* ¶¶ 27, 59. But, the advances provided by Access Funding typically "represented only about 30% of the present value of those future payments." *Id.* "These advances often consisted of $500 for signing a contract, $1000 when a court date was set, and another $1000 when a judge approved the sale." *Id.* ¶ 59.

Jundanian, Boghosian, and Borkowski each allegedly "participated in establishing Access Funding's policies related to advances, including the terms of the advances and how they were presented to consumers, and dictated when Access Funding would issue advances to consumers." *Id.* ¶ 60. The advance agreements notified the consumers that they would be liable to repay the advances if they did not ultimately go through with the transaction, and that in order to keep the advances, they would have to cooperate fully with the company in obtaining court approval for the transaction. *Id.* ¶¶ 61, 96.

Specifically, the Amended Complaint alleges: "Consumers who could not otherwise repay the advances were told that they were obligated to go forward with the transfer even if they realized it was not in their best interest." *Id.* ¶ 97. And, the consumers, many of whom "were lead-poising

victims with cognitive impairments," *id.* ¶ 28, "did not understand the risks or conditions of the advances, including that the advances did not bind them to complete the transactions." *Id.* ¶ 98.

The Amended Complaint also concerns Smith's conduct as an IPA. *Id.* ¶¶ 62-83. The Bureau asserts that Access Funding "steered nearly all its Maryland consumers" to Smith, "who acted as the IPA for almost all of its Maryland transactions." *Id.* ¶ 33.

According to the Bureau, "Smith had both personal and professional ties to the Access Funding Defendants." *Id.* ¶ 34. Ordinarily, Access Funding directly "paid Smith $250 for each IPA letter he provided." *Id.* ¶ 35. To initiate Smith's contact with consumers, Access Funding "sen[t] him a copy of the consumer's structured-settlement-transfer-disclosure statement, along with the consumer's phone number." *Id.* ¶ 36. In some cases, "Access Funding couriered to consumers prepaid cell phones that Smith used to contact the consumers." *Id.* ¶ 37. "Other times, Access Funding's salespeople initiated a three-way call with Smith and a consumer." *Id.*

Before Smith spoke to the consumers, "Access Funding had consumers sign statements indicating that they had received IPA services from Smith . . . ." *Id.* ¶ 38. However, "neither Access Funding nor Smith typically informed consumers that Smith was an attorney, and consumers typically did not know that Smith was an attorney." *Id.* ¶ 39. Indeed, they "did not believe that Smith was acting as their attorney, and they did nothing to indicate that they intended to have an attorney-client relationship with him." *Id.* ¶ 40.

Generally, before Smith spoke with a consumer, he "spent ten to fifteen minutes reviewing the settlement-transfer-disclosure statement and any other documents provided by Access Funding." *Id.* ¶ 41. Beyond the documents Access Funding provided, "Smith did not ask for any additional information . . . ." *Id.* ¶ 42. His "phone calls with consumers typically lasted between five and ten minutes." *Id.* ¶ 43. And, during the calls, he "merely recited the terms from the

structured-settlement transfer disclosure statement provided by Access Funding and asked whether the consumers understood them." *Id*.

Notably, "Smith did not tell consumers he was acting as their attorney on these calls or at any other time." *Id*. ¶ 44. "In some instances, Access Funding's salespeople were on these calls along with Smith and the consumer." *Id*. ¶ 45. And, "Smith did not explain to consumers that he represented them, as opposed to Access Funding, or that their interests might be different from Access Funding's." *Id*. ¶ 46. Aside "from this single, brief phone call, Smith typically had no other contact with the consumer." *Id*. ¶ 47. Indeed, he "never met with a consumer in person." *Id*. ¶ 50.

Following each telephone call, Smith drafted and sent a letter and invoice to Access Funding, "stating that the consumer had received 'independent professional advice.'" *Id*. ¶ 48. Later, Access Funding "submitted the IPA letters to the court for approval of the transfer." *Id*. Consumers did not receive or approve these letters. *Id*. ¶ 49.

