**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | |
| Plaintiff, | Case No. 1-16-cv-03759-ELH |
| v. | |
| ACCESS FUNDING, LLC, ACCESS HOLDING, LLC, RELIANCE FUNDING, LLC, LEE JUNDANIAN, RAFFI BOGHOSIAN, MICHAEL BORKOWSKI, and CHARLES SMITH, | |
| Defendants. | |

**CONSUMER FINANCIAL PROTECTION BUREAU'S
MEMORANDUM IN SUPPORT OF ITS MOTIONS
FOR (1) A MODIFICATION OF THE SCHEDULING ORDER AND
(2) LEAVE TO FILE A SECOND AMENDED COMPLAINT**

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), respectfully submits this memorandum in support of its motions to modify the scheduling order and for leave to file a second amended complaint. These motions follow the late production by Access Funding, LLC, ("Access Funding") of tens of thousands of documents from November 2018 through February 2019 and the completion of depositions in March 2019. Access Funding's delayed document production made it impossible for the Bureau to discover the facts that are the basis for the proposed amendment before the original June 22, 2018, deadline for the amendment of pleadings.

The Bureau has good cause for its requests because newly produced documents, many of which were responsive to requests the Bureau made of Access Funding as early as

September 2015, together with the March 2019 deposition testimony, revealed information about the services Access Funding executives and employees provided to consumers and how, in providing those services, they engaged in unfair, abusive, and deceptive acts and practices under the Consumer Financial Protection Act of 2010 ("CFPA").

The Bureau has diligently sought information from Access Funding since the inception of its investigation in September 2015 and through discovery. The Bureau could not know that Access Funding withheld responsive documents until November 2018 at the earliest. Defendants will suffer little delay or prejudice if the Court grants these motions. The Bureau does not seek additional time for discovery, and after these motions are resolved, can proceed to the briefing of pretrial dispositive motions.

Justice requires that the Bureau be allowed to amend its complaint based on these newly discovered facts. The proposed Second Amended Complaint is not futile. It includes additional allegations of fact and additional counts against the Access Funding Defendants.[1] The Bureau alleges that Access Funding provided advice to consumers regarding their individual financial matters—namely, whether to sell structured-settlement payments for an immediate lump sum. These allegations establish that Access Funding is a "covered person" under the CFPA because it provided "financial advisory services." The additional counts state that the Access Funding Defendants engaged in unfair, deceptive, and abusive acts or practices, in violation of §§ 1031 and 1036 of the CFPA, in connection with these financial-advisory services.

---

[1] The "Access Funding Defendants" are all defendants except Charles Smith.

## OVERVIEW

### 1. Recently discovered facts support new claims against Access Funding.

Late-produced documents show that Access Funding acted as financial advisors to consumers. These new documents and related deposition testimony demonstrate that Access Funding employees interacted with consumers in a much more direct and didactic way than the Bureau previously understood. The proposed Second Amended Complaint alleges that Access Funding provided financial advisory services to consumers and in doing so committed unfair, deceptive, and abusive acts and practices.

Structured-settlement transfers are complex transactions that require consumers to sign complicated documents. The consumers in this case, many of whom were victims of lead-paint poisoning, typically lacked an understanding of the risks posed by Access Funding's financial-advisory services. Access Funding offered consumers advice concerning their financial best interests and purported to evaluate the individualized benefits of proposed structured-settlement transfers. In explaining the supposed financial benefit of a particular structured-settlement transfer, Access Funding routinely advised consumers about the time value of money and the effect of inflation.[2]

Specifically, Access Funding trained its sales associates that explaining the so-called "time value of money" should be used as a sales tactic and that this tactic was the most important part of any sales call.[3] Sales associates advised unsophisticated consumers that having cash today in a lump sum was a better financial decision than waiting to receive their payments over time with statements such as "a dollar today is worth more than a

---

[2] *See* Coll Declaration Exhibits 1 and 2 (hereafter Coll Decl. Ex.).
[3] Coll Decl. Ex. 3 at 14.

dollar tomorrow."[4] One call script also dramatized the nature of the advice sales associates should give, instructing Access Funding sales associates to "make [consumers] visualize the dream" and "scare them with the nightmare."[5] Access Funding advised consumers that receiving a reduced lump-sum payment immediately was financially preferable to receiving payments over time.[6] In fact, Access Funding pushed consumers to choose arrangements that maximized Access Funding's profits.[7] Access Funding sales associates then minimized for consumers the importance of receiving independent professional advice regarding the structured-settlement transfer by regularly referring consumers to Defendant Smith.

By providing financial advice to consumers regarding their structured-settlement transfers, Access Funding created relationships with consumers in which consumers viewed the Access Funding sales associates as a trusted advisor.

### 2. The Bureau consistently sought information from Access Funding.

The Bureau's motions to modify the scheduling order and for leave to file a Second Amended Complaint should be granted because Access Funding improperly withheld documents from the Bureau for over three years. These documents, and the deposition testimony elicited by the Bureau based on these documents, underpin the new allegations in the proposed Second Amended Complaint.

---

[4] Coll Decl. Ex. 1 at 8.
[5] Coll Decl. Ex. 3 at 14.
[6] Coll Decl. Ex. 4 at 14 ("It is your job to take [consumers] to the promise[d] land and paint the picture of how great life would be if they had a lump sum to buy the things that would solve their problems.").
[7] Coll Decl. Ex. 1 at 9.

The Bureau sent its first civil investigative demand (CID) to Access Funding on September 18, 2015.[8] On November 21, 2016, the Bureau filed the complaint that initiated this lawsuit against Access Funding and the other Defendants.[9] The Bureau issued requests for production of documents to Access Funding on May 7, 2018, and July 27, 2018.[10] Access Funding repeatedly stated that it had produced all responsive documents during the investigation.[11] In late November 2018, the Bureau learned from the Maryland Attorney General's Office of previously withheld documents and quickly contacted the Defendants.[12] On November 30, 2018; January 2, 2019; January 29, 2019; and February 22, 2019, Access Funding produced a total of nearly 40,000 documents to the Bureau.[13] Many of these documents were responsive to one or more Bureau requests made over the previous three years and had never been produced before.

### a. The Bureau first requested the documents in September 2015.

In its very first contact with Access Funding, LLC—by civil investigative demand on September 18, 2015—the Bureau sought:

- "All policies, procedures, and training materials relating to…consumer sales, solicitations, or telemarketing; . . . communications with consumers or third parties about consumer transactions; assessing a consumer's financial needs and use of Structured Settlement transfer proceeds; structuring consumer transactions;

---

[8] Coll Decl. ¶ 7.
[9] ECF 1.
[10] Coll Decl. Exs. 5 and 6.
[11] *See* Coll Decl. Exs. 7 and 8.
[12] Coll Decl. Ex. 9.
[13] Coll Decl. ¶ 13.

interest or effective-interest rates, discount rates, and calculations of the same; . . .[and] terms or fees associated with consumer transactions,"[14]

- "All telephone scripts, talking points, and FAQs,"[15]

- "All written materials, including but not limited to scripts, talking points, outlines, guidelines, and FAQs, used by individuals who advise consumers regarding Structured Settlements,"[16] and

- "All documents (other than contracts or agreements) used to communicate the costs and/or benefits to the consumer of a Company product or service."[17]

Counsel for Access Funding and the Bureau exchanged several letters regarding CID compliance.[18] In one letter, dated October 13, 2015, Access Funding's counsel downplayed the influence of Access Funding employees on consumers and minimized the amount of communication between Access Funding and consumers:

> The individual tells Access how much money they need and what their payments are, and Access then makes them an offer. If the Company and the individual agree on terms, the deal terms are provided in a disclosure statement, which is sent via the mail to the annuitant and signed before a notary. At this point, the 45-90 day process of legally perfecting the sale of the purchased income stream through a court order begins. During this time, there is minimal communication with the annuitants with the exception of local counsel providing a Notice of Hearing related to their upcoming court date and providing the annuitant the anticipated funding date.[19]

The new documents and related testimony demonstrate that this representation was misleading.

---

[14] Coll Decl. ¶ 14.
[15] Coll Decl. ¶ 15.
[16] Coll Decl. ¶ 16.
[17] Coll Decl. ¶ 17.
[18] Coll Decl. ¶ 18.
[19] *See* Coll Decl. ¶ 19.

### b.  The Bureau requested the documents a second time in May 2018.

After concluding its investigation and filing this lawsuit, the Bureau issued its first requests for production of documents to Access Funding on May 7, 2018. These requests sought:

- "All Documents relating to [Access Funding's] evaluation of a consumer's mental capacity to complete a Structured Settlement transfer,"[20]

- "All Documents relating to [Access Funding's] evaluation of a consumer's best interest in connection with a Structured Settlement transfer,"[21]

- "All Documents used by any of [Access Funding's] employees who interacted with consumers regarding Structured Settlements, including but not limited to scripts, talking points, outlines, marketing, advertisements, and FAQs,"[22] and

- "All Documents used to assess or describe a consumer's financial situation or needs or anticipated use of the proceeds from the consumer's transfer of Structured Settlement payments to Access Funding."[23]

Access Funding objected to these four requests and referred generally to the documents already produced in response to the September 18, 2015, CID.[24] Access Funding produced no additional documents to the Bureau in response to these requests.

---

[20] Coll Decl. Ex. 5 at 7.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *See* Coll Decl. Ex. 7 at 7-9.

### c. The Bureau requested the documents a third time in July 2018.

The Bureau issued additional requests for production of documents to Access Funding on July 27, 2018. These requests sought:

- "All Documents reflecting communications with consumers, regardless of whether they completed a structured-settlement transfer with Access Funding,"[25] and

- "All policies, procedures, and other Documents relating to [Access Funding's] interactions with consumers."[26]

In replying to these two requests, Access Funding again referenced its productions in response to the September 18, 2015, CID and produced no additional documents.

### d. Access Funding produced additional responsive documents after November 2018.

On November 20, 2018, the Bureau learned of a recent, large production of documents by Access Funding to the Maryland Attorney General's Office.[27] The Bureau received several documents from the Maryland Attorney General's Office and ran searches to confirm that they were not duplicates of information already in the Bureau's possession. On November 27, 2018, the Bureau requested a meet and confer with Defendants regarding the Bureau's potential motion to compel the production of these improperly withheld documents.[28] Access Funding then agreed to produce the documents it had produced to the Maryland Attorney General's Office and to jointly seek an extension of discovery and other deadlines to provide the Bureau time to review them.[29]

---

[25] Coll Decl. Ex. 6 at 6.
[26] *Id.*
[27] Coll Decl. ¶ 20
[28] Coll Decl. Ex. 9.
[29] Coll Decl. Ex. 10.

Access Funding produced over 35,000 documents to the Bureau on November 30, 2018.[30] Differences between production formats used by Access Funding in its various productions required that the Bureau perform document-specific manual searches to determine that the November 30, 2018, production contained many responsive documents that Access Funding had not previously produced.[31] By a December 18, 2018 letter, the Bureau asked Access Funding to conduct an additional search using search terms identified by the Bureau to probe the completeness of the production made to the Maryland Attorney General's Office for the Bureau's purposes.[32] The Bureau also requested that Defendants join another motion to extend deadlines so the Bureau could review the newly produced documents and revise its deposition strategy as necessary.[33] Access Funding produced additional documents on January 2, 2019; January 29, 2019; and February 22, 2019.[34] Together, these last three productions contained over 4,500 additional documents, and each of the three productions contained responsive, previously withheld documents.[35]

### e.  The new documents revealed new facts.

The productions on or after November 30, 2018 included never-before-seen sales-related documents that improved and changed the Bureau's understanding of the Access Funding Defendants' interactions with consumers:  rather than acting as a passive broker of structured-settlement transfers, Access Funding provided significant financial advice to

---

[30] Coll Decl. ¶ 22 and Ex. 11.
[31] Coll Decl. ¶ 24.
[32] Coll Decl. Ex. 12.
[33] *Id.*
[34] Coll Decl. Exs. 13-15.
[35] Coll Decl. ¶ 13.[36] Coll Decl. Ex. 4 at 27-28.

consumers. In particular, Access Funding produced for the first time the Access Funding Sales Manual and certain sales scripts, all of which were responsive to multiple requests in the September 18, 2015, CID and the May 7, 2018, and July 27, 2018, requests for production.

The Access Funding Sales Manual stated:[36]

- "Everyone wants the money, but they are afraid of getting ripped off or making the wrong decision. Before you get to the quoting part of the conversation, two things must occur: 1) **You have made a connection with the customer, built up the best interest, evaluated their financial needs and have come up with a customized plan that solves their problem.** 2) Properly explained the TMV concept. The TMV concept and best interest support are your two key selling points used to counter price objections. It doesn't matter how many times you have to repeat yourself, keep using examples of TMV until it sinks in and they understand" (emphasis added).

- "A lot of customers are hesitant to sell their monthly payments because in many cases it is their only source of income. You need to redirect the conversation and get them thinking about the benefits of the lump vs. the negatives of not receiving monthly payments. Most of the prospects are very short sighted, so get them thinking about the future. Ask them 'What were you planning on doing when the money payments stop? What is your plan B? You are going to have to either get a job or start a business eventually, so why not start preparing for the future now?' If

---

[36] Coll Decl. Ex. 4 at 27-28.

you cannot get them to take the short sighted blinders off, do not purchase the immediate payments. Instead start purchasing 1 or 2 years out...."

The Sales Manual also outlined Access Funding's approach with consumers, further altering the Bureau's analysis of the completeness of its allegations and claims. While Defendant Boghosian's deposition testimony disclaims the use of the full Sales Manual in practice, the document productions and testimony of other witnesses demonstrates that these sections regarding interactions with consumers are a distillation of the best practices developed by sales people over the course of Access Funding's operation.

One call script[37] included the following instructions for salespeople, including:

- "Remember that with each option the payments that are closer in will get you the best dollar for dollar return because of the time value of money that we discussed. A dollar today is worth more than a dollar tomorrow, right?"

- "That is why it is so important that the time value of money concept is engrained in their head from the start. Repetition is key here. Go over the options again maximizing the benefits and minimizing the negatives. Say the same thing over and over in different ways. Use examples of inflation...."

- "Build up the best interest so that they choose the bigger deal with the bigger spreads."

- "Know your audience. These are not finance wizards and the savings on the back end or additional funds need to be put in perspective. If you are talking to a young urban, use the Jordan's example. If you can tell that they are a heavy smoker, use the cigarettes example. If it is a single mother, use the bags of groceries example."

---

[37] Coll Decl. Ex. 1 at 8-9, 12.

Another sales script includes as the answer to consumers' questions about what separates Access Funding from its competitors: "We take the time to listen to your needs and customize a plan that will work for you. We do not pressure you to sell more payments than you need to. My job is to help you take care of your financial needs today without putting you in a position that will not hurt you tomorrow."[38] A version of a sales script not produced until February 22, 2019, included the statement, "Note: Prudent practice is to obtain an [*sic*] mental evaluation—make sure she has the mental capacity to understand the contract and enter into the transaction."[39] With the production of these sales scripts, the Bureau first learned of these specific sales tactics.

### f.  March 2019 deposition testimony corroborated the Bureau's new understanding of Access Funding's actions.

The recently produced documents also enabled the Bureau to question deponents more effectively about Access Funding's practices. One former Access Funding sales associate testified about the importance of explaining the time value of money and inflation to consumers.[40] He said:  "The best and the easiest way is . . . typically a dollar today is worth more than a dollar tomorrow. And the reason why that is, there's inflation, cost of goods and services going up over a period of time, and the money that's sitting there for you with no increase, it's just losing value every year."[41] Further, he stated that he would ask questions to understand consumers' needs to formulate the options available from Access Funding.[42] In addition, the former Access Funding sales manager testified that

---

[38] *Id.* at 7.
[39] Coll Decl. Ex. 16 at 6.
[40] Coll Decl. Ex. 2 at 8-9.
[41] *Id.* at 9.
[42] *Id.* at 5-6.

he was aware sales associates would sometimes provide consumers with their "professional opinion" about the best structured settlement purchase option for them.[43]

### g. The parties have jointly requested multiple extensions to the scheduling order.

The Court has granted five extensions of the discovery deadline in this matter, all of which were jointly requested by the parties: two extensions to allow the parties time for settlement discussion,[44] two to grant the Bureau time before depositions to review the thousands of documents previously withheld by the Defendants,[45] and one to allow the continuation of a consumer deposition.[46] None of the joint motions addressed the deadline for amending the pleadings, because that date had passed before the parties requested the first extension to pursue settlement negotiations and the Bureau was operating under the assumption that it had received from Defendants all responsive documents.[47]

Discovery closed on April 9, 2019, and pretrial dispositive motions would have been due by May 24, 2019.[48]

### LEGAL STANDARD

When a party seeks to amend its pleadings after the deadline for doing so in a court's scheduling order has expired, it must satisfy Rule 16, which states that the court's

---

[43] Coll Decl. Ex. 17 at 6.
[44] ECF 79 and 84.
[45] ECF 86 and 93.
[46] ECF 98.
[47] *See* ECF 79.
[48] ECF 98. (After a May 15, 2019, conference call (ECF 101) and the filing of a proposed schedule (ECF 104), the Court ordered the filing of these motions by May 24, 2019 (ECF 105).)

schedule "may be modified only for good cause and with the judge's consent."[49] The

moving party has the burden of demonstrating good cause, which involves a showing that

it has acted diligently and in good faith.[50] A party's failure to move for leave to amend

before the deadline does not, in itself, constitute a lack of diligence, even where the

information supporting amendment was known before the party filed its request.[51] If the

amendment would cause delay, the court may consider the length of the delay and whether

it will prejudice the non-moving party.[52]

Once the moving party has demonstrated good cause for the requested modification,

the court will turn to Rule 15, which specifies that leave to amend a complaint "shall be

freely given when justice so requires."[53] Such leave "should be denied only when the

amendment would be prejudicial to the opposing party, there has been bad faith on the

part of the moving party, or the amendment would be futile."[54]  The decision to allow an

amended complaint is within the discretion of the court, but must be based upon a

justifying reason.[55] "If the underlying facts or circumstances relied upon by plaintiff may be

---

[49] Fed. R. Civ. P. 16(b)(4); *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *see also Cook v. Howard*, 484 F. App'x 805, 814-15 (4th Cir. 2012) (per curiam) ("[U]nder Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment.").

[50] *Kantsevoy v. LumenR LLC*, No. 17-359, 2018 WL 3468078 at *5-6 (D. Md. Mar. 13, 2018).

[51] *Weisheit v. Rosenberg & Assoc., LLC*, No. JKB-17-0823, 2018 WL 1942196 at *3-4, (D. Md. April 25, 2018).

[52] *Id*. at *6.

[53] Fed. R. Civ. P. 15(a)(2).

[54] *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (internal quotation and citation omitted).

[55] *Foman v. Davis*, 371 U.S. 178, 182 (1962).

a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."[56]

## ARGUMENT

### 1. The Bureau has shown good cause to extend time to amend the pleadings.

To demonstrate good cause, the party seeking relief must "'show that the deadlines cannot reasonably be met despite the party's diligence,' and whatever other factors are also considered, 'the good-cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule.'"[57] In determining whether the moving party has met its burden to show good cause, a court may consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party."[58]

While the deadline for amending the pleadings passed nearly eleven months ago, the Bureau has worked assiduously during that time to litigate and resolve this matter. The Bureau repeatedly sought information regarding Access Funding's communications with consumers, including its policies, procedures, and sales scripts, and Access Funding repeatedly responded that it had produced all responsive documents. The Bureau did not become aware until the end of November 2018 that additional responsive documents existed and had been withheld improperly by Access Funding during the Bureau's investigation and during discovery. After discovering the existence of these nearly 40,000

---

[56] *Id.*

[57] *Cook*, 484 F. App'x at 815 (alterations in *Cook*) (quoting 6A Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1522.2 (3d ed. 2010)).

[58] *Elat v. Ngoubene*, 993 F.Supp.2d 497, 520 (D. Md. 2014) (citing *Tawwaab v. Va. Linen Serv., Inc.*, 729 F.Supp.2d 757, 768-69 (Bankr. D. Md. 2010)).[59] Discovery closed on April 9, 2019. *See* ECF 98.

additional documents, the Bureau quickly reviewed them—including those the Defendants produced immediately before the start of depositions last January and February.

The effects of the requested extension would not prejudice the Defendants. Because the new counts in the proposed Second Amended Complaint mirror counts in the First Amended Complaint, the Bureau is not seeking any additional time for discovery and Defendants should not need additional discovery either.[59] After the Second Amended Complaint is entered, the Bureau expects to proceed to the parties' briefing of motions for summary judgment. In sum, the Bureau has demonstrated good cause for requesting leave to amend the pleadings after the deadline in the scheduling order.

### 2.  The Bureau's proposed amendment would not cause prejudice and is made in good faith.

Rule 15 states that leave to amend the pleadings before trial "shall be freely given when justice so requires."[60] Part of the Rule 15 analysis is to determine whether the amendment would be prejudicial to the opposing party or there has been bad faith on the part of the moving party.[61] Like in *Davis v. Piper Aircraft Corp.,* where the Fourth Circuit held that, because the "defendant was from the outset made fully aware of the events giving rise to the action," permitting the plaintiff to amend the complaint "could not in any way prejudice the preparation of defendant's case,"[62] Defendants would not be prejudiced here, because they have always been aware of the facts underpinning the proposed Second Amended Complaint's new allegations. And the Bureau has not acted in bad faith—the Bureau repeatedly sought facts regarding Access Funding's sales tactics, and, as soon as it

---

[59] Discovery closed on April 9, 2019. *See* ECF 98.
[60] Fed. R. Civ. P. 15(a)(2).
[61] *Edwards*, 178 F.3d at 242.
[62] *See* 615 F.2d 606, 613 (4th Cir. 1980).

was apparent that Defendants wrongly withheld responsive documents, the Bureau demanded their production. The Bureau is not seeking unfair tactical advantage, adding surprise allegations, or causing unwarranted delay.[63] Accordingly, the Bureau should be allowed to amend its Complaint and to test its allegations against Defendants on the merits.

### 3. The Bureau's proposed amendment is not futile.

A court may deny leave to amend where it would be futile to do so.[64] An amendment is futile where the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) because it "fails to 'state a claim to relief that is plausible on its face.'"[65] In determining whether an amendment is futile, "the Court construes all facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."[66] And for purposes of evaluating the likelihood of dismissal, the allegations in the proposed amended complaint must be assumed to be true.[67]

### a. Access Funding is a "covered person."

A "covered person" is one that offers or provides a consumer-financial product or service.[68] The CFPA defines "financial product or service" to include "providing financial advisory services . . . to consumers on individual financial matters."[69] The court has already found that certain practices constitute providing financial-advisory services. Specifically, in

---

[63] *See* 6 Wright & Miller, § 1487 n.30.
[64] *See, e.g.*, *Edwards*, 178 F.3d at 242.
[65] *Applegate, LP v. City of Frederick*, 179 F. Supp. 3d 522, 527–28 (D. Md. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[66] *Id.* (citing *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997)).
[67] *See Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) (citing *Twombly*, 550 U.S. at 555).
[68] 12 U.S.C. § 5481(6)(A).
[69] 12 U.S.C. § 5481(15)(A)(viii).

its order regarding Defendants' motions to dismiss the November 2016 complaint, the court noted that the CFPA defines one type of financial product or service as "providing financial advisory services . . . to consumers on individual financial matters," (quoting 12 U.S.C. § 5481(15)(A)(viii)), and stated that with respect to Defendant Charles Smith "[t]he decision whether to sell a structured settlement for an immediate lump sum payment is clearly an 'individual financial matter.'"[70]

The new facts in the proposed Second Amended Complaint illustrate Access Funding's actions as a provider of financial-advisory services. Access Funding advised consumers about the supposed financial benefit of structured-settlement transfers generally and the benefits to the consumer in particular of the offered lump-sum payments, including attempting to explain to consumers the time value of money and the effect of inflation to show that a lump sum was more financially beneficial than receiving payments over time.[71] Access Funding trained its sales associates that explaining the so-called "time value of money" should be used as a sales tactic to convince consumers to complete the transaction and that this tactic was the most important part of any sales call.[72] As demonstrated by the language in the Sales Manual—"You have made a connection with the customer, built up the best interest, evaluated their financial needs and have come up with a customized plan that solves their problem"—Access Funding told consumers that it would assess their best interests and evaluate their needs, when in fact Access Funding pushed consumers to choose the arrangements that maximized Access Funding's profits.[73]

---

[70] Memorandum, *CFPB v. Access Funding, et al.*, September 13, 2017, J. Motz, ECF 27.
[71] Coll Decl. Ex. 1 and 2.
[72] Coll Decl. Ex. 3 at 14.
[73] Coll Decl. Ex. 4 at 27.

In sum, these actions turned Access Funding employees from salespeople to providers of financial advice as they helped consumers decide whether to sell a structured settlement for an immediate lump-sum payment.

### b. The Access Funding Defendants engaged in unfair, deceptive, and abusive acts practices.

The proposed Second Amended Complaint alleges that the Access Funding Defendants engaged in unfair, abusive, and deceptive acts and practices. Each of these three counts mirror the counts that the Bureau has previously alleged against Smith.[74] While the First Amended Complaint alleged that the Access Funding Defendants substantially assisted Smith's unfair, deceptive, and abusive acts and practices ("UDAAPs"), the Bureau did not at the time of filing have facts sufficient to allege that the Access Funding Defendants directly engaged in UDAAPs. The new facts change that. Each of the Bureau's new claims hinge on two key aspects of Access Funding's conduct: (1) advising consumers that transferring their structured-settlement payments would be more financially beneficial than collecting the payments over time, (2) while simultaneously minimizing for consumers the importance of their receiving independent professional advice regarding the structured-settlement transfer. Access Funding referred consumers to Smith, who was not independent from Access Funding and who did not provide consumers with true independent professional advice, while discouraging consumers from seeking truly independent professional advice.

---

[74] *See* First Amended Complaint, December 13, 2017, ECF 44.

### i. The Access Funding Defendants' actions were unfair.

An act or practice is "unfair" if it "is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and that "such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[75] This standard for the meaning of unfair acts or practices is borrowed from the Federal Trade Commission Act ("FTCA").[76] Under the FTCA, a "substantial injury" is generally a financial one, although certain other types of injuries are cognizable as well.[77] As the FTC has recognized, unfairness claims often involve "sales techniques [that] prevent consumers from effectively making their own decisions."[78]

Access Funding offered or provided financial-advisory services to consumers regarding their structured-settlement transactions, including advising consumers that transferring their structured-settlement payments would be more financially beneficial than collecting the payments over time.[79] After establishing a relationship with consumers by providing financial advisory services, Access Funding referred nearly all Maryland consumers to Smith. Access Funding did not tell consumers about its relationship with Smith. Then Smith provided no advice to these consumers and was compensated directly by Access Funding for his services.

---

[75] 12 U.S.C. § 5531(c)(1).

[76] *CFPB v. NDG Fin. Corp.*, 15-CV-5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) (citing *CFPB v. ITT Educ. Servs., Inc.,* No. 1:14 Civ. 00292, 2015 WL 1013508, at *25 (S.D. Ind. Mar. 6, 2015)).

[77] *Id.*

[78] *See* FTC Policy Statement on Unfairness (1980), *available at* https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness.

[79] *See* Coll Decl. Ex. 1.

Access Funding's conduct caused or was likely to cause substantial injury because it led consumers to believe that the structured-settlement transfer was a good financial decision for them. Access Funding's conduct also prevented consumers from obtaining real independent advice before completing their structured-settlement transfers. Consumers who otherwise could have availed themselves of truly independent advice, which might have dissuaded them from moving forward with transactions that were not in their best interests or permitted them to evaluate alternatives, were not aware that the advice they were receiving was not independent.

The injury to consumers was not reasonably avoidable because financially unsophisticated consumers were led to believe that the Access Funding sales people were providing advice in their best interests. Further, Access Funding minimized the importance of receiving the kind of independent professional advice that could have alerted consumers about the risks and potential injury that could result from entering into a structured-settlement transfer with Access Funding. In addition, the injury to consumers was not reasonably avoidable because Smith, the purported independent professional advisor to whom Access Funding referred consumers, was not actually independent, thus lulling consumers into believing that they were, in fact, receiving the kind of independent professional advice that could have alerted them to the risks and potential injury that could result from entering into a structured-settlement transfer with Access Funding.

The injury was not outweighed by countervailing benefits to consumers or to competition. While consumers received a lump sum from their structured-settlement transfers, that benefit did not outweigh their injury. These consumers received a structured settlement because a court determined that a structured settlement would be better for

them than a lump sum, and many consumers' structured settlements were based on their suffering cognitive impairments. Access Funding's conduct prevented consumers from receiving the independent professional advice that may have prevented them from selling their future payments at all or for so little. Further, competition was harmed by Access Funding's conduct, since there is a competitive market for structured settlement deals, and consumers receiving true independent advice likely would demand a larger lump-sum payment for their future structure-settlement payments.

### ii. The Access Funding Defendants' actions were deceptive.

Under the CFPA, it is unlawful for a covered person to engage in a deceptive act or practice.[80] An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.[81]

Access Funding told consumers that transferring their structured-settlement payments would be more financially beneficial than collecting the payments over time, but then prevented consumers from receiving the required independent advice that might reveal whether the transaction was actually in the consumer's best interest. Access Funding referred nearly all of its Maryland consumers to Smith for independent advice, ensured Smith could contact the consumers, had consumers sign documents saying they had received independent professional advice before they had spoken with Smith, and paid Smith directly for his services.

---

[80] 12 U.S.C. § 5536(a)(1)(B).
[81] *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016); *see also CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016), reconsideration denied, No. 15-CV-5211 (CM), 2016 WL 7742784 (S.D.N.Y. Dec. 19, 2016).

Access Funding represented, directly or indirectly, expressly or by implication, to consumers that they needed independent advice on their structured-settlement transfers to complete them. Access Funding also represented to consumers that Smith would provide independent advice. Access Funding also had consumers sign documents stating: "I have been advised to seek independent professional advice in connection with the transfer. I have received independent professional advice and desire to go forward with the transaction." In fact, Access Funding omitted or misrepresented its relationship with Smith. Smith had personal and professional ties to the Access Funding Defendants and was paid directly by Access Funding. Consumers were reasonable in believing Access Funding's express representations that Smith would provide independent professional advice to them. Access Funding's express misrepresentations about Smith's independence are presumptively material.[82] Further, these misrepresentations are likely material to consumers because, if they had known that Smith was not independent, they could have opted to seek advice elsewhere.[83]

### iii.   The Access Funding Defendants' actions were abusive.

Under the CFPA, an act or practice is abusive in connection with the provision of a consumer financial product or service if it takes unreasonable advantage of "the reasonable

---

[82] FTC Policy Statement on Deception. *See also Fanning v. FTC*, 821 F.3d 164, 172-73 (1st Cir. 2016); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992).
[83] FTC Policy Statement on Deception; *see also FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (citing *Cliffdale Assoc., Inc.*, 103 F.T.C. 110, 165 (1984)); *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (quoting *Matter of Cliffdale Assoc., Inc.*, 103 F.T.C. 110 (1984)).

reliance by the consumer on a covered person to act in the interests of the consumer"[84] or if it takes unreasonable advantage of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service."[85]

The Access Funding Defendants' actions were abusive in two ways. First, consumers reasonably relied on Access Funding to provide financial-advisory services related to their structured-settlement transfers, and the Access Funding Defendants took unreasonable advantage of that reliance.[86] Access Funding encouraged salespeople to create a relationship with consumers in which consumers felt comfortable relying on the salespeople's advice. Salespeople advised consumers that transferring their structured-settlement payments would be more financially beneficial than collecting the payments over time, told consumers that it would assist consumers in completing a structured-settlement transfer, and directed consumers to Smith as part of that completion. Consumers reasonably relied on Access Funding to provide the financial-advisory services to complete the transaction and to act in consumers' interests. Access Funding minimized the importance of receiving the kind of independent professional advice that could have alerted consumers about the risks and potential injury that could result from entering into a structured-settlement transfer with Access Funding, and instead referred consumers to Smith, who was not independent from Access Funding and who did not provide consumers with true independent professional advice. In doing so, Access Funding took unreasonable advantage of consumers' reasonable reliance on Access Funding to act in their interests.

---

[84] 12 U.S.C. § 5531(d)(2)(C); *see also CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 918-21 (S.D. Ind. 2015).
[85] 12 U.S.C. § 5531(d)(2)(A).
[86] *See* 12 U.S.C. § 5531(d)(2)(C).

Second, the Access Funding Defendants took unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the financial-advisory services they provided.[87] Structured-settlement transfers are complicated transactions, and the consumers targeted by Access Funding were not financially sophisticated. Indeed, many suffered cognitive impairments as a result of lead poisoning, which led to their court-ordered structured settlement in the first place. Access Funding provided financial advice to unsophisticated consumers that was misleading or untrue. Access Funding also downplayed the importance of consumers receiving independent professional advice regarding the structured-settlement transfer and instead referred consumers to Smith, who was not independent from Access Funding and who Access Funding relied upon to quickly process the transaction and not provide consumers with true independent professional advice. Access Funding took unreasonable advantage of consumers' lack of understanding of the risk and cost of the financial-advisory services.

## CONCLUSION

Because the Bureau has shown good cause to modify the scheduling order, and because the proposed amendment would not be prejudicial to Defendants, is not being presented in bad faith, and would not be futile, the Court should extend the deadline for amending pleadings and grant the Bureau leave to amend its complaint.


Respectfully submitted,

_/s/ Christina S. Coll_
Christina S. Coll
Meghan Sherman Cater

---

[87] *See* 12 U.S.C. § 5531(d)(2)(A).

James Meade
Navid Vazire
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, D.C. 20552
Telephone (Coll): 202-435-7843
Telephone (Cater): 202-435-9165
Telephone (Meade): 415-645-6616
Telephone (Vazire): 202-435-7270
Facsimile: 202-435-7722
christina.coll@cfpb.gov
meghan.cater@cfpb.gov
james.meade@cfpb.gov
navid.vazire@cfpb.gov
*Attorneys for Plaintiff*
Consumer Financial Protection Bureau