IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | |
| *Plaintiff*, | |
| v. | Civil Action No. ELH-16-3759 |
| ACCESS FUNDING, LLC, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

In November 2016, plaintiff Consumer Financial Protection Bureau (the "Bureau" or "CFPB") filed suit against a host of defendants under the Consumer Financial Protection Act of 2010 ("CFPA" or the "Act"), 12 U.S.C. §§ 5481 *et seq*., challenging their structured settlement practices. ECF 1 ("Complaint").[1] In particular, CFPB sued the following defendants: Access Funding, LLC ("Access Funding"); Access Holding, LLC ("Access Holding"); Reliance Funding, LLC ("Reliance"); Lee Jundanian, former Chief Executive Officer ("CEO") of Access Funding; Raffi Boghsian, Chief Operating Officer ("COO") of Access Funding; Michael Borkowski, CEO of Access Funding (collectively, the "Access Funding Defendants"); and Charles Smith, Esquire, financial advisor. Among other things, the Access Funding Defendants allegedly steered consumers to Smith for advice with respect to the sale of their structured settlements to the Access Funding Defendants, and paid Smith for his work.

The Complaint contains five counts: Count I is lodged against Smith for Unfair Acts and Practices Under the CFPA.; Count II is lodged against Smith for Deceptive Acts and Practices

---

[1] The case was originally assigned to Judge J. Frederick Motz. It was reassigned to me on December 7, 2017, due to the retirement of Judge Motz.

Under the CFPA; Count III, filed against Smith, asserts Abusive Acts and Practices Under the CFPA; Count IV is filed against the Access Funding Defendants for Substantial Assistance to Smith's Unfair, Deceptive, and Abusive Acts; and Count VI[2] is filed against the Access Funding Defendants for Abusive Acts and Practices Related to Advances to Customers.  ECF 1, ¶¶ 44–81.

On September 13, 2017, Judge J. Frederick Motz, to whom the case was then assigned, dismissed Counts I–IV of the Complaint as to Smith.  ECF 27.  He found that Smith was engaged in the practice of law when he provided advice to consumers, and therefore his conduct fell under the "practice of law" exclusion to the CFPA in 12 U.S.C. § 5571(e).  ECF 27 at 26.  The Bureau moved to amend the complaint, seeking to add allegations that consumers never formed an attorney-client relationship with Smith.  ECF 37.  The Access Funding Defendants and Smith opposed the motion.  ECF 39; ECF 40.  I granted the Bureau's motion on December 13, 2017.  ECF 42; ECF 43.  And, on the same day, the Bureau filed its Amended Complaint (ECF 44), again naming Smith as a defendant, based on additional allegations.

This Memorandum Opinion resolves the "Motions for (1) a Modification of the Scheduling Order and (2) Leave to File a Second Amended Complaint" (ECF 106) filed by the Bureau, supported by a memorandum of law (ECF 107) (collectively, the "Motion").  Plaintiff has also submitted the proposed Second Amended Complaint (ECF 106-1), the Declaration of Christina S. Coll, Esquire, Senior Litigation Counsel for the Bureau (ECF 108), and several exhibits.  ECF 108-1 to ECF 108-17.  The proposed Second Amended Complaint ("SAC") adds three counts under the Act against defendants Access Funding, Access Holding, Reliance, Jundanian, Boghosian, and Borkowski.  ECF 106-1, ¶¶ 108–127.

---

[2] The Complaint omitted Count V.

Smith opposes the Motion. ECF 109 (the "Smith Opposition"). The Access Funding Defendants also oppose the Motion. ECF 110 (the "Access Funding Opposition"). The Access Funding Opposition is supported by several exhibits. ECF 110–1 to ECF 110-7. The Bureau has replied. ECF 111 (the "Reply"). The Reply is supported by another Declaration of Christina S. Coll, Esquire (ECF 111-1) and several exhibits. *See* ECF 111-2 to ECF 111-4.

The Motion is fully briefed and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will deny the Motion.

## I.     Statutory Background

As noted, the case concerns structured settlement factoring. Structured settlement factoring involves the offer to "recipients of structured settlements the opportunity to transfer a portion of their future payment streams in exchange for [payment of] a discounted immediate lump sum." ECF 44, ¶ 20. CFPB alleges that defendants violated the CFPA by playing a part in a scheme to pursue structured settlement holders in order to purchase their settlements on unfair terms.

The CFPA prevents "a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). The CFPA defines "covered person" in part as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). Further, the CFPA defines a "financial product or service" in part as "providing financial advisory services. . . to consumers on individual financial matters. . ." 12 U.S.C. § 5481(15)(viii).

Under the CFPA, an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §

5531(c)(1). An act or practice is "deceptive" if it involves a representation, omission, or practice that is both material and likely to mislead reasonable consumers. *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (internal citation omitted). And, an act or practice is "abusive" if it "takes unreasonable advantage of" either "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2).

The requirement of independent financial advice in a structured settlement transaction is based on Maryland's Structured Settlement Protection Act ("SSPA"). *See* Maryland Code (2013 Repl. Vol, 2019 Supp.), § 5-1101 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."). The SSPA is intended to protect certain payees from "deceptive practices." C.J. § 5-1101.1. Under the SSPA, a court must authorize by order the transfer of structured settlements, and may do so only if the "payee received independent professional advice ['IPA'] regarding the legal, tax, and financial implications of the transfer." *Id.* at § 5-1102(b)(3).[3]

At about the same time that the Bureau began its investigation of defendants in 2015, Maryland's Consumer Protection Division began its own investigation. According to the defense, the two agencies have "worked in tandem" in prosecuting the defendants, including the sharing of documents. ECF 110 at 2, n.2; *id.* at 3 n.4.

## II. Factual and Procedural Background[4]

---

[3] The SSPA was enacted in 2000. Several amendments, including § 5-1101.1, went into effect on October 1, 2016, pursuant to Article II, § 17(c) of the Maryland Constitution. I have quoted from the statute that was in effect prior to October 2016.

[4] Facts about the scheme alleged in the Complaint and the Amended Complaint are set forth in Judge Motz's Memorandum Opinion granting in part and denying in part the motion to dismiss the initial Complaint (ECF 27) and my Memorandum Opinion denying the defendants' motion for partial summary judgment with respect to the Amended Complaint (ECF 87). Because the facts are laid out there in detail, it is not necessary to discuss them at length here.

As noted, on September 13, 2017, Judge Motz dismissed Counts I–IV of the Complaint against Smith. In the Amended Complaint (ECF 44), filed December 13, 2017, CFPB alleged that the Access Funding Defendants targeted "consumers who had previously transferred a portion of their structured settlements." *Id.* ¶ 23. They allegedly pressured payees into "signing away their future payment streams" in exchange for a lump sum that "typically represented only about 30% of the present value of those future payments." *Id.* ¶ 27. In addition, the Access Funding Defendants allegedly referred the payees to Smith to act as the IPA, as required under the Maryland SSPA, yet Smith was compensated for his services by the Access Funding Defendants. *Id.* ¶¶ 33–34. The Bureau also added allegations reflecting that Smith and the payees he advised never entered into an attorney-client relationship. *Id.* ¶¶ 35–57.

The Amended Complaint otherwise alleged the same scheme as the initial Complaint: that Smith engaged in unfair (Count I), deceptive (Count II), and abusive (Count III) acts and practices, in violation of 12 U.S.C. §§ 5531(a), (b), and (d), and that the Access Funding Defendants substantially assisted Smith's unfair, deceptive, and abusive acts (Count IV), in violation of 12 U.S.C. § 5536(a)(3). *See* ECF 44, ¶¶ 62–92. Count V is based on the conduct of the Access Funding Defendants with respect to credit advances. *See id.* ¶¶ 93–99.

Thereafter, on December 27, 2017, Smith moved to dismiss, or in the alternative, for summary judgment. ECF 46. Defendant Borkowski also moved to dismiss. ECF 48. And, on April 6, 2018, the defendants filed a joint motion for partial summary judgment with respect to the Amended Complaint. ECF 58. By Order of June 5, 2018 (ECF 66), I denied the motions to dismiss filed by Smith (ECF 46) and Borkowski (ECF 48). And, on January 18, 2019, I denied the defendants' joint motion for partial summary judgment. ECF 87; ECF 88.

In the meantime, on February 22, 2018, I entered a Scheduling Order. ECF 56. It set a discovery deadline of September 26, 2018; a dispositive motion deadline of October 30, 2018; and a deadline of June 22, 2018, for amending the pleadings. *Id.*

On September 10, 2018, the parties submitted a joint motion to extend the discovery deadline to November 16, 2018, and the dispositive motion deadline to December 28, 2018. ECF 77. That motion was granted. ECF 79. Then, on October 29, 2018, the parties submitted another joint motion, seeking to extend the discovery deadline to December 19, 2018, and the dispositive motion deadline to January 30, 2019. ECF 83. Again, I granted the motion. ECF 84.

A discovery dispute arose in late 2018 regarding interactions between the Access Funding Defendants and the consumer payees. The Bureau claimed it had been seeking certain information about the Access Funding Defendants' interactions with consumers since September 2015. ECF 107 at 5. In this regard, plaintiff claimed that it had sent three requests to the Access Funding Defendants: the civil investigative demand ("CID") on September 18, 2015; a request for production of documents ("RFP") on May 7, 2018; and another RFP on July 27, 2018. *Id.* at 5–8.

According to Christina Coll, the Bureau made the following requests in the 2015 CID, ECF 108, ¶¶ 14–17:

> "All policies, procedures, and training materials relating to. . . consumer sales, solicitations, or telemarketing; . . . communications with consumers or third parties about consumer transactions; assessing a consumer's financial needs and use of Structured Settlement transfer proceeds; structuring consumer transactions; interest or effective-interest rates, discount rates, and calculations of the same; . . .[and] terms or fees associated with consumer transactions."

> "All telephone scripts, talking points, and FAQs."

> "All written materials, including, but not limited to scripts, talking points, outlines, guidelines, and FAQs used by individuals who advise consumers regarding Structured Settlements."

> "All documents (other than contracts or agreements) used to communicate the costs and/or benefits to the consumer of a Company product or service."

The Access Funding Defendants aver that they produced "thousands upon thousands" of documents in response to the CID. ECF 110 at 12. The Bureau claims that the Access Funding Defendants' responses to the CID "downplayed the influence of Access Funding employees on consumers." ECF 107 at 6. In a letter to the Bureau of October 13, 2015, Access Funding's counsel stated: "The individual tells Access how much money they need and what their payments are, and Access then makes them an offer." ECF 108, ¶ 19.

In May 7, 2018, CFPB submitted the following RFP, in part, ECF 108-5 at 7:

"8. All Documents relating to [Access Funding's] evaluation of a consumer's mental capacity to complete a Structured Settlement transfer."

"9. All Documents relating to [Access Funding's] evaluation of a consumer's best interest in connection with a Structured Settlement transfer."

"10. All Documents used by any of [Access Funding's] employees who interacted with consumers regarding Structured Settlements, including but not limited to scripts, talking points, outlines, marketing, advertisements, and FAQs."

"12. All Documents used to assess or describe a consumer's financial situation or needs or anticipated use of the proceeds from the consumer's transfer of Structured Settlement payments to Access Funding."

CFBP's RFP of July 27, 2018, sought, ECF 108-6 at 6:

"23. All Documents reflecting communications with consumers, regardless of whether they completed a structured-settlement transfer with Access Funding."

"29. All policies, procedures, and other Documents relating to [Access Funding's] interactions with consumers."

The Access Funding Defendants did not produce any additional documents on these topics in response to either RFP. ECF 108-7 at 7–9; ECF 108-8 at 5, 8. As noted, the State has conducted a separate but related investigation of defendants. And, on November 20, 2018, the Bureau received information from the Maryland Attorney General's Office, indicating that the Access Funding Defendants had made a production to that office of about 200,000 documents.

Apparently, that production contained documents responsive to the Bureau's earlier document requests, which had not been produced by the defense. ECF 108, ¶ 20.

CFPB notified counsel for the Access Funding Defendants by email dated November 27, 2018, that the Bureau believed "defendants have withheld responsive, non-privileged documents that should have been produced in response to Bureau's discovery requests." ECF 108-9 at 2. The Bureau also informed the Access Funding Defendants that it "intend[ed] to file a motion to compel production and a motion to extend the discovery schedule given the prejudice to the Bureau from not having received responsive discovery before the currently-scheduled depositions." *Id.* at 3.

Also on November 27, 2018, the Bureau wrote to counsel for the Access Funding Defendants, seeking to meet and confer. ECF 108-9. The Access Funding Defendants "agreed to produce the documents" they had produced to the Maryland Attorney General's Office "and to jointly seek an extension of discovery and other deadlines to provide the Bureau time to review them." ECF 107 at 8; ECF 108-10.

On November 30, 2018, the Access Funding Defendants produced over 35,000 documents to the Bureau, some of which were responsive to the Bureau's earlier requests. ECF 107 at 9; ECF 108-11. The Access Funding Defendants explain that, in the State case, the Circuit Court for Baltimore City ruled in November 2018 that the Access Funding Defendants had ten days to "produce certain documents based on broad keyword terms . . . ." ECF 110 at 7. Further, "these documents were produced in response to broadly worded orders, completed on a short timeline" and "the Access Funding Defendants had no ability to remove documents that had already been produced during the pre-litigation investigations," such as documents that were "irrelevant" or "duplicative" documents. *Id.* at 8. Defense counsel noted that, because they produced the

materials to the Maryland Attorney General's Office on a 10-day timeline, they "were unable to review the materials for relevance, etc." ECF 108-11 at 3.

On December 4, 2018, the parties filed a joint motion to extend the discovery deadline to February 19, 2019, and the deadline for dispositive motions to April 1, 2019, so that the Bureau could review the document production. However, the parties did not seek an extension of the deadline for amendment of the pleadings. ECF 85. I granted the motion. ECF 86.

In a letter from the Bureau to the Access Funding Defendants dated December 18, 2018, the Bureau stated it would file a motion to compel production if the Access Funding Defendants did not produce the results of a search using a specific set of search terms designed to allow the Bureau to "compare the information in the November 30 production with the productions received during the investigation." ECF 108-12 at 2–3. The Bureau also directed the Access Funding Defendants to join in another motion to extend deadlines. *Id.* at 3. The Bureau asserted that there were about "10,000 documents in the November 30, 2018 production" that had not previously been produced to the Bureau. *Id.* at 3. For comparison, the Bureau, states, the Access Funding Defendants produced "fewer than 9,000 documents in response to its CIDs during the course of its investigation." *Id.*

The Access Funding Defendants made additional productions on January 2, 2019 (ECF 108-13); January 29, 2019 (ECF 108-14); and February 22, 2019 (ECF 108-15). ECF 107 at 9. According to the Bureau, these three productions totaled approximately 4,500 documents. ECF 107 at 9.

I granted another joint motion on March 29, 2019 (ECF 97), extending the discovery deadline to April 9, 2019, and the dispositive motions deadline to May 24, 2019. ECF 98. No mention was made in the joint motion of changing the deadline to amend the pleadings. ECF 97.

However, in a joint status report filed on May 6, 2019, the Bureau indicated that it was considering whether to file a motion for leave to file a second amended complaint. ECF 100 at 2–3. On May 20, 2019, I entered an Order extending until May 24, 2019, the time for the Bureau to file motions to modify the scheduling order and for leave to file a second amended complaint. ECF 105.

The Bureau filed the Motion on May 24, 2019 (ECF 106), supported by a memorandum. ECF 107. It contends that the belated document production contained documents that had previously been requested by the Bureau but not produced. *Id.* Plaintiff points to the "Access Funding Sales Manual and certain sales scripts, all of which were responsive to multiple requests" in the CID and RFPs. *Id.* at 10.

The Access Funding Sales Manual (ECF 108-4, the "Manual") provides: "You have made a connection with the customer, built up the best interest, evaluated their financial needs and have come up with a customized plan that solves their problem." *Id.* at 27. Further, the Manual instructs the sales executive to ask the consumer a series of questions: "Ask them 'What were you planning on doing when the money payments stop? What is your plan B? You are going to have to either get a job or start a business eventually, so why not start preparing for the future now?'" *Id.* at 28.

According to the Bureau, the sales scripts that stress the "time value of money" concept: the sales associates were instructed to educate consumers on inflation and to advise that "a dollar today is worth more than a dollar tomorrow." ECF 108-1 at 8. In this script, the sales executives were instructed to say: "I will personally see the transaction through from the starting line to the finish line. You will never be treated like a number. We take the time to listen to your needs and customize a plan that will work for you. . .My job is to help you take care of your financial needs today without putting you in a position that will not [sic] hurt you tomorrow." *Id.* at 7.

Thus, CFPD contends that, in the belated production of documents produced by the Access Funding Defendants, it has found evidence that the Access Funding Defendants are "covered persons" under the CFPA as to the provision of financial advisory services. ECF 107 at 9–10. As a result, it seeks to add three new claims under the CFPA against the Access Funding Defendants with respect to their interactions with consumer payees: Count VI for Unfair Acts and Practices; Count VII for Deceptive Acts and Practices; and Count VIII for Abusive Acts and Practices. ECF 106-1, ¶¶ 108–127. No new counts are proposed against Smith.

In particular, the SAC alleges, *inter alia*, that "Access Funding also provided 'financial advisory services' in the form of advice to consumers regarding their individual financial matters—namely whether to sell structured-settlement payments for an immediate lump sum." ECF 106-1, ¶ 7. Further, the proposed SAC alleges that Access Funding "purported to offer consumers advice on their financial best interests and on the benefits and costs of entering into a structured-settlement transfer"; that it "trained its sales associates that explaining the so-called 'time value of money' should be used as a sales tactic"; and that consumers "typically lacked an understanding about the material risks, costs and conditions of utilizing Access Funding's financial-advisory services." *Id.* ¶¶ 29–31. It asserts: "By providing financial advice to customers regarding their structured-settlement transfers, Access Funding created relationships with consumers in which consumers viewed the Access Funding sales associates as an advisor." *Id.* ¶ 38. The Bureau also adds allegations as to the Access Funding executives. *Id.* ¶¶ 63–65.

In addition to the exhibits already referenced, the Bureau submitted with the Motion a portion of the deposition transcript of sales associate Joseph Kim on March 28, 2019. ECF 108-2. Kim discussed the extent to which he asked consumers about their financial situations (*id.* at 5–8, 10–11) and discussed the "time value of money" concept (*id.* at 8–10). The Bureau also

included emails with attached scripts that were produced on November 28, 2019 (ECF 108-3, ECF 108-16), and a portion of the deposition transcript of Access Funding National Sales Manager Mark Gutierrez on March 5, 2019. ECF 108-17. He was questioned about an email in which a sales associate told a customer, "In my professional opinion, the second option is way more beneficial to you considering the payments you will receive in the end." *Id.* at 6. Gutierrez testified that it was not standard for sales people to give their professional opinion to customers, but "it would happen from time to time." *Id.* These submissions, the Bureau claims, support its contention that the Access Funding Defendants provided financial advice to consumers. ECF 107 at 9–10.

### III. Legal Standard

A complaint may be amended "once as a matter of course" within twenty-one days of service of a defendant's answer or Rule 12(b), (e), or (f) motion, "whichever is earlier." Fed. R. Civ. P. 15(a)(1)(b). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, the court "should freely give leave when justice so requires." *Id.*

Here, suit was filed in November 2016. The revised deadline to amend pleadings expired on June 22, 2018. ECF 56. The Motion was filed almost a year later, on May 24, 2019, more than a month after the fifth extension of the discovery deadline. *See* ECF 98 (extending discovery deadline to April 9, 2019).

When a party seeks to amend a pleading after the expiration of a deadline set forth in a scheduling order, Rule 16(b)(4) is implicated. Rule 16(b)(4) provides that a scheduling order may be modified "only for good cause and with the judge's consent."

Thus, at this juncture, the Bureau must do more than satisfy the liberal standard for amendments set forth in Fed. R. Civ. P. 15(a). Because the Motion was filed well after the deadline set forth in the Scheduling Order, the Bureau must first meet the requirements of Rule 16(b)(4), "the good cause standard must be satisfied to justify leave to amend the pleadings." *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *see Cook v. Howard*, 484 Fed. App'x. 805, 814–15 (4th Cir. 2012) ("[U]nder Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment."); *Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016) ("Plaintiffs must do more than satisfy the liberal standard of Fed. R. Civ. P. 15(a); they must first meet the mandates of Fed. R. Civ. P. 16(b)(4)...."); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 519–20 (D. Md. 2014) (applying a two-prong test under Rules 16(b)(4) and 15(a) in analyzing an untimely motion for leave to amend).

The "burden for demonstrating good cause rests on the moving party." *United States v. Hartford Accident & Indemnity Co.*, JKB-14-2148, 2016 WL 386218, at *5 (D. Md. Feb. 2, 2016). To demonstrate good cause, the party seeking relief must "'show that the deadlines cannot reasonably be met despite the party's diligence,' and whatever other factors are also considered, 'the good-cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule.'" *Cook*, 484 Fed. App'x. at 815 (alterations in *Cook*) (quoting 6A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1522.2 (3d ed.)).

In determining whether the moving party has met its burden to show good cause, courts may consider "whether the moving party acted in good faith, the length of the delay and its effects,

and whether the delay will prejudice the non-moving party." *Elat*, 993 F. Supp. 2d at 520 (citing *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768–69 (D. Md. 2010)). Notably, "[c]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 107 (D. Md. 2013) (internal quotations and citation omitted). If the moving "'party was not diligent, the inquiry should end.'" *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W. Va. 1995) (emphasis omitted)); *accord CBX Technologies, Inc. v. GCC Technologies*, LLC, JKB-10-2112, 2012 WL 3038639 at *4 (D. Md. July 24, 2012) (denying motion to amend complaint because plaintiff's "failure to anticipate" its needs was "of its own doing and not the fault of any other entity"), *aff'd*, 533 Fed. App'x. 182 (4th Cir. 2013).

If the movant shows good cause for modification of the scheduling order, the inquiry shifts to Rule 15(a). Rule 15(a)(2) states: "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *See also Foman v. Davis*, 371 U.S. 178, 182 (1962); *Simmons v. United Mortg. & Loan Inv.*, LLC, 634 F.3d 754, 769 (4th Cir. 2011). Under Rule 15(a), the district court has "broad discretion concerning motions to amend pleadings." *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam); *see also Foman*, 371 U.S. at 182; *Laber v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc).

A district court may deny a motion to amend for reasons "'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'" *Booth*, 337 F. App'x at 312 (quoting *Foman*, 371 U.S. at 182). However, "[d]elay alone is an insufficient reason to deny leave to amend." *Edwards v.*

*City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999). "Rather, the delay must be accompanied by prejudice, bad faith, or futility." *Id.* (citation omitted); see *Simmons*, 634 F.3d at 769; *Equal Rights Center v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010).

"Perhaps the most important factor listed by the [Supreme] Court for denying leave to amend is that the opposing party will be prejudiced if the movant is permitted to alter a pleading." 6C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1487 at 701 (3d ed.) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971); *United States v. Hougham*, 364 U.S. 310 (1960)). The burden of showing prejudice falls on "the party opposing amendment." *Atl. Bulk Carrier Corp. v. Milan Exp. Co.*, 3:10-cv-103, 2010 WL 2929612, at *4 (E.D. Va. July 23, 2010). And, "if the court is persuaded that no prejudice will accrue, the amendment should be allowed." WRIGHT & MILLER, § 1487 at 701.

The case of *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423 (4th Cir. 2011), is noteworthy. There, the Court said, *id.* at 439: "'Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing.... [T]he further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant....'" (quoting *Laber*, 438 F.3d at 427) (alteration in *Laber*).

The court must examine the facts of each case "to determine if the threat of prejudice is sufficient to justify denying leave to amend." WRIGHT & MILLER, § 1487 at 701. To be sure, "prejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party, but that basis for a finding of prejudice essentially applies where the amendment is offered shortly before or during trial." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). In contrast, "[a]n amendment is not prejudicial ... if it merely adds an additional theory of recovery to the facts

already pled and is offered before any discovery has occurred." *Laber*, 438 F.3d at 427 (emphasis added).

Furthermore, a proposed amendment must not be futile. *See Foman*, 371 U.S. at 182. According to the Fourth Circuit, a proposed amendment should be denied as futile "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson*, 785 F.2d at 510; *see also* WRIGHT & MILLER § 1487 ("[A] proposed amendment that clearly is frivolous, advancing a claim or defense that is legally insufficient on its face,[ ] or that fails to include allegations to cure defects in the original pleading,[ ] should be denied."). A motion to amend can also be denied on the basis of futility where the proposed amendment "could not withstand a motion to dismiss." *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995); *see also Devil's Advocate, LLC v. Zurich Am. Ins. Co.*, 666 Fed.App'x. 256, 267 (4th Cir. 2016) (per curiam) (affirming district court's denial of leave to amend on the basis of futility, because the amended complaint would not survive a motion to dismiss under Rule 12(b)(6)); *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420–21 (4th Cir. 1990) ("There is no error in disallowing an amendment when the claim sought to be pleaded by amendment plainly would be subject to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).").

But, the review for futility "is not equivalent to an evaluation of the underlying merits of the case. To the contrary, '[u]nless a proposed amendment may clearly be seen to be futile because of substantive or procedural considerations, ... conjecture about the merits of the litigation should not enter into the decision whether to allow amendment.'" *Next Generation Grp., LLC v. Sylvan Learning Ctrs.*, LLC, CCB-11-0986, 2012 WL 37397, at *3 (D. Md. Jan. 5, 2012) (quoting *Davis v. Piper Aircraft Corp.*, 615 F.2d, 606, 613 (4th Cir. 1980)).

Rule 16(b)(4) may appear at odds with Rule 15(a)(2). In *Nourison*, 535 F.3d at 298, the Fourth Circuit explained:

> There is tension within the Federal Rules of Civil Procedure between Rule 15(a) and Rule 16(b).... Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile. HCMF Corp. v. Allen, 238 F.3d 273, 276-77 (4th Cir. 2001). On the other hand, Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge."

## IV.     Discussion

As noted, CFPB filed suit in November 2016. Various pretrial deadlines here have been extended multiple times. As CFPB observes, the parties previously consented to "two extensions to allow the parties time for settlement discussions; two to grant the Bureau time before depositions to review the thousands of documents previously withheld by the Defendants; and one to allow the continuation of a consumer deposition." ECF 107 at 13.

The deadline to amend pleadings was set for June 22, 2018. ECF 56. Notably, that deadline was not extended. CFPB sought to file the SAC in May 2019, almost a year beyond the deadline, and nearly six months after plaintiff received the majority of the documents that it claims were belatedly produced by defendants.

### A.   Delay

The Bureau argues that it has shown good cause to amend. It contends that the Access Funding Defendants' delay in producing responsive documents "made it impossible for the Bureau to discover the facts that are the basis for the proposed amendment before the original June 22, 2018 deadline for the amendment of pleadings." ECF 107 at 1. These facts, the Bureau claims, show that "Access Funding provided advice to consumers regarding their individual financial matters—namely, whether to sell structured-settlement payments for an immediate lump sum.

These allegations establish that Access Funding is a 'covered person' under the CFPA because it provided 'financial advisory services.'" *Id.* at 2.

CFPB acknowledges that "the deadline for amending the pleadings passed nearly eleven months" before it sought to amend the suit. *Id.* at 15. It also acknowledges that it never sought to extend the deadline to amend the pleadings, explaining "that date had passed before the parties requested the first extension to pursue settlement negotiations and the Bureau was operating under the assumption that it had received from Defendants all responsive documents." *Id.* at 13.

However, the Bureau maintains that it has "repeatedly sought information regarding Access Funding's communications with consumers, including its policies, procedures, and sales scripts, and Access Funding repeatedly responded that it had produced all responsive documents." *Id.* at 15. And, it maintains that it only became aware in November 2018 that "additional responsive documents existed and had been withheld improperly by Access Funding during the Bureau's investigation and during discovery." *Id.* Further, it contends that it reviewed the new documents quickly upon receipt. *Id.* at 16. And, it contends that the deposition testimony "corroborated" its new understanding of Access Funding's operations. *Id.* at 12. In sum, it argues that these efforts constitute "good cause for requesting leave to amend the pleadings after the deadline in the scheduling order." *Id.* at 16.

The Access Funding Defendants disagree. They assert: "Filing a request for leave to amend nearly a year after the expiration of the deadline for amendments is presumptively unreasonable." ECF 110 at 13. They note that the amendment comes "well over a month after the (fifth) extended discovery deadline." *Id.* at 2. And, they maintain that the lack of evidence to prove a claim does not excuse the failure to plead a claim in a timely manner. *Id.* at 13 (citing *Crouch v. City of Hyattsville*, No. DKC-09-2544, 2012 WL 718849, at *3 (D. Md. Mar. 5, 2012)).

According to the Access Funding Defendants, the "time value of money" concept is the "cornerstone of the Bureau's present motion." ECF 110 at 9. Yet, they argue that the Bureau "knew the concepts of the time value of money and inflation were an integral part of sales executives' discussions with annuitants since *before* it filed this action." ECF 110 at 5 (emphasis in original); *see also id.* at 14. They insist that the information contained in the documents in issue did not provide the Bureau with new information on which to base new allegations, so as to justify the belated filing of the SAC. *Id.* at 14–16.[5] Rather, the Access Funding Defendants suggest that the production merely strengthened a claim about which the Bureau already had knowledge. Because CFBP knew about the "time value of money" concept before the belated document production, the Access Funding Defendants contend that plaintiff "cannot reasonably claim that it lacked sufficient information" on the topic to have timely amended. *Id.* at 13.

According to the defense, the Bureau "waited until well after the eleventh hour" to file the SAC. *Id.* at 5. The Access Funding Defendants insist that CFPB cannot establish good cause under Fed. R. Civ. P. 16 for its unreasonable delay, given that it has known of the issues prior to filing suit in November 2016; discovery is completed; and prejudicial delay will ensue. *Id.* Further, they contend the claims are barred by the CFPA's three-year statute of limitations. *Id.*[6]

To support their position, the Access Funding Defendants have submitted several exhibits that they had previously produced, which show their use of the concept of the "time value of

---

[5] The Access Funding Defendants seem to suggest that the late-produced documents do not count as "new" documents because they had previously produced them to the Maryland Attorney General's Office. ECF 110 at 3. They assert in a footnote: "It is understood that all the documents the Access Funding Defendants provided to the Division during the latter's investigation were shared with the Bureau, and vice-a-versa." *Id.* n.4. However, an assumption that government agencies are sharing documents does not nullify the discovery obligation to produce responsive documents.

[6] Based on the disposition of the Motion, I need not address the limitations issue.

money." The exhibits include emails with consumers referencing the concept (ECF 110-1; ECF 110-2); a portion of the investigative hearing transcript of Access Funding "internal counsel" Ryan Nardontonia, conducted on March 29, 2016 (ECF 110-3 at 1), stating that "time, value, money is something that sales talked about a lot" (ECF 110-3 at 4; ECF 110 at 5); a portion of the investigative hearing transcript for Gutierrez, conducted on March 30, 2016 (ECF 110-4 at 1), in which he discussed the "time, value of money" concept (ECF 110-4 at 4–5; ECF 110 at 5); a portion of the investigative hearing transcript for Boghosian on February 10, 2016, in which he discussed the ways in which sales associates personalized offers to consumers (ECF 110-6); and a portion of the deposition transcript of Boghosian on March 5, 2019, discussing the "time value of money" concept (ECF 110-5).

In addition, the Access Funding Defendants submitted a copy of the email of January 28, 2014 (ECF 110-7), about which Gutierrez was questioned by the Bureau at his deposition on March 5, 2019 (ECF 108-17). They assert that "this document was produced to the Bureau during the Bureau's investigation (2015-2016) . . . before it filed its Complaint." ECF 110 at 17. Therefore, they claim that it cannot support the untimely amendment of the suit. *Id.*

Further, the Access Funding Defendants argue that the Bureau has known "since at least February 2016" that sales associates would ask consumers questions about their financial needs to formulate options. *Id.* at 16. They point to an investigative hearing in February 2016, at which Boghosian stated that sales associates would "offer different scenarios of transactions that anyone could enter." ECF 110-6 at 2. In addition, the Access Funding Defendants point to the investigative hearing transcript for Gutierrez on March 30, 2016, in which he stated that sales executives would "try to assess any financial needs" of consumers in order to "pitch them on a deal." ECF 110-4 at 4.

The Access Funding Defendants also argue that the Bureau has "expansive investigatory power." ECF 110 at 19. In their view, this "significant investigatory authority under the CFPA," *id.* at 18, as well as Maryland law, should "forestall any argument that [plaintiff] lacked information sufficient to bring the claims it now seeks." *Id.* at 19. In their view, the Bureau's proper recourse was to bring a motion to compel to enforce the CID. *Id.*

Smith also claims that the Bureau "cannot show good cause why it waited almost six months from its receipt of the documents (including three months after the close of discovery) to seek to amend its Complaint or even raise the issue." ECF 109 at 5. In his view, CFPB has not been diligent. *Id.*

In its Reply, the Bureau reiterates that it consistently requested information from the Access Funding Defendants, who "repeatedly informed the Bureau that they had already produced all responsive documents." ECF 111 at 3. It argues that the limited information the Access Funding Defendants initially produced was insufficient to put the Bureau on notice of the claims it seeks to add in the SAC. *Id.* at 4–5.

According to CFPB, the Access Funding Defendants concealed the crucial facts that that their employees were "not merely acting as salespeople, but also providing consumers financial advisory services in a manner that was unfair, abusive, and deceptive." *Id.* at 2. In addition, the Bureau argues that prior productions and testimony concealed "the extent of the financial advice [the Access Funding Defendants] were giving consumers." *Id.* at 4. It contends that without the full context of the late-produced documents, the statements concerning "time value of money" appeared "insignificant." *Id.* at 5.

The Bureau submitted with its Reply a different version of the "Access Sales Process Manual," which defendants have previously produced. ECF 111-2 at 3–5. According to CFPB,

however, the document did not "include any reference to the time value of money, inflation, or direct salespeople to evaluate consumers' 'financial needs' and 'come up with a customized plan that solves' consumers' problems—tactics that are squarely the provision of financial advice to consumers." ECF 111 at 4. Gutierrez "testified at his investigational hearing that this document, which appeared to outline the steps taken by Access Funding salespeople to complete a structured settlement transfer, accurately described the Access Funding sales process." *Id.*; *see* ECF 111-3. This, the Bureau claims, was misleading, given the information in the late-produced Manual. *See* ECF 111 at 4; ECF 108-4.

Further, the Bureau notes that the "time value of money" was only one of several facts in support of its belief that the Access Funding Defendants provided financial advice to consumers. ECF 111 at 2. The late-produced Manual and sales scripts provided the Bureau with more information about the financial advisory services the Access Funding Defendants were allegedly providing, including, but not limited to, the "time value of money" concept. *Id.*

"Whatever the Bureau's powers," the CFPB argues, "it was diligent and reasonable in seeking information from the Defendants, first at the CID stage and again during discovery, that would have uncovered the facts supporting the Bureau's new claims." *Id.* at 7. Because of the concealment, however, the Bureau maintains that it had no reason to think a motion to compel was necessary. *Id.*

The Bureau acknowledges that the proposed amendment is extremely late. *See* ECF 107 at 15. To be sure, the Bureau has sought documents from the Access Funding Defendants, and the documents highlighted by the Bureau were responsive to earlier requests. Although the Access Funding Defendants did not complete the production until the end of February 2019, the majority of the documents were produced to the Bureau on November 30, 2018. ECF 107 at 9. Moreover,

by December 18, 2018, the Bureau had identified that about a third of the documents produced on November 30, 2019, were not duplicates. ECF 108-12 at 3. Discovery closed on April 9, 2019. ECF 98. The Bureau needed time to review the new documents. But, it has not provided this Court with an adequate reason for why it waited until May 2019 to seek to amend.

The Bureau clearly had prior notice of at least some of the key information that it contends is contained in the documents that were belatedly produced. The Bureau acknowledges, as it must, that it was aware of the Access Funding Defendants' use of the "time value of money" concept before the belated production of documents. *See* ECF 111 at 5. The fact that the sales executives' statements concerning the "time value of money" seemed "insignificant" (ECF 111 at 5) to the Bureau before its receipt of the belated document production does not mean CFPB had insufficient information on which to base a claim against the Access Funding Defendants as "covered persons" under the Act. To the contrary, documents produced during the course of discovery, and interviews conducted during the investigation, put the Bureau on notice that the sales executives allegedly were making personalized financial recommendations to consumers. *See* ECF 110-6 at 2; ECF 110-4 at 4.

Documents concerning these matters were in the Bureau's possession well before the parties completed depositions in March 2019. ECF 110 at 9–10, 20. This is sufficient information for the Bureau to have lodged a new claim far earlier than it did. The Bureau did not have to marshal evidence sufficient to prove the claim. *See Crouch v. City of Hyattsville*, *supra*, DKC-09-2544, 2012 WL 718849, at *3 (D. Md. Mar. 5, 2012). The Bureau conflates the standards needed to allege a claim with those needed to prove one. *Cf. Teachers Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 170, 173 (4th Cir. 2007) (recognizing, in a securities case, that "consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the

23

necessary facts were to be developed during discovery"; under the "notice pleading rules . . . the court [must] ask whether *any conceivable set of facts* could be proved consistent with the complaint's allegations) (emphasis in *Hunter*).

### B. Prejudice to Defendants

The Bureau argues that the defendants would not be prejudiced by the proposed amendment because defendants "have always been aware of the facts underpinning the proposed Second Amended Complaint's new allegations," and the new allegations are not "surprise allegations." ECF 107 at 16–17.

The Access Funding Defendants disagree. They contend that they will be prejudiced by the SAC, given that discovery has closed. ECF 110 at 20. Additionally, the Access Funding Defendants argue that they will be unfairly prejudiced by an amendment because they "had already drafted almost all of their Motion for Summary Judgment based on the Amended Complaint." *Id.* at 21. They also assert that the "Court should not countenance this delay in a case that is approaching its third anniversary on the Court's docket." *Id.* at 5.

Further, the Access Funding Defendants maintain that the "Bureau's strategic decision to proceed with depositions without informing the Access Funding Defendants or the Court that it intended to bring new claims causes extreme prejudice to the Access Funding Defendants." *Id.* at 20. They assert that had they "known that there was a separate issue of whether Access Funding's sales executives provided 'financial advisory services' to the consumers, it would have adopted a different strategy with regard to those depositions." *Id.* Moreover, they argue that they "should not be forced to" schedule and conduct depositions again "because the Bureau intentionally waited until after the depositions were completed to assert new claims based on old information." *Id.* at 21. They add that "it may be difficult if not impossible to re-depose some of the annuitants." *Id.*

In addition, the Access Funding Defendants point to the email of January 28, 2014 (ECF 110-7), about which Gutierrez was questioned at his deposition in March 2019. ECF 108-17. They note that it was produced during the Bureau's investigation in 2015-2016. ECF 110 at 17. They assert: "Permitting an amendment based on this document would be highly prejudicial." *Id.*

In its Reply, the Bureau insists that there is no prejudice to the Access Funding Defendants because they "have had these documents all along, and have known about [their] own sales tactics since the beginning of the Bureau's investigation." ECF 111 at 12. Further, it asserts that although the Access Funding Defendants "imply that they will seek to conduct depositions if the Second Amended Complaint is filed," they "did not notice a single deposition during discovery." *Id.* Moreover, the Bureau observes that the Access Funding Defendants "have not identified who they say they will want to depose and why the amendment to the complaint would require a deposition." *Id.* The Bureau also maintains that it "would agree to any appropriate extension of time to fit Defendants' schedules." *Id.*

Smith posits that he "is not the Defendant who allegedly failed to produce documents" and thus he should not suffer the prejudice of a delay in resolving the litigation. ECF 109 at 5. Although he is not named in any of the new counts, Smith claims that the Bureau's "lack of diligence is going to penalize [him] by costing him additional time and expense by requiring that he participate in discovery and motions practice in a case in which the CFPB's investigation began nearly four years ago and that was filed nearly three years ago." *Id.* In his view, all defendants will be prejudiced by the "extension of discovery" that "[j]ustice would necessarily require . . . if any amendment to the complaint were to be granted." *Id.* at 6.

The Bureau addresses the Smith Opposition in its Reply, and notes that he does not identify any additional discovery he might need. ECF 111 at 13. It also notes that "the additional claims in the proposed Second Amended Complaint do not name Smith." *Id.*

I am satisfied that a substantive amendment of the suit at this juncture would be unfairly prejudicial to defendants. For one thing, it will prolong the litigation, which has been pending for years, and that itself is a burden to the litigants. *See Alexander v. Marriott Intern., Inc.*, RWT 09-cv-2402, 2011 WL 1231029, at *11 (D. Md. Mar. 29, 2011) (denying proposed amendment in part because doing so would "prejudice Defendants by extending this already protracted litigation"). And, the new theory that CFPB seeks to pursue – that the Access Funding Defendants are themselves "covered persons" with respect to financial advice – is not a simple matter. It may well "require the gathering and analysis of facts not already considered by the opposing party." *Johnson*, 785 F.2d at 510; *see Class Produce Group, LLC v. Harleysville Worchester Insurance Co.*, No. SAG-16-cv-3431, 2018 WL 5785664, at *3–4 (D. Md. Nov. 5, 2018) (denying leave to amend where the plaintiff sought "to introduce a new legal theory" and offered "no explanation for why it did not make [the new allegation] in a timely fashion" even when the amended complaint did not "come shortly before or during trial, [but rather] well into the discovery period.")

It is likely that additional discovery *would* be necessary: the Access Funding Defendants may need to re-depose annuitants. ECF 110 at 21. If the Motion had been filed before the depositions were taken, the defendants could have adjusted their strategy accordingly. *See Hodges v. Mayor & City Council of Annapolis*, No. SAG-15-3537, 2017 WL 1832199, at *3 (D. Md. May 8, 2017) (denying untimely motion to amend when its introduction after the close of discovery deprived the defendant "of the opportunity to properly question" an expert.).

Even if additional discovery is not necessary, defending against new legal claims in a complex case requires significant additional resources. Therefore, there is prejudice to the defendants, beyond mere delay.[7]

### V.     Conclusion

The delay between the receipt of the late-produced documents and the Motion, as well as the prejudice to defendants that would result from the amendment, lead me to conclude that the Bureau has not met the good cause standard under Fed. R. Civ. P. 16(b)(4). For the aforementioned reasons, plaintiff's Motion is denied.

A separate Order follows.


Date: November 25, 2019                                              _____/s/_____
                                                                    Ellen L. Hollander
                                                                    United States District Judge

---

[7] The Access Funding Defendants should not mistake this Court's decision as to the Motion as a tacit approval of their litigation strategy.