According to the Amended Complaint, Smith did not provide consumers with advice about whether structured-settlement transfers would be in their best interest, *id*. ¶¶ 52-53; never advised a consumer not to enter into a structured-settlement transfer contract, *id*. ¶ 54; and never advised a consumer to seek additional money from Access Funding or to sell fewer payments, or a different duration of payments, to Access Funding. *Id*. ¶¶ 55-56.

The Bureau maintains that "Jundanian, Boghosian, and Borkowski were aware that Access Funding was steering nearly all of its Maryland customers to Smith, that Smith had ties to the Access Funding Defendants, and that Smith was compensated directly by Access Funding . . . ." *Id*. ¶ 58.

## II.     *Linton v. Access Funding*

On July 6, 2016, Crystal Linton and Dimeca D. Johnson, on behalf of themselves and others similarly situated, filed a class action suit in the Circuit Court for Baltimore City against Access Funding; Reliance Funding; Access Holding; Assoc, LLC; En Cor, LLC; Smith; and Smith's law firm, CES Law Group, LLC.  ECF 59-1 at 8-50 ("*Linton* Complaint").  In addition, the *Linton* plaintiffs sued another lawyer, Anuj Sud, and his law firm, SudLaw, LLC.  *Id.*  Notably, they did not sue the three Access Funding executives that the Bureau has sued in this case: Jundanian, Boghosian, and Borkowski.  *Id.* The *Linton* Complaint asserted claims, under Maryland law, of negligence, misrepresentation, fraud, and civil conspiracy.  *Id.* at 39-49.

On May 10, 2016, the State of Maryland, Office of the Attorney General, Consumer Protection Division (the "Division"), filed suit in the Circuit Court for Baltimore City against Access Holding; Reliance Funding; Assoc, LLC; En Cor, LLC; Jundanian; Boghosian; Borkowski; Smith; and Smith's former law partner, Scott Blumenfeld.  *See State of Maryland, Office of the Attorney General, Consumer Protection Division v. Access Funding, LLC, et al.*, Case No. 24-C-16-002855.  The Division asserted, *inter alia*, state-law violations based on Smith's failure to provide IPA services to Access Funding's customers.  Litigation is ongoing.  *See Division*, Case No. 24-C-16-002855, Docket No. 169 (Jan. 9, 2019).

On March 28, 2017, the parties in *Linton* filed a "Joint Motion for Preliminary Approval of Class Action Settlement" (ECF 59-1 at 52-60), with a proposed "Stipulation of Settlement."  *Id.* at 61-83 (the "Settlement Agreement").  The settlement class consisted of "all natural persons who were or are Maryland residents, . . . and who between January 1, 2012 and July 6, 2016, transferred all or a portion of their structured settlement payment rights . . . to Access Funding, LLC, Assoc, LLC, En Cor, LLC, Access Holding, LLC, or Reliance Funding, LLC, or any of their designees."

*Id.* at 70-71, ¶ 2.1.  The parties estimated a Settlement Class of about 100 persons covering 163 transactions.  *Id.* at 71, ¶ 2.2.

Of significance here, the Settlement Agreement provides, in relevant part, *id.* at 73:

3.2     Upon the Effective Date, each Settlement Class Member who has not opted out of the proposed settlement shall be permanently enjoined and barred from filing, commencing, intervening (as class members or otherwise) or receiving any benefits from any lawsuit or arbitration proceeding arising out of or related to any of the Released Claims.

3.3     Upon the Effective Date, each Settlement Class Member who has not opted out of the proposed settlement shall irrevocably assign and transfer to the Defendants any and all benefits or recoveries, including any recovery based on the equitable remedies of restitution, disgorgement of profits or damages obtained by the Bureau in the Bureau's Lawsuit or the Division in the Division's Lawsuit for the benefit of each Settlement Class Member.

The term "Effective Date" is defined as "the date on which the Judgment finally approving this Stipulation and Settlement becomes Final.  The Effective Date shall be, if there are no timely objections to the Settlement, thirty (30) days after entry of the Court's order granting final approval of the settlement."  *Id.* at 68-69, ¶ 1.11.  And, "'Final' means the date which all appellate rights with respect to the Judgment have expired or have been exhausted in a manner to affirm the Judgment, and when no further appeals are possible, including review by the United States Supreme Court."  *Id.* at 69, ¶ 1.12.  Moreover, paragraph 1.1, ECF 59-1 at 67, defines the "Bureau's Lawsuit" as the case *sub judice*.  And, paragraph 1.9, ECF 59-1 at 68, defines the "Division's Lawsuit" as the Division's suit pending in the Circuit Court for Baltimore City: *Division*, Case No. 24-C-16-002855.

Further, the Settlement Agreement provides: "Each of the Defendants shall have the right in each of their sole discretion to terminate the settlement if either the Bureau or [Maryland] does not provide, in writing, its agreement to dismiss its respective lawsuit with prejudice upon a Final Approval Order or [Maryland] or the Bureau opposes the Court's Final Approval of the

Settlement." *Id*. at 79, ¶ 10.3. At this time, none of the *Linton* defendants have elected to exercise this right. *See Linton*, Case. No. 24-C-16-003894-OT.

The State of Maryland moved to intervene as a plaintiff on April 13, 2017 (ECF 64-2 at 2-10), arguing that (1) the settlement amount was inadequate because the $770,000 in compensation for class members covered only 4% of the financial harm that those individuals suffered; (2) the settlement was unfair because it diverted $330,000 of the settlement amount to plaintiffs' counsel; (3) the settlement appears to draw exclusively on insurance money, requiring none of the defendants to make a direct contribution to the settlement fund; and (4) the settlement purports to "release" the defendants from claims brought by the Bureau in federal court. *Id*. at 5-8.

Shortly thereafter, the *Linton* court granted the State's motion to intervene. ECF 59-1 at 102-06. On September 22, 2017, the court preliminarily approved the Settlement Agreement. *Id*. at 108-16. And, it approved the "Notice of Class Action Settlement" (*id*. at 118-26), which was sent to members of the settlement class. Only one member, Gregory Ramsel, elected to opt out of the Settlement Agreement, entering into a separate "Settlement and Release Agreement" with Access Funding. *Id*. at 128-133.

On February 9, 2018, over the State's objections, the State court (Handy, J.) entered a comprehensive "Final Approval Order," *id*. at 135-62, approving the Settlement Agreement and ordering the parties to comply with its terms. And, on the same date, the court dismissed the case, with prejudice. *Id*. at 164 (the "Order").

The State sought judicial review on February 22, 2018, in the Maryland Court of Special Appeals. *See Linton,* Case. No. 24-C-16-003894-OT, Docket No. 77. That appeal remains pending. *See Consumer Protection Bureau v. Crystal Linton, et al.*, No. 2609, Sept. Term 2017.[5]

---

[5] Oral argument is scheduled for March 2019.

### III.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86.

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S. Ct. 2505. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

# IV. Discussion

Defendants contend that, in light of the Settlement Agreement in *Linton* (ECF 59-1 at 61-83), the Bureau's claim for damages "on behalf of the class members is barred by the doctrine of *res judicata* and the bar against obtaining a double recovery." ECF 59 at 2. In addition, they argue that the Bureau's claim for monetary relief is "moot and not justiciable," because the class members in *Linton* "assigned to the [*Linton*] defendants . . . and Smith, all rights to any recovery obtained by the CFPB on their behalf in this case." *Id.*

The Fourth Circuit has made clear: "Settlement agreements operate on contract principles, and thus the preclusive effect of a settlement agreement 'should be measured by the intent of the parties.'" *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) (citing 18A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4443 (2d ed. 2002)). A settlement "may be designed either to support or reduce the preclusion effects of the adjudication." WRIGHT & MILLER, § 4443 (2d ed. 2018). "There is no preclusion at all if the parties do not intend to preclude later litigation, although . . . an objective manifestation of intent may support preclusion that was not subjectively intended." *Id.* Therefore, "careful attention should be devoted to the specific circumstances of the particular litigation." *Id.*

The basis for defendants' Motion is a settlement agreement. Notably, however, the CFPB is not a party to it. But, as discussed below, defendants contend that the Bureau is in privity with the *Linton* plaintiffs "to the extent that it seeks to obtain private remedies for their benefit." ECF 59 at 8.

I begin with a review of the principles of contract construction.

## A.    Principles of Contract Construction[6]

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, ___ F. App'x ____, 2019 WL 181453, at *2 (4th Cir. Jan. 14, 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

"In determining whether there was an enforceable contract, [courts] begin [the] analysis by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015). *See also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001)

---

[6] "In a federal question case that incorporates a state law issue, such as contract formation, a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise." *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995). In this case, the Settlement Agreement includes a choice-of-law provision, providing that Maryland law is controlling. *See* ECF 59-1 at 81, ¶ 12.6.

("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty. v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour,*

*Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intentions, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of

the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

As indicated, to determine the parties' intention, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

## B.  Claim Preclusion

Res judicata, or claim preclusion, is a judicial doctrine by which "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States,* 440 U.S. 147, 153 (1979); *see Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008).  The doctrine precludes parties from "contesting matters that they have had a full and fair opportunity to litigate," thereby conserving judicial resources and minimizing the possibility of inconsistent decisions. *Montana*, 440 U.S. at 153-54.  The doctrine of res judicata was "designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Laurel Sand & Gravel, Inc.*, 519 F.3d at 161-62 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).

Res judicata also extends to claims that could have been asserted and litigated in the original suit. *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 210 (4th Cir. 2013).  But, it does not bar a claim that could not have been brought in the earlier litigation. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).

The party who asserts res judicata has the burden of showing its application. *See Bennett v. Garner*, ___ F.3d ____, 2019 WL 209106, at *3 (4th Cir. Jan. 16, 2019).  In this case, as Judge Motz previously observed, ECF 27 at 11-12: "The Full Faith and Credit Act, 28 U.S.C. § 1738, dictates that a federal court must give a state court judgment the same preclusive effect it would be given in the courts of the state that rendered the judgment. Therefore, this court must give any Maryland judgments the same preclusive effect they would be given in Maryland state court under Maryland law."

Where a federal court assesses res judicata based on a prior proceeding in a Maryland state court, Maryland preclusion principles apply. *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 127 (4th Cir. 2000); *Williams v. 21st Mortg. Corp.*, PX-1210, 2017 WL 1133706, at *7 (D. Md. Mar. 27, 2017) (citing *Migra v. Warren Cty. School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). As the Fourth Circuit recently explained in *Bennett v. Garner*, 2019 WL 209106, at *2: "In considering the preclusive effect of an earlier state court judgment on a new claim, [federal courts] apply the 'preclusion law of the State in which judgment was rendered.'" (citations omitted).

Under Maryland law, the doctrine of res judicata applies when the following three elements are present: "(1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and later suit, and (3) an identity of parties or their privies in the two suits." *Clodfelter*, 720 F.3d at 210 (citation and quotation marks omitted); *see Weiner v. Fort*, 197 F. App'x 261, 264 (4th Cir. 2006); *In re Varat Enter., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) (stating that "claim preclusion occurs when three conditions are satisfied: 1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and, 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding"); *Young–Henderson v. Spartanberg Area Mental Health Ctr.,* 945 F.2d 770, 773 (4th Cir. 1991) (quoting *Nash Cty. Bd. of Educ. v. Biltmore Co.,* 640 F.2d 484, 486 (4th Cir. 1981)). *See also Davis v. Wicomico Cty. Bureau*, 447 Md. 302, 306, 135 A.3d 419, 422 (2016) ("The requirements of the doctrine of res judicata [include] . . . that there was a final judgment on the merits.").

"A 'final judgment' is 'a judgment, degree, sentence, order, determination, decision, or other action by a court . . . from which an appeal . . . may be taken.'" *Addison v. Lochearn Nursing*

*Home, LLC*, 411 Md. 251, 261, 983 A.2d 138, 144 (2009) (quoting Md. Code (2013 Repl. Vol., 2017 Supp.), § 12-101(f) of the Courts and Judicial Proceedings Article). "A ruling of the circuit court, to constitute a final judgment, must, among other things, be an 'unqualified, final disposition of the matter in controversy.'" *Addison*, 411 Md. at 262, 983 A.2d at 145 (quoting *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989)).

Of relevance here, "a private settlement agreement does not give rise to preclusion if it is not transformed into a judgment. Whatever effect it has on the future relationships between the parties derives from its force as a contract, not from res judicata." WRIGHT & MILLER, § 4443. As to the first element of res judicata, only an issue that is essential to a final judgment on the merits can be afforded preclusive effect. *Garrity v. Maryland State Board of Plumbing*, 447 Md. 359, 368, 135 A.3d 452, 459 (2016).

Here, defendants assert that the *Linton* Order approving the Settlement Agreement constitutes a final judgment under Maryland law. ECF 59 at 18. Further, they contend that if the Court denies the requested relief, the *Linton* "class members and Ramsel would receive a double recovery." *Id*. at 18.

However, in reviewing the text of the Settlement Agreement, it is apparent that the Order is not final. As mentioned, the Settlement Agreement states, in pertinent part, ECF 59-1 at 73:

> Upon the Effective Date, each Settlement Class Member who has not opted out of the proposed settlement shall irrevocably assign and transfer to the Defendants any and all benefits or recoveries, including any recovery based on the equitable remedies of restitution, disgorgement of profits or damages obtained by the Bureau in the Bureau's Lawsuit or the Division in the Division's Lawsuit for the benefit of each Settlement Class Member.

"Effective Date" is defined as "the date on which the Judgment finally approving this Stipulation and Settlement becomes Final. The Effective Date shall be, if there are no timely objections to the Settlement, thirty (30) days after entry of the Court's order granting final approval

of the settlement." *Id*. at 68-69, ¶ 1.11. "'Final' means the date [on] which all appellate rights with respect to the Judgment have expired or have been exhausted in a manner to affirm the Judgment, and when no further appeals are possible, including review by the United States Supreme Court." *Id*. at 69, ¶ 1.12.

The State filed a timely objection to the Settlement Agreement, as noted in the *Linton* Order. *See* ECF 59-1 at 164. And, the State subsequently appealed the Order, which is now pending before the Maryland Court of Special Appeals. *See Linton,* Case. No. 24-C-16-003894-OT, Docket No. 77. Therefore, as all appellate rights with respect to the Settlement Agreement have neither expired nor been exhausted, the Settlement Agreement is not "Final." Thus, the Order is not a final judgment on the merits that can be afforded preclusive effect. And, in order to invoke res judicata, there must be a *final* judgment on the merits.

A cause of action is "identical" for purposes of res judicata if it "involves a right arising out of the same transaction or series of connected transactions that gave rise to the claims in the first action." *Harnett v. Billman*, 800 F.2d 1308, 1314 (4th Cir. 1986). Res judicata thereby accounts for "issues that . . . could have been raised in that [first] action." *San Remo Hotel, L.P. v. City and Cty. of San Francisco, Cal.*, 545 U.S. 323, 336 n.16 (2005) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Moreover, "[a] plaintiff's invocation of a different legal theory in the subsequent action" does not preclude application of res judicata. *Onawola v. Johns Hopkins Univ.*, No. AMD 07–870, 2007 WL 5428683, at *1 (D. Md. Sept. 24, 2007); *see* Restatement (Second) of Judgments § 24(2) cmt. c (1982).

As to third element of res judicata, defendants contend that the Bureau, although not a party to the Agreement, is in privity with the *Linton* plaintiffs. Therefore, to the extent that CFPB seeks to obtain remedies on the consumers' behalf, "the doctrine of *res judicata* bars the Bureau's claims

for monetary relief[.]" ECF 59 at 7. In response, the Bureau asserts that, in seeking consumer redress, it "is not merely representing the private interests of those consumers who would receive the redress; it is also vindicating the *public* interest in effective law enforcement." *Id.* at 11 (emphasis in original).

Parties are in privity for purposes of res judicata where they are "so identified in interest . . . that [they] represent the same legal right in respect to the subject matter involved." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651 (4th Cir. 2005). However, at this juncture it is unnecessary to consider the parties' contentions as to privity. Because the Order approving the Settlement Agreement is not a final judgment on the merits, defendants' res judicata claim fails.

### C.    Mootness Doctrine[7]

Defendants also contend that CFPB's claim for monetary relief on behalf of the Class Members and Ramsel is moot. ECF 59 at 21.

A case becomes moot when the issues presented are "'no longer live or the parties lack a legally cognizable interest in the outcome.'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (other internal citations omitted); *see also Grutzmacher v. Howard Cty.*, 851 F.3d 332, 349 (4th Cir. 2017).

The Fourth Circuit has stated that "'mootness goes to the heart of the Article III jurisdiction of the courts.'" *Castendet-Lewis v. Sessions*, 855 F.3d 253, 260 (4th Cir. 2017) (quoting

---

[7] As defendants point out, ECF 59 at 21, n.12, because this case is founded on federal question jurisdiction, and not diversity jurisdiction, I must apply the federal mootness doctrine, which differs from Maryland's mootness doctrine. *See Thana v. Bd. of License Comm'rs for Charles Cty.*, 226 Md. App. 555, 568, 130 A.3d 1103, 1111 (2016) ("Unlike the Article III constitutional constraints on the federal courts, . . . [Maryland's] mootness doctrine is based entirely on prudential considerations that do not constitutionally bar us from reaching the merits of a moot action.") (internal quotation marks and citations omitted) (alteration in *Thana*).

*Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002)). "'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)); *see also Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted).

In *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 133 (2011), the Supreme Court said: "Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary . . . . For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." *See also Campbell-Ewald Co. v. Gomez*, ___ U.S. ___, 136 S. Ct. 663, 678 (2016) ("'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'") (alteration and citation omitted); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (stating that Article III standing "enforces the Constitution's case-or-controversy requirement"), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014).

In other words, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson,* 415 U.S. 452, 459 n.10 (1974); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). And, "[w]hen a case or controversy ceases to exist—either due to a change in the facts or the law—'the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.'" *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015)); *see Chafin v. Chafin*, 568 U.S.

165, 172 (2013) (holding that "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts") (internal quotation marks and brackets omitted); *Knox v. Service Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (stating that "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party") (internal quotation marks omitted).

Defendants maintain that, in accordance with the Settlement Agreement, the *Linton* class members and Ramsel assigned to the defendants "all benefits or recoveries, including any recovery based on the equitable remedies of restitution, disgorgement of profits or damages obtained by the Bureau in the Bureau's lawsuit . . . ." ECF 59-1 at 73. And, as a result of this assignment, the Bureau's suit is moot as no case or controversy exists. ECF 59 at 21-22. Defendants argue that "the Court cannot provide effective relief to the consumers" because the class members and Ramsel have already received the monetary relief they sought to obtain. *Id.* at 22; *see also Friedman's, Inc.*, 290 F.3d 191, 197 (4th Cir. 2002) ("[W]hen a state court orders the same relief sought by the plaintiff in a parallel federal action, there is no longer a live controversy and the parallel federal claim is moot.").

However, as noted by the Bureau, "the *Linton* class members' potential recoveries have not yet been assigned to Defendants because . . . the class settlement that includes the potential assignment is not final or effective." ECF 64 at 22. As discussed, *supra*, the *Linton* Order approving the Settlement Agreement is not final. Therefore, the Bureau's suit is not moot and dismissal of the Bureau's claim for monetary relief is not warranted.

## V.    Conclusion

For the reasons stated above, I shall deny defendants' Joint Motion for Partial Summary Judgment, without prejudice to their right to new the Motion when the settlement is final.[8]

An Order follows.

Date: January 18th, 2019                                    /s/
                                                    Ellen L. Hollander
                                                    United States District Judge

---

[8] Even if the settlement order were final, I express no opinion as to the merits of the Motion